IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRYAN CLINGER, MONICA BARBA, and HEATHER RUDY, on behalf of themselves and all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| EDGEWELL PERSONAL CARE BRANDS, LLC, a Delaware Limited Liability Company; and | **DEMAND FOR JURY TRIAL** |
| Defendant. | Dated:  July 28, 2021 |

Plaintiffs Bryan Clinger, Monica Barba, and Heather Rudy ("Plaintiffs"), brings this action on behalf of themselves and all others similarly situated against Edgewell Personal Care Brands, LLC ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This case centers around Defendant's 'Banana Boat' line of sunscreen products (the "Product"), which independent testing has recently revealed suffer from benzene contamination. Benzene, a harmful carcinogen that offers no therapeutic sunscreen benefit, does not appear on the ingredients label.

2.      The sunscreen products are adulterated and/or misbranded in violation of federal and state law, rendering them worthless. Defendant has further violated various state laws regarding deceptive and unfair trade practices and breach of warranty.

3.      Accordingly, Plaintiffs bring this suit on behalf of themselves and a nationwide class alleging fraud by omission. Plaintiffs also bring suit on behalf of a Florida Sub-Class alleging violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* ("FDUTPA"), and an Illinois Sub-Class alleging violations of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* ("ILCFA"). Plaintiffs seek economic, injunctive, and declaratory relief on behalf of themselves and the Class and Sub-Classes.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

5.      This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District, has conducted systematic and continuous business activities in and throughout the State of Connecticut, including in this District, and/or has caused its products to be disseminated in this District.

6.      Venue in this district is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## PARTIES

7.      Plaintiff Bryan Clinger is a resident and citizen of Florida. Within the applicable statute(s) of limitations, Plaintiff Clinger purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, Banana Boat Kids Max Protect & Play Sunscreen Spray.

8.     Plaintiff Monica Barba is a resident and citizen of Florida. Within the applicable statute(s) of limitations, Plaintiff Barba purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, Banana Boat Protective Dry Oil Sunscreen Spray.

9.     Plaintiff Heather Rudy is a resident and citizen of Illinois. Within the applicable statute(s) of limitations, Plaintiff Rudy purchased Banana Boat sunscreen in Illinois, including Banana Boat Kids Max Protect & Play Sunscreen Spray.

10.     Defendant EDGEWELL PERSONAL CARE BRANDS, LLC is a Delaware corporation with its principal place of business in Shelton, Connecticut.  Defendant EDGEWELL PERSONAL CARE BRANDS, LLC distributes its personal care products, including Banana Boat sunscreen products, throughout the United States.

## FACTS

11.     Sunscreen, also known as sunblock or suntan lotion, is a product mean to offer protection against the sun's ultraviolet (UV) radiation.

12.     Sunscreens can be categorized according to their mechanism of action. There are 'physical sunscreens', which stay on the surface of the skin and deflect UV light; and 'chemical sunscreens', which absorb UV light.

13.     Since 1974, sunscreens contain a Sun Protection Factor ("SPF"), which measures the fraction of harmful UV rays that reach the skin. For example, SPF 50 means that 1/50th of the harmful UV radiation will reach the skin, assuming at least 2mg of sunscreen is applied per square centimeter of skin. Sunscreens must be reapplied often, typically every 2-3 hours.

14.     The most common active ingredients in U.S. sunscreen products include avobenzone, homosalate, octinoxate, octisalate, octocylene, oxybenzone, titanium dioxide, and zinc oxide.

15.     Sunscreens most typically come in lotion or spray applications, and to a lesser extent, gel applications.

16.     The U.S. sun care market has grown steadily for decades, and as of 2016 had an estimated market size of $1.95 billion.

17.     Growing consumer awareness regarding the ill effects of over exposure to ultraviolet (UV) rays has been the primary driver for growth. These include, *inter alia*, sunburn and the increased risk of skin cancers.

18.     Notably, most sunscreens are considered drugs that are regulated by the U.S. Food and Drug Administration ("FDA"). Other 'after-sun' products are typically treated as a cosmetic by FDA, subjecting them to different regulations.

19.     In or around March 2021, Valisure, an analytical pharmacy, patient advocacy and consumer protection organization, released testing results of a number of sunscreen products.[1]

20.     In its testing, Valisure found benzene in 43 out of 224 sunscreens and in 8 of 48 after-sun products.

21.     Testing done on the Banana Boat Product revealed widespread benzene contamination. Though the entire product line was not tested, benzene contamination was revealed through testing of the following Banana Boat items: Kids Max Protect & Play Sunscreen Spray, Kids Sport Sunscreen, Protective Dry Oil Clear Sunscreen Spray, Simply Protect Kids (a/k/a Kids Mineral Enriched) Sunscreen Spray, Ultra Defense Ultra Mist Clear Sunscreen Spray, Ultra Sport Clear Sunscreen Spray, and UltraMist Deep Tanning Dry Oil Continuous Clear Spray. Valisure CP at 12-15.

---

[1]   May 24, 2021 Valisure Citizens Petition, avail. at https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf ("Valisure CP").

22.     The carcinogenic properties of benzene are well documented, as noted be the Centers for Disease Control and Prevention ("CDC"). *See* CDC, *Facts About Benzene* (2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

23.     The Department of Health and Human Services (DHHS) has determined that benzene causes cancer in humans. Long-term exposure to high levels of benzene in the air can cause leukemia, cancer of the blood-forming organs.

24.     Its carcinogenic properties aside, another major effect of benzene from long-term exposure is on the blood. (Long-term exposure means exposure of a year or more.) Benzene causes harmful effects on the bone marrow and can cause a decrease in red blood cells, leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance for infection.

25.     The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[2]

26.     Likewise, The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[3]

---

[2] International Agency for Research on Cancer and World Health Organization, *IARC Monographs on the Ide Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health (NIOSH), Benzene* (October 30, 2019), https://www.cdc.gov/niosh/npg/npgd0049.html; Identification of Carcinogenic Hazards to Humans, avail. at https://monographs.iarc.who.int/list-of-classifications.

[3] CDC, *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (October 30, 2019), https://www.cdc.gov/niosh/npg/npgd0049.html.

27.     Accordingly, FDA guidance provides that no level of benzene is safe, and benzene is not permitted in these types of products. As noted by Valisure:

> FDA currently recognizes the high danger of this compound and lists it as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity ... However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million ("ppm").

Valisure CP at 1 (quoting FDA, Q3C – 2017 Tables and List Guidance for Industry, https://www.fda.gov/media/71737/download).

28.     Because the majority of products tested did *not* contain detectable levels of benzene, its use is not "unavoidable" in order to achieve the therapeutic benefits of sunscreen.

29.     Not surprisingly, in FDA's "list of acceptable active ingredients in products that are labeled as sunscreen[,]" benzene is not among them.[4]

30.     Further, Valisure investigated the possibility that benzene occurred due to the natural degradation of sunscreen's active ingredients, and determined that it did not. Thus, the presence of benzene in the sunscreen products is likely due to contamination during the manufacturing process. Valisure CP at 7-8.

31.     The benzene contamination of the Product was not divulged to the consumer on the product label, in the ingredients list or otherwise.

---

[4] FDA, *Sunscreen: How to Help Protect Your Skin from the Sun*, https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun.

32.     Under the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, *et seq.* ("FFDCA"), and its implementing regulations, the Product constitutes adulterated and/or misbranded drugs.

33.     A drug shall be deemed to be adulterated under the FFDCA if, *inter alia*:

(a)     " it consists in whole or in part of any filthy, putrid, or decomposed substance" (21 U.S.C. § 351(a)(1));

(b)     "it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth" (21 U.S.C. § 351(a)(2)(A));

(c)     "it has been prepared, packed, or held under insanitary conditions…whereby it may have been rendered injurious to health" (21 U.S.C. § 351(a)(2)(A)); and/or

(d)     "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug…has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess" (21 U.S.C. § 351(a)(2)(B)).

34.     A drug shall be deemed to be misbranded under the FFDCA if, *inter alia*:

(a)     "its labeling is false or misleading in any particular" (21 U.S.C. § 352(a)(1)); or

(b)     "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof" (21 U.S.C. § 352(j)).

35.     The Product is likewise adulterated and/or misbranded under Florida's Drug and Cosmetic Act, Fla. Stat. § 499.001, *et seq.* ("FLDCA") and Illinois' Food, Drug and Cosmetic Act, 410 Ill. Comp. Stat 620/1, *et seq.* ("ILFDCA"). *See* Fla. Stat. § 499.006(1)-(3) (adulteration provisions substantively identical FFDCA provisions cited in ¶ 33, *supra*); 410 Ill. Comp. Stat. 620/2.15, 620/14(a)(1), *et seq.* (same); Fla. Stat. § 499.007(1), (10).. (misbranding provisions substantively identical to FFDCA provisions cited in ¶ 34, *supra*); 410 Ill. Comp. Stat. 620/15(a), (j) (same).

36.     The adulteration and/or misbranding of any drug in interstate commerce constitutes a violation of the FFDCA, FLDCA, and ILFDCA. 21 U.S.C. § 331(b); Fla. Stat. § 499.005(2); 410 Ill. Comp. Stat. 620/3, 620/3.2

37.     The FFDCA further prohibits the "introduction or delivery for introduction into interstate commerce [or] receipt in interstate commerce of any…drug…that is adulterated or misbranded[.]" 21 U.S.C. § 331(a),(c). The FLDCA and ILFDCA contain similar prohibitions. *See* Fla. Stat. § 499.005(1),(3),(4); 410 Ill. Comp. Stat. 620/3, 620/3.1, 620/3.3.

38.     The FLDCA and ILFDCA further prohibit the manufacturing, repackaging, sale, offering for sale, or distribution of any drug that is adulterated or misbranded. *See* Fla. Stat. § 499.005(1),(4); 410 Ill. Comp. Stat. 620/3, 620/3.3.

39.     Plaintiffs and the Classes have suffered injury in fact and have lost money as a result of Defendant's unlawful sale of the Product. Indeed, no reasonable consumer, including Plaintiffs, would have purchased the Product had they known it was adulterated and/or misbranded.

40.     Defendant's egregious conduct in selling a drug that is unlawfully adulterated and/or misbranded aside, Defendant engaged in further fraudulent, unfair, deceptive, misleading,

and/or unlawful conduct stemming from its omissions surrounding benzene contamination affecting the Product.

41.     No reasonable consumer, including Plaintiffs, would have purchased Defendant's Product had they known the truth of the representations and omissions described herein. Accordingly, Plaintiffs and the Classes suffered injury in fact and lost money as a result of Defendant's misleading representations and omissions and did not receive the benefit-of-the-bargain.

42.     Plaintiffs and the Classes' injury is underscored by the fact that numerous other products offering the same therapeutic benefit at comparable prices exist that are not prone to benzene contamination.

43.     Plaintiffs and the Classes may be harmed again in the future because they want to purchase the Product in the future; however, without injunctive relief Plaintiffs would not be able to know or trust that Defendant will truthfully and legally label the Product and would be likely to be misled again.

## CLASS ALLEGATIONS

44.     In accordance with Fed R. Civ. P. 23(b)(3) and 23(b)(2), Plaintiffs bring this action on behalf of the following class of persons (the "Class"):

> All natural persons residing in the United States who purchased the Product in the United States for personal use and not for re-sale.

45.     Further, in accordance with Fed R. Civ. P. 23(b)(3) and 23(b)(2), Plaintiffs Clinger and Barba bring this action on behalf of the following class of persons (the "Florida Sub-Class"):

> All natural persons residing in the State of Florida who purchased the Product in Florida for personal use and not for re-sale.

46.     Further, in accordance with Fed R. Civ. P. 23(b)(3) and 23(b)(2), Plaintiff Rudy brings this action on behalf of the following class of persons (the "Illinois Sub-Class"):

> All natural persons residing in the State of Illinois who purchased the Product in Illinois for personal use and not for re-sale.

47.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is proper, as more information is gleaned in discovery.

48.     Excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

49.     **Numerosity.** The members of the Class and Sub-Classes are so numerous that joinder of all members is impracticable. On information and belief, there are in excess of a hundred thousand members of the Class and Sub-Classes. Discovery will reveal, through Defendant's records, the approximate number of Class and Sub-Class members.

50.     **Commonality.** Common questions of law and fact apply to the claims of all Class and Sub-Class Members and include (but are not limited to) the following:

> a.      Whether Defendant omitted, in connection with the sale of the Product, whether the Product was subject to benzene contamination;
>
> b.      Whether Defendant was aware, or should have known, that the Product contained benzene (or, alternatively, a significant risk of benzene contamination) when it marketed and sold the Product to Plaintiffs and the other members of the Class;
>
> c.      Whether the Product was adulterated and/or misbranded under the FFDCA and/or FLDCA (for the Florida Sub-Classes);

    d.      Whether Defendant violated the FFDCA and/or FLDCA (for the Florida Sub-Classes);

    e.      Whether Defendant's violations of the FFDCA and/or FLDCA constitute violations of FDUTPA (for the Florida Sub-Classes);

    f.      Whether, independent of whether Defendant's conduct violated the FFDCA, Defendant's conduct constitutes an unfair act or practice in violation of FDUTPA and/or ILCFA (for the Sub-Classes);

    g.      Whether, independent of whether Defendant's conduct violated the FFDCA, Defendant's conduct constitutes a deceptive act or practice in violation of FDUTPA and/or ILCFA (for the Sub-Classes);

    h.      Whether Defendant's conduct and/or omissions in the marketing, advertising, labeling, and/or packaging of the Product in the manner discussed herein is likely to deceive reasonable consumers;

    i.      Whether Defendant's Product is worthless;

    j.      Whether Plaintiffs and the Class and Sub-Class Members are entitled to damages, and the proper measure of the loss;

    k.      Whether Plaintiffs and the Class and Sub-Class Members are entitled to attorney's fees and expenses, and in what amount; and

    l.      Whether Plaintiffs and the Class and Sub-Class Members are entitled to declaratory, injunctive, and/or other equitable relief.

51.    **Typicality.**  Plaintiffs' claims are typical of the claims of all Class and Sub-Class Members. The harm suffered by Plaintiffs and the Classes was and is caused by the same misconduct by Defendant.

52.    **Adequacy.**  Plaintiffs have retained counsel highly experienced in complex consumer class action litigation and intends to prosecute this action vigorously. Plaintiffs are members of the Class and Sub-Classes described herein and do not have interests antagonistic to, or in conflict with, the other members of the Class or Sub-Classes.

53.    **Predominance and Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Sub-Class members are relatively small, the expense and burden

of individual litigation make it impossible for individual Class and Sub-Class members to seek redress for the wrongful conduct asserted herein. If class treatment of these claims is not available, Defendant would likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, and/or otherwise escape liability for its wrongdoing.  Further, common questions of law and fact predominate.

54.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

55.    The prosecution of separate actions by individual members of the Class and Sub-Classes would run the risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for the Defendant. Prosecution as a class action will eliminate the possibility of repetitious litigation.

56.    **Class Certification Pursuant to Fed. R. Civ. P. 23(b)(2).** Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendant's actions are generally applicable to the Class and Sub-Classes as a whole, and Plaintiffs seek equitable remedies with respect to the Class and Sub-Classes as a whole. Defendant has acted or refused to act on grounds generally applicable to the Class and Sub-Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole. Moreover, Plaintiffs continue to have use for sunscreen products. If the Court were to enjoin Defendant from making misrepresentations and omissions described above, and refrain from producing sunscreen products with benzene, then Plaintiffs would consider purchasing Defendant's Product in the future. Without an injunction, Plaintiffs would be unable to trust Defendant's representations and would not purchase the Product.

## CLAIMS FOR RELIEF

57.     Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

### COUNT I
### Fraud By Omission
### (On Behalf of the Nationwide Class)

58.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

59.     Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class ("Class," for purposes of this Count).

60.     Defendant omitted material facts, including that the Product was subject to contamination by benzene, a known human carcinogen, in connection with the sale of the Product, or that the Product was manufactured, packaged, handled and/or stored in such a way unreasonably subjecting it to unhealthy contamination.

61.     Defendant was aware, or at least should have known, that the Product contained benzene (or, alternatively, a significant risk of benzene contamination) when it marketed and sold the Product to Plaintiffs and the other members of the Class.

62.     Having been aware of the presence (or, alternatively, the significant risk thereof) of benzene in the Product, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know thereof, Defendant had a duty to disclose this defect to Plaintiffs and the other members of the Class in connection with the sale of the Product.

63.     Moreover, as the disclosure of this issue is directly related to the safety of the Product, and applicable law requires the disclosure of the presence of chemicals such as benzene,

Defendant had an affirmative duty and was bound to disclose the presence of benzene in its Products, which it omitted from disclosure.

64.     In purchasing the Product, Plaintiffs and the other members of the Class justifiably relied on Defendant to disclose the presence (or, alternatively, the significant potential presence) of benzene in the Product.

65.     Defendant's omissions of material fact were intended to induce and in fact induced Plaintiffs and Class members to purchase Defendant's Products, which Defendant knew or reasonably should have known were subject to benzene contamination and thus were unreasonably hazardous to health.

66.     Had Plaintiffs and the other members of the Class known the truth of these omissions, they would not have purchased the Products or would have paid less for the Products.

67.     As a direct and proximate result of Defendant's omissions, Plaintiffs and the other members of the Class either overpaid for the Products or would not have purchased the Products at all, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT II
### Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*
### Premised on Violations of the FFDCA and FLDCA
### (On Behalf of the Florida Sub-Class)

68.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

69.     Plaintiffs Clinger and Barba ("Plaintiffs," for purposes of this Count) bring this Count individually and on behalf of the other members of the Florida Sub-Class ("Sub-Class," for purposes of this Count).

70.     Plaintiffs and the Sub-Class are "consumers" within the meaning of Part II of Chapter 501, Florida Statutes, relating to Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

71.     Defendant is a "person" or "entity" as used in FDUTPA.

72.     Defendant's conduct alleged herein relating to the distribution and/or sale of the Product constitutes "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

73.     FDUTPA declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204(1).

74.     Further, FDUTPA violations may be predicated on the violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).

75.     Violations of the FFDCA and FLDCA constitute unfair, unconscionable, and/or deceptive acts or practices in violation of FDUTPA.

76.     By violating 21 U.S.C. § 331(a)-(c) and Fla. Stat. § 499.005(1)-(4), Defendant has violated the FFDCA and FLDCA and engaged in unfair competition and/or unconscionable / unfair acts or practices in violation of FDUTPA.

77.     Further, by violating 21 U.S.C. § 331(a)-(c) and Fla. Stat. § 499.005(1)-(4), Defendant violated a statute proscribing an unfair method of competition.

78.     Further, by violating 21 U.S.C. § 331(a)-(c) and Fla. Stat. § 499.005(1)-(4), Defendant has engaged in an unfair practice. Defendant's violations of these provisions offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

79.     Defendant violations of 21 U.S.C. § 331(a)-(c) and Fla. Stat. § 499.005(1)-(4) stem from the Product being adulterated and/or misbranded.

80.     The Product is adulterated under both the FFDCA and FLDCA in that at least one of the following are true:

- it consists of benzene, a filthy, putrid or decomposed substance;

- it was manufactured, packaged, or stored in conditions unreasonably subjecting it to benzene contamination;

- it was unreasonably manufactured, packaged, or stored in conditions such that it may have been contaminated by harmful substances;

- it was manufactured, packaged, or stored in unsanitary conditions potentially rendering the Product as injurious to health; and/or

- the Product's manufacturing, processing, packaging, or storage methods do not conform with good manufacturing practice to assure that the Product only contains what it purports to contain;

- the Product's manufacturing, processing, packaging, or storage facilities do not conform with industry practice to assure that the Product only contains what it purports to contain; and/or

- the Product's manufacturing, processing, packaging, or storage control processes do not conform with industry practice to assure that the Product only contains what it purports to contain.

81.     The Product is misbranded under both the FFDCA and FLDCA in that: the Product label, which makes no disclosure as to benzene contamination (in the ingredients list or otherwise),

is false and/or misleading; and/or the benzene contamination renders the Product dangerous to health when used as directed.

82.     As a direct and proximate result of Defendant's violations of the FFDCA and FLDCA (and hence FDUTPA), Plaintiffs and the Sub-Class have lost money and suffered actual damages. Since the Product was adulterated and/or misbranded, Defendant illegally sold the Product to Plaintiffs and the Sub-Class, thereby causing Plaintiffs and the Sub-Class Members' loss of money as measured by the full purchase price.

83.     Alternatively, the Product as it was presented for sale—which is *per se* neither adulterated or misbranded—is inherently worth more than an adulterated and/or misbranded product, which is what the consumers actually received.

84.     This injury is of the type Fla. Stat. § 501.201, *et seq*., was designed to prevent and directly results from Defendant's conduct violating a law which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

85.     There is no federal or state law which affirmatively authorizes Defendant to engage in the harmful conduct alleged throughout this Complaint.

86.     In addition to actual damages, Plaintiffs and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

### COUNT III
**Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.***
**Unfair Acts or Practices**
**(On Behalf of the Florida Sub-Class)**

87.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

88.     Plaintiffs Clinger and Barba ("Plaintiffs," for purposes of this Count) bring this Count individually and on behalf of the other members of the Florida Sub-Class ("Sub-Class," for purposes of this Count).

89.     Independent of whether Defendant's conduct violated the FFDCA or FLDCA, Defendant's conduct, as described throughout the complaint, are unfair acts or practices in violation of FDUTPA.

90.     Defendant's practices, as described herein, offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The Product label instructs consumers to regularly apply substantial amounts of sunscreen to achieve the therapeutic benefit, and consumers (including Plaintiffs and the Sub-Class) do so without knowledge that the product is contaminated with a known human carcinogen (or, alternatively, there is a substantial risk thereof).

91.     Further, the benzene serves no benefit, therapeutic or otherwise. Defendant subjected consumers, including Plaintiffs and the Sub-Class, to a harmful carcinogen which served no therapeutic benefit when other sunscreen products without benzene contamination were available at comparable prices.

92.     Alternatively, or in addition, Defendant's *modus operandi* constitutes an unfair practice in that it knew (or should have known) it was selling a topical sunscreen without reasonable controls in place to prevent the type of contamination leading to the benzene detected in the Product.

93.     The practices complained of herein are not limited to a single instance but rather were done pervasively and uniformly against Plaintiffs and the Classes.

94.     Defendant's unfair conduct, which caused substantial injury to Plaintiffs and the Class due to Defendant's common omissions and/or unscrupulous practices, and which lacks any reasonable or legitimate justification, could not have been avoided by reasonable consumers.

95.     As a direct and proximate result of Defendant's unfair practices (which violate FDUTPA), Plaintiffs and the Sub-Class have lost money and suffered actual damages. Absent Defendant's immoral and unscrupulous business practice of selling a topical sunscreen not free of benzene contamination, Defendant would not have sold the Product, and Plaintiffs and the Class would not have lost funds purchasing it.

96.     Defendant has benefitted from the conduct complained of herein while Plaintiffs and the Class and Sub-Class Members have been misled as to the nature and integrity of the Product and have lost money, in the form of the purchase price of the Product (or, alternatively, by receiving a Product that was worth far less than the Product as represented).

97.     This injury is of the type Fla. Stat. § 501.201, *et seq.*, was designed to prevent and directly results from Defendant's unfair conduct.

98.     In addition to actual damages, Plaintiffs and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

<u>**COUNT IV**</u>
**Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.***
**Deceptive Acts or Practices**
**(On Behalf of the Florida Sub-Class)**

99.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

100.   Plaintiffs Clinger and Barba ("Plaintiffs," for purposes of this Count) bring this Count individually and on behalf of the other members of the Florida Sub-Class ("Sub-Class," for purposes of this Count).

101.   Independent of whether Defendant's conduct violated the FFDCA or FLDCA, Defendant's conduct, as described throughout the complaint, are deceptive acts or practices in violation of FDUTPA.

102.   Defendant engaged in deceptive conduct in violation of FDUTPA when it made omissions regarding benzene contamination (or, alternatively, the potential for benzene contamination) in the Product. These omissions are likely to mislead consumers acting reasonably under the circumstances, to the consumer's detriment (including Plaintiffs).

103.   Reasonable consumers such as Plaintiffs do not expect carcinogens to be present in a topical sunscreen, and at the very least expect the presence of carcinogens to be brought to their attention on the product label. By failing to disclose this information, Defendant has engaged, and continues to engage, in conduct likely to deceive members of the public.

104.   Defendant's omissions (as detailed herein) are likely to mislead reasonable consumers and cause them injury.

105.   As a direct and proximate result of Defendant's deceptive acts or practices (which violate FDUTPA), Plaintiffs and the Sub-Class have lost money and suffered actual damages. But for the omissions, reasonable consumers would not have purchased the Product, thereby injuring them financially as measured by the full purchase price.

106.   Alternatively, the Product as it was presented for sale—without disclosures as to the presence of (or alternatively, risk of) carcinogens—is inherently worth more than a sunscreen product containing (or, alternatively, potentially containing) benzene, which is what consumers

actually received. Defendant was able to charge more for the Product due to their deceptive acts violating FDUTPA.

107.    This injury is of the type Fla. Stat. § 501.201, *et seq.*, was designed to prevent and directly results from Defendant's deceptive conduct.

108.    In addition to actual damages, Plaintiffs and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

<u>**COUNT V**</u>
**Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.***
**Unfair Acts or Practices**
**(On Behalf of the Illinois Sub-Class)**

109.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

110.    Plaintiff Rudy ("Plaintiff," for purposes of this Count) brings this Count individually and on behalf of the other members of the Illinois Sub-Class ("Sub-Class," for purposes of this Count).

111.    Plaintiff and the Sub-Class are "consumers" within the meaning of 815 ILCS 505/1(e).

112.    Defendant is a "person" within the meaning of 815 ILCS 505/1(c).

113.    Defendant's conduct alleged herein relating to the distribution and/or sale of the Product constitutes "trade" and/or "commerce" within the meaning of 815 ILCS 505/1(f).

114.    ILCFA prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such

material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'" 815 ILCS 505/2.

115.     An act or practice is unfair where it offends public policy, is immoral, unethical, oppressive, or unscrupulous, and/or causes substantial injury to consumers.

116.     As noted herein, Defendant violated the FFDCA (and by extension the ILFDCA) in numerous ways, as described in Count II. Therefore, there is no statute that permits the conduct complained of herein.

117.     Independent of whether Defendant's conduct violated the FFDCA or ILFDCA, Defendant's conduct, as described throughout the complaint, are unfair business practices in violation of ILCFA.

118.     Defendant's practices, as described herein, offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The Product label instructs consumers to regularly apply substantial amounts of sunscreen to achieve the therapeutic benefit, and consumers (including Plaintiff and the Sub-Class) do so without knowledge that the product is contaminated with a known human carcinogen (or, alternatively, there is a substantial risk thereof).

119.     Further, the benzene serves no benefit, therapeutic or otherwise. Defendant subjected consumers, including Plaintiff and the Sub-Class, to a harmful carcinogen which served no therapeutic benefit when other sunscreen products without benzene contamination were available at comparable prices.

120.     Alternatively, or in addition, Defendant's *modus operandi* constitutes an unfair practice in that it knew (or should have known) it was selling a topical sunscreen without

reasonable controls in place to prevent the type of contamination leading to the benzene detected in the Product.

121.    The practices complained of herein are not limited to a single instance but rather were done pervasively and uniformly against Plaintiff and the Classes.

122.    Defendant's unfair conduct, which caused substantial injury to Plaintiff and the Class due to Defendant's common omissions and/or unscrupulous practices, and which lacks any reasonable or legitimate justification, could not have been avoided by reasonable consumers.

123.    Defendant has benefitted from the conduct complained of herein while Plaintiff and the Class and Sub-Class Members have been misled as to the nature and integrity of the Product and have lost money, in the form of the purchase price of the Product.

124.    Defendant acquired money from Plaintiff and the Sub-Class by way of the unfair acts or practices alleged herein.

125.    As a direct and proximate result of Defendant's unfair practices (which violate ILCFA), Plaintiff and the Sub-Class have lost money and suffered actual damages. Absent Defendant's immoral and unscrupulous business practice of selling a topical sunscreen not free of benzene contamination, Defendant would not have sold the Product, and Plaintiff and the Class would not have lost funds purchasing it.

126.    Alternatively, Plaintiff and the Sub-Class have suffered actual loss by being deprived of the benefit-of-the-bargain as a result of Defendant's unfair acts or practices as alleged herein. Plaintiff and the Sub-Class paid more for the Product than its actual worth.

127.    This injury is of the type the ILCFA was designed to prevent and directly results from Defendant's unfair conduct.

128.     In addition to actual damages, Plaintiff and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a.

**COUNT VI**
**Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1,** *et seq.*
**Deceptive Acts or Practices**
**(On Behalf of the Illinois Sub-Class)**

129.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

130.     Plaintiff Rudy ("Plaintiff," for purposes of this Count) brings this Count individually and on behalf of the other members of the Illinois Sub-Class ("Sub-Class," for purposes of this Count).

131.     Defendant's conduct, as described throughout the complaint, are deceptive acts or practices in violation of ILCFA.

132.     Defendant engaged in deceptive conduct in violation of ILCFA when it made omissions regarding benzene contamination (or, alternatively, the potential for benzene contamination) in the Product. These omissions are likely to mislead consumers acting reasonably under the circumstances, to the consumer's detriment (including Plaintiff).

133.     Defendant further violated ILCFA by engaging in deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act by: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods are original or new if they are deteriorated or altered; and/or representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another. 815 ILCS 510/2(5)-(7).

134.     Reasonable consumers such as Plaintiff do not expect carcinogens to be present in a topical sunscreen, and at the very least expect the presence of carcinogens to be brought to their

attention on the product label. By failing to disclose this information, Defendant has engaged, and continues to engage, in conduct likely to deceive members of the public.

135.    Defendant's omissions (as detailed herein) are likely to mislead reasonable consumers and cause them injury.

136.    In its advertising, packaging, and labeling of the Product, Defendant made the material omissions complained of herein in order to induce consumers, including Plaintiff and the Sub-Class, into purchasing the Product.

137.    Defendant failed and continues to fail to make these material disclosures, including (among others) a disclosure as to the benzene contamination affecting the Product, even though Defendant knew or should have known about the issue.

138.    Defendant acquired money from Plaintiff and the Sub-Class by way of the deceptive acts or practices alleged herein.

139.    As a direct and proximate result of Defendant's deceptive acts or practices (which violate ILCFA), Plaintiff and the Sub-Class have lost money and suffered actual damages. But for the omissions, reasonable consumers including Plaintiff would not have purchased the Product, thereby injuring them financially as measured by the full purchase price.

140.    Alternatively, the Product as it was presented for sale—without disclosures as to the presence of (or alternatively, risk of) carcinogens—is inherently worth more than a sunscreen product containing (or, alternatively, potentially containing) benzene, which is what consumers actually received. Defendant was able to charge more for the Product due to their deceptive acts violating FDUTPA, and Plaintiff and the Sub-Class were denied their benefit of the bargain.

141.    This injury is of the type ILCFA was designed to prevent and directly results from Defendant's deceptive conduct.

142.     In addition to actual damages, Plaintiff and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and on behalf of the members of the Classes defined herein, pray for judgment and relief on all Claims for Relief as follows:

A.     An order certifying that the action may be maintained as a Class Action and that Plaintiffs be appointed the Class Representatives and their undersigned counsel as Class Counsel;

B.     An order enjoining Defendant from pursuing the policies, acts, and practices complained of herein;

C.     Damages;

D.     Restitution;

E.     Pre-judgment interest from the date of filing this suit;

F.     Declaratory relief;

G.     Reasonable attorneys' fees;

H.     Costs of this suit; and,

I.     Such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiffs and the Members of the Classes hereby request a trial by jury.

Dated: July 28, 2021                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                By:    /s/ Joseph P. Guglielmo
                                       Joseph P. Guglielmo (ct27481)
                                       The Helmsley Building
                                       230 Park Avenue, 17th Floor
                                       New York, NY 10169
                                       Telephone:  212-223-6444

Facsimile:  212-223-6334
jguglielmo@scott-scott.com

*and*

Gillian L. Wade (to apply *pro hac vice*)
gwade@mjfwlaw.com
Marc A. Castaneda (to apply *pro hac vice*)
mcastaneda@mjfwlaw.com
**MILSTEIN JACKSON FAIRCHILD &
WADE, LLP**
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Tel: (310) 396-9600
Fax: (310) 396-9635

*and*

**CARNEY BATES & PULLIAM, PLLC**
Hank Bates (to apply *pro hac vice*)
hbates@cbplaw.com
David Slade (to apply *pro hac vice*)
dslade@cbplaw.com
Sam Jackson (to apply *pro hac vice*)
519 West 7th St.
Little Rock, AR 72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

*and*

**CASEY LAW FIRM, LLC**
Ryan Casey (to apply *pro hac vice*)
ryan@rcaseylaw.com
PO Box 4577
Frisco, CO 80443
Tel: (970) 372-6509
Fax: (970) 372-6482

*Attorneys for Plaintiffs*