IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

BRYAN CLINGER, MONICA BARBA, and
HEATHER RUDY, on behalf of themselves
and all others similarly situated,

          Plaintiffs,

v.

EDGEWELL PERSONAL CARE BRANDS,
LLC, a Delaware Limited Liability Company,

          Defendant.

Case No.: 3:21-cv-01040 (MPS)

November 12, 2021

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ........................................................................................1

II.  JURISDICTION AND VENUE ...............................................................................1

III. PARTIES ...............................................................................................................2

IV.  FACTS ..................................................................................................................3

    A.   Sunscreen Background ...............................................................................3

    B.   Benzene in Defendant's Product ...............................................................4

    C.   The Product Violates the FFDCA and its Implementing Regulations, and
         Contravenes Agency Guidance ..................................................................7

        (i)    Defendant's Product is 'misbranded' under 21 U.S.C. § 352 and the relevant
            regulations ......................................................................................8

        (ii).   Defendant's Product is 'adulterated' under 21 U.S.C. § 352 and the relevant
            regulations ....................................................................................13

        (iii)  Defendant's Product does not meet the general requirements for
            nonprescription drugs to be marketed without an approved application ................16

        (iv)  The sunscreen monograph ..............................................................18

    D.   Plaintiffs' Purchases of the Product ..........................................................19

V.   CLASS ALLEGATIONS ........................................................................................22

CLAIMS FOR RELIEF ....................................................................................................26

PRAYER FOR RELIEF .....................................................................................................43

JURY DEMAND ...............................................................................................................43

Plaintiffs Bryan Clinger, Monica Barba, and Heather Rudy ("Plaintiffs") bring this action and file this amended complaint on behalf of themselves and all others similarly situated against Edgewell Personal Care Brands, LLC ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## I.  NATURE OF THE ACTION

1.     This case centers around Defendant's 'Banana Boat' line of sunscreen products (the "Product"), which independent testing has recently revealed suffer from benzene contamination. Benzene, a harmful carcinogen that offers no therapeutic sunscreen benefit, does not appear on the Product label, in the ingredients list or otherwise.

2.     The sunscreen products are adulterated, misbranded, and/or constitute unapproved new drugs, in violation of federal and state law, rendering them worthless.

3.     Accordingly, Plaintiffs bring this suit on behalf of themselves and a nationwide class alleging fraud by omission, unjust enrichment, breach of express warranty, breach of implied warranty, and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*. Plaintiffs also bring suit on behalf of a Florida Sub-Class alleging violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. ("FDUTPA"), and an Illinois Sub-Class alleging violations of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq*. ("ILCFA"). Plaintiffs seek economic, injunctive, and declaratory relief on behalf of themselves and the Class and Sub-Classes.

## II.  JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member

of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

5.      This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District, has conducted systematic and continuous business activities in and throughout the State of Connecticut, including in this District, and/or has caused its products to be disseminated in this District.

6.      Venue in this district is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

III.    **PARTIES**

7.      Plaintiff Bryan Clinger is a resident and citizen of Florida. Within the applicable statute(s) of limitations, Plaintiff Clinger purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, Banana Boat Kids Max Protect & Play Sunscreen Spray.

8.      Plaintiff Monica Barba is a resident and citizen of Florida. Within the applicable statute(s) of limitations, Plaintiff Barba purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, Banana Boat Protective Dry Oil Sunscreen Spray.

9.      Plaintiff Heather Rudy is a resident and citizen of Illinois. Within the applicable statute(s) of limitations, Plaintiff Rudy purchased Banana Boat sunscreen in Illinois, including Banana Boat Kids Max Protect & Play Sunscreen Spray.

10.     Defendant Edgewell Personal Care Brands, LLC is a Delaware corporation with its principal place of business in Shelton, Connecticut.  Defendant Edgewell Personal Care Brands, LLC, manufacturers, sells, and/or distributes its personal care products, including Banana Boat sunscreen products, throughout the United States.

2

IV.   **FACTS**

   A.   **Sunscreen Background**

11.     Sunscreen, also known as sunblock or suntan lotion, is a product meant to offer protection against the sun's ultraviolet (UV) radiation.

12.     Sunscreens can be categorized according to their mechanism of action. There are 'physical sunscreens', which stay on the surface of the skin and deflect UV light; and 'chemical sunscreens', which absorb UV light.

13.     Since 1974, sunscreens contain a Sun Protection Factor ("SPF"), which measures the fraction of harmful UV rays that reach the skin. For example, SPF 50 means that 1/50th of the harmful UV radiation will reach the skin, assuming at least 2mg of sunscreen is applied per square centimeter of skin. Sunscreens must be reapplied often, typically every 2-3 hours.

14.     The most common active ingredients in U.S. sunscreen products include avobenzone, homosalate, octinoxate, octisalate, octocylene, oxybenzone, titanium dioxide, and zinc oxide.

15.     Sunscreens most typically come in lotion or spray applications, and to a lesser extent, gel applications.

16.     The U.S. sun care market has grown steadily for decades, and as of 2016 had an estimated market size of $1.95 billion, and it is expected to grow to over $24 billion by 2029.

17.     Growing consumer awareness regarding the ill effects of over exposure to ultraviolet (UV) rays has been the primary driver for growth. These include, *inter alia*, sunburn and the increased risk of skin cancers.

18.     Many medical organizations recommend wearing sunscreen daily, advice many consumers have taken to heart.[1]

19.     And on days when consumers are utilizing the Product, they do so liberally. Sunscreen labels typically instruct users to apply the sunscreen heavily and often. One Banana Boat label, for example, instructs users to "Apply Liberally" and "Reapply" every 2 hours. Product Label, Ex. A to Def. Mot. to Dismiss, ECF No. 36-2 at 7.

### B.     Benzene in Defendant's Product

20.     The carcinogenic properties of benzene are well documented, as noted by the Centers for Disease Control and Prevention ("CDC"). *See* CDC, *Facts About Benzene* (2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

21.     The Department of Health and Human Services (DHHS) has determined that benzene causes cancer in humans. Long-term exposure to high levels of benzene in the air can cause leukemia, cancer of the blood-forming organs.

22.     The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[2]

23.     Its carcinogenic properties aside, another major effect of benzene from long-term exposure is on the blood. (Long-term exposure means exposure of a year or more.) Benzene causes

---

[1] A. Foster, Why dermatologists recommend you wear sunscreen every day, Chicago Trib. (Feb. 8, 2020), at https://www.chicagotribune.com/consumer-reviews/sns-bestreviews-skincare-why-you-need-spf-every-day-20200208-h7hkiswe3jh3hfvqvuyouir7zy-story.html.

[2] International Agency for Research on Cancer and World Health Organization, *IARC Monographs on the Ide Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health (NIOSH), Benzene* (October 30, 2019), https://www.cdc.gov/niosh/npg/npgd0049.html; Identification of Carcinogenic Hazards to Humans, avail. at https://monographs.iarc.who.int/list-of-classifications.

harmful effects on the bone marrow and can cause a decrease in red blood cells, leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance for infection.

24.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[3]

25.     Due to its industrial applications, benzene is regularly found in products such as gasoline, plastics, detergents, pesticides, drugs, synthetic fibers, and cigarette smoke.

26.     Because exposure to benzene is so prevalent in industrial products, limiting or eliminating its use in products where it is not necessary (such as Defendant's Product) is even more important.

27.     In or around March 2021, Valisure, an analytical pharmacy, patient advocacy and consumer protection organization, released testing results of a number of sunscreen products.[4]

28.     In its testing, Valisure found benzene in 43 out of 224 sunscreens and in 8 of 48 after-sun products.

29.     Testing done on the Banana Boat Product revealed widespread benzene contamination. Though the entire product line was not tested, benzene contamination was revealed through testing of the following Banana Boat items: Kids Max Protect & Play Sunscreen Spray, Kids Sport Sunscreen, Protective Dry Oil Clear Sunscreen Spray, Simply Protect Kids (a/k/a Kids

---

[3] CDC, *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (October 30, 2019), https://www.cdc.gov/niosh/npg/npgd0049.html.

[4] May 24, 2021 Valisure Citizens Petition, avail. at https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf ("Valisure CP").

Mineral Enriched) Sunscreen Spray, Ultra Defense Ultra Mist Clear Sunscreen Spray, Ultra Sport Clear Sunscreen Spray, and UltraMist Deep Tanning Dry Oil Continuous Clear Spray. Valisure CP at 12-15

30.     Because the majority of sunscreen products tested did *not* contain detectable levels of benzene, its use is not unavoidable to manufacture an effective sunscreen.

31.     Further, Valisure investigated the possibility that benzene occurred due to the natural degradation of sunscreen's active ingredients and determined that it did not. Valisure CP at 7-8.

32.     Upon information and belief, the presence of benzene in the sunscreen products was likely due to one of the following: (a) it was added intentionally to the sunscreen formulation, one of its ingredients, or its packaging; (b) contamination occurring during the manufacturing, processing, packing, or holding processes; or (c) leftover impurities in case benzene was utilized in some other way, such as a solvent in which other materials were dissolved to form a solution.

33.     Under any scenario, however, the Product would still violate federal and state law, including the regulations pertaining to sunscreen and over-the-counter drug products. Because the source of the benzene is unknown to Plaintiffs at this time (and absent discovery), these factual theories (and corresponding regulatory violations) are pled in the alternative.

34.     The benzene contamination of the Product was not divulged to the consumer on the product label, in the ingredients list or otherwise.

35.     Notably, a number of Defendant's competitors responded to the Valisure testing by issuing voluntary recalls of their sunscreen products. Johnson & Johnson, for example, acknowledged the presence of benzene in their products, and recalled various products so it could investigate the source of the benzene.

36.     Defendant has not recalled the Product, and upon information and belief continues to omit any reference to benzene on the label.

### C.     The Product Violates the FFDCA and its Implementing Regulations, and Contravenes Agency Guidance

37.     Plaintiffs bring claims under various state consumer and warranty theories and are not seeking to enforce any federal statute or regulation. However, much of the conduct giving rise to Plaintiffs' claims was likewise in violation of the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, *et seq.* ("FFDCA") and its implementing regulations.

38.     Most sunscreens, including the Product, are considered drugs that are regulated by the U.S. Food and Drug Administration ("FDA").[5]

39.     They are therefore subject to the FFDCA and its implementing regulations. These include, *inter alia*, the FFDCA's provisions regarding misbranded drugs, adulterated drugs, and nonprescription over-the-counter ("OTC") drugs that may be marketed without an approved drug application. 21 U.S.C. §§ 351, 352, 355h.

40.     Under the FFDCA and its implementing regulations, Defendant's Product constitutes a misbranded drug, adulterated drug, and/or unapproved new drug that does not meet the general requirements for nonprescription drugs to be marketed without an approved application.

41.     The manufacture of any misbranded or adulterated drug is prohibited under federal law. 21 U.S.C § 331(g). The same is true under Florida's Drug and Cosmetic Act, Fla. Stat. § 499.001, *et seq.* ("FLDCA") at §§ 499.005(1), (4) and Illinois' Food, Drug and Cosmetic Act, 410 Ill. Comp. Stat 620/1, *et seq.* ("ILFDCA") at 620/3, 620/3.3.

---

[5] Other 'after-sun' products are typically treated as a cosmetic by FDA, subjecting them to different regulations.

42.     The introduction or delivery for introduction into interstate commerce (or receipt thereof) of any misbranded or adulterated drug is prohibited under federal law. 21 U.S.C. § 331(a), (c). The FLDCA and ILFDCA contain similar prohibitions. *See* Fla. Stat. § 499.005(1),(3),(4); 410 Ill. Comp. Stat. 620/3, 620/3.1, 620/3.3.

43.     Further, the introduction or delivery for introduction into interstate commerce of a purported nonprescription OTC drug that fails to meet the OTC drug requirements is prohibited under federal law. 21 U.S.C §§ 355(a) and 331(d).

> **(i)     Defendant's Product is 'misbranded' under 21 U.S.C. § 352 and the relevant regulations**

44.     Defendant's Product is 'misbranded' under 21 U.S.C. § 352.

45.     It is similarly misbranded under the applicable regulations, which state, in part, that an OTC drug "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in [21 C.F.R. §§ 330.1 – 330.15] and each of the conditions contained in any applicable monograph." 21 C.F.R. § 330.1. The general regulations also incorporate the statutory language, providing that a drug is misbranded where it is not "labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act[.]" 21 C.F.R. § 330.1(c)(1).

46.     21 U.S.C. § 352(a)(1) provides that a drug shall be deemed to be misbranded under the FFDCA if, *inter alia*, if "its labeling is false or misleading in any particular."

47.     Further, "[i]f an article is alleged to be misbranded because the labeling…is misleading, then in determining whether the labeling…is misleading there shall be taken into account (among other things) not only representations made or suggested by statement [or] word,…but also the extent to which the labeling…fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article…under such conditions of use as are customary or usual." 21 U.S.C. § 321(n).

48. Here, the Defendant has violated 21 U.S.C. § 352(a)(1) rendering Product 'misbranded.'

49. The Product labeling (in the ingredients list or otherwise) fails to reveal that the Product contains or may contain benzene. This absence of this disclosure conveys that it is *not* possible that benzene may be in the product bottle, which independent third-party testing has proved demonstrably false.

50. The omission that the Product contains or may contain a dangerous carcinogen is a material fact for any consumer item, and especially so for a product that is purchased for the purpose of promoting health and *preventing* cancer and is to be used liberally and reapplied often.

51. The Product purchased by at least two Plaintiffs was even marketed specifically for children and named "Kids MAX Protect & Play." It is axiomatic that a "maximum protection" product for one's child meant to prevent cancer would not needlessly contain chemicals that caused cancer.

52. Exposure or potential exposure to carcinogens is even more material given that other products which offer the same protection are carcinogen-free.

53. 21 U.S.C. § 352(e)(1)(A)(iii) provides that a drug is also misbranded under the FFDCA "[i]f it is a drug, unless its label bears[, *inter alia*,] the established name of each inactive ingredient listed in alphabetical order on the outside container of the retail package." The regulations incorporate the same, mandating disclosure of "[t]he ingredient information required by [21 USC § 352(e)]" of the FFDCA. 21 C.F.R. § 201.10(a).[6]

---

[6] The FFDCA requires a label to list, *inter alia*, "the established name and quantity of…each active ingredient" as well as "the established name of each inactive ingredient[.]" 21 U.S.C. § 352(e)(ii), (iii).

54.     The regulations similarly provide, as part of the label's content requirements, that the label discloses the "'inactive ingredients' followed by a listing of the established name of each inactive ingredient." 21 C.F.R. § 201.66(c)(8).

55.     Part 201 (which governs labeling) defines "active ingredient" as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans." 21 C.F.R. § 201.66(b)(2). "Inactive ingredient means any component other than an active ingredient." 21 C.F.R. § 201.66(b)(8).

56.     While 'component' as it is used in Part 201 is not defined, Part 201 specifies that with respect to a finished product's label ingredient list, "[t]he term ingredient applies to *any substance in the drug*[.]" 21 C.F.R. § 201.10(b) (emphasis added). Thus, OTC drugs as they are delivered to consumers may only contain 'active ingredients' or 'inactive ingredients.'

57.     Further, a substance that is present in some, but not all, bottles of a drug product should still be listed as an 'inactive ingredient' if a manufacturer were to, as here, use a uniform ingredients list.

58.     In its OTC Labeling Guidance, when discussing 21 C.F.R. § 201.66(c)(8)'s 'inactive ingredient' requirement, FDA explains:

> **E. Inactive ingredients: "contains one or more of these ingredients" labeling.**
>
> There may be circumstances when manufacturers, packers, and distributors who market OTC drug products use multiple suppliers for some drug products to maintain an uninterrupted supply of the drug product to their customers. In such cases, the specific inactive ingredients in the drug products may vary slightly from supplier to supplier: some inactive ingredients may be present in drug products coming from all suppliers while other inactive ingredients may not be present. To have one label for all drug products, we recommend that the ingredients that may (or may not) be contained in each individual drug product be listed on the labeling in the following manner.

- We believe that this type of inactive ingredient labeling can be accomplished best by placing those ingredients that may (or may not) be contained in an OTC drug product in the inactive ingredient listing, as set forth in § 201.66(c)(8), with an asterisk placed next to those ingredients (e.g., acacia*, dextrose*, sucrose, xanthum gum*). The asterisk would then be reprinted at the bottom or end of the inactive ingredient section in the Drug Facts box with the notation "* contains one or more of these ingredients" (if more than one ingredient may (or may not) be in the drug product), or "* may contain this ingredient" (if only one ingredient may (or may not) be in the drug product), whichever is appropriate.

….

Manufacturers, packers, and distributors are also reminded to follow all applicable current good manufacturing practice regulations in 21 CFR part 211 for finished pharmaceuticals so that manufacturers maintain appropriate records showing which lot numbers of the drug product contain which inactive ingredients.

FDA, *Guidance for Industry: Labeling OTC Human Drug Products* (May 2009) at 9, 12-13, avail. at https://www.fda.gov/media/76481/download.

59.     Thus, had Defendant followed FDA's guidance, it would have at least included benzene in the inactive ingredients list with a 'may contain this ingredient' asterisk. Since Defendant chose to use uniform ingredient labeling in all lots of the Product, it was required to make this disclosure, which it failed to do.

60.     Here, the Defendant has violated 21 U.S.C. § 352(e) and/or related regulations, rendering the Product 'misbranded.'

61.     Benzene is a substance found in Defendant's Product by independent, third-party testing. Defendant has not disputed these findings, and Defendant's competitors (but not Defendant) have sought fit to issue recalls pulling their sunscreen products off the market.

62.     Upon information and reasonable belief, benzene is not an 'active ingredient' in Defendant's Product as it does not nor could be intended to provide protection from UV rays. Nor is benzene on the FDA's list of approved active ingredients for sunscreen products.

63.     Benzene is therefore an inactive ingredient, yet Defendant unlawfully omitted it as such on the Product label. Defendant should have included benzene in the 'inactive ingredients' panel, with our without a 'may contain this ingredient' asterisk as appropriate.

64.     Alternatively, even if benzene were not required to be listed as an inactive ingredient, 21 U.S.C. § 352(j) provides that a drug is also misbranded under the FFDCA if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

65.     Here, the Defendant has violated 21 U.S.C. § 352(j), rendering the Product 'misbranded.'

66.     As described herein, consumer use of sunscreen has grown steadily. Further, sunscreen products typically instruct users to apply sunscreen liberally and reapply often. For example, in the Banana Boat sunscreen label attached to Defendant's Motion to Dismiss, the "Sun Safety Directions" include instructions to "Apply Liberally" and "Reapply" every 2 hours. Product Label, Ex. A to Def. Mot. to Dismiss, ECF No. 36-2 at 7.

67.     Further, "recent studies by FDA researchers have shown that significant amounts of sunscreen ingredients absorb through the skin and are found in the blood; specifically, over 400 times the threshold for systemic carcinogenicity assessment for at least one sunscreen active ingredient."[7]

68.     Given that the Product is to be applied liberally and frequently, and given that carcinogen-free sunscreens exist offering the same therapeutic benefit, utilizing a sunscreen

---

[7] Valisure CP at 2 (citing M. Matta, *Effect of Sunscreen Application Under Maximal Use Conditions on Plasma Concentration of Sunscreen Active Ingredients A Randomized Clinical Trial*. AM. MED. ASS'N J. (2019); M. Matta, *Effect of Sunscreen Application on Plasma Concentration of Sunscreen Active Ingredients A Randomized Clinical Trial*. AM. MED. ASS'N J. (2020)).

containing benzene creates a completely avoidable and unreasonable risk, and is dangerous to one's health.

69.     This is consistent with FDA's approach to the use of benzene in drug manufacturing. Recognizing benzene's industrial use as a solvent, FDA has advised drug manufacturers to avoid using benzene, which it classifies as a "known human carcinogen" and "Class 1 solvent…to be avoided[.]" In its non-binding guidance as to residual solvents (solvents than remain as impurities in finished drug products), FDA explains:

### IV.   LIMITS OF RESIDUAL SOLVENTS

#### A.  Solvents to Be Avoided

Solvents in Class 1 (Table 1; see companion document) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1, unless otherwise justified.

FDA, *Guidance for Industry: Q3C Impurities: Residual Solvents* (Dec. 1997), avail. at https://www.fda.gov/media/71736/download, at 6 (emphasis in original).

70.     Insofar as the benzene in Defendant's Product was intentionally utilized or was a residual solvent impurity, since its use was not unavoidable, its presence at any level presents an unacceptable toxicity, rendering the product dangerous.

71.     Accordingly, the Product is 'misbranded' under the FFDCA. It is similarly misbranded under FLDCA and ILFDCA. *See* Fla. Stat. § 499.007(1), (10); 410 Ill. Comp. Stat. 620/15(a), (j).

### (ii)  Defendant's Product is 'adulterated' under 21 U.S.C. § 352 and the relevant regulations

72.     In addition to (or in the alternative to) being 'misbranded' under 21 U.S.C. § 352, Defendant's Product is 'adulterated' under 21 U.S.C. § 351 and related regulations.

13

73.    21 U.S.C. § 351(a)(1) provides that a drug shall deemed to be adulterated under the FFDCA if, *inter alia*, "it consists in whole or in part of any filthy, putrid, or decomposed substance[.]"

74.    Defendant's Product consist in part of benzene, an inherently volatile and unstable compound subject to rapid decomposition.

75.    The inherent nature of benzene aside, insofar as the benzene exists as an impurity or contaminant (rather than an intentional ingredient), its presence in the Product exists as a filthy, putrid, and/or decomposed substance.

76.    21 U.S.C. § 351(a)(2)(A) provides that a drug is also adulterated under the FFDCA "if it has been prepared, packed, or held under insanitary conditions…whereby it may have been rendered injurious to health[.]" Similarly, a drug is also adulterated "if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health[.]" 21 U.S.C. § 351(a)(3).

77.    If it is the case that the benzene in Defendant's Product was not added intentionally to the sunscreen formulation, it follows that the benzene exists due to either contamination or the failure to remove impurities.

78.    With respect to potential contamination, the undisputed discovery of benzene in Defendant's Product—if not intentional—evidences that the Product was either manufactured, packaged, or stored under conditions where it, at the very least, *may have been* rendered injurious to health. This renders the Product adulterated, regardless of whether those conditions resulted in benzene contamination in every single product bottle.

79.    Alternatively, if the presence of benzene is that of an impurity (left over after its use as a solvent during the manufacturing process), the mere decision to utilize benzene—as

14

opposed to other equally effective, less harmful (and non-carcinogenic) chemicals—amounts to preparing the Product in a way whereby it *may* be rendered injurious to health.

80.   As noted *supra* (¶ 69), this is essentially the position taken by FDA in its guidance documents: that benzene 'should not be employed in the manufacture of' the Product 'because of [the chemical's] unacceptable toxicity.'

81.   In the further alternative, even if the decision of Defendant or one of its agents to utilize benzene as a solvent does not amount to preparing the sunscreen in a way potentially rendering in injurious to health, the failure to utilize adequate procedures to remove impurities during the manufacturing process amounts to precisely that.

82.   <u>21 U.S.C. § 351(a)(2)(B)</u> provides that a drug is also adulterated under the FFDCA if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug…has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]"

83.   The general regulations governing OTC drugs clarify that OTC drugs must be "manufactured in compliance with current good manufacturing practices, as established by [21 C.F.R.] parts 210 and 211." 21 C.F.R. § 330.1(a); *see also* 21 C.F.R. § 330.1(f) ("[t]he product container and container components meet the requirements of [21 C.F.R.] § 211.94"). "The failure to comply with any regulation set forth in [Parts 210 and 211] in the manufacture, processing, packing, or holding of a drug shall render such drug to be adulterated under [21 U.S.C. § 351(a)(2)(B)]." 21 C.F.R. § 210.1(b).

84.   Insofar as benzene—a harmful carcinogen—made its way into Defendant's Product by accident, it follows that it was due to poor manufacturing processes by either Defendant or its

agents. Indeed, Defendant asserts that not *all* of its Product contains benzene, or that the amount

of benzene in its Product varies from lot to lot.  *See,* Dkt. No. 36, fn. 1 & 3.  Implicit in this

argument is the concession that the presence of any benzene in the Product is in aberration from

the desired manufacturing process.  Further evidencing this fact, Defendant's competitors that have

issued recalls following Valisure's testing of their products have announced they are investigating

how exactly the benzene contamination may have occurred, and they acknowledge that it should

not have happened.

85.     Accordingly, the Product is 'adulterated' under the FFDCA. It is similarly

adulterated under FLDCA and ILFDCA. *See* Fla. Stat. § 499.006(1)-(3) (adulteration provisions

substantively identical FFDCA provisions cited in ¶ 33, supra); 410 Ill. Comp. Stat. 620/2.15,

620/14(a)(1), et seq. (same).

**(iii) Defendant's Product does not meet the general requirements for nonprescription drugs to be marketed without an approved application**

86.     In addition to (or in the alternative) to being 'misbranded' and/or 'adulterated'

under 21 U.S.C. §§ 351-352, Defendant's Product is an unapproved new drug marketed in

violation of 21 U.S.C. §§ 331 and 355.

87.     21 U.S.C. § 355h sets forth the requirements for marketing nonprescription OTC

drugs without an approved new drug application, and OTC drugs failing to meet those

requirements are rendered unapproved new drugs marketed in violation of 21 U.S.C §§ 355(a) and

331(d).

88.     In other words, to avail themselves of the privilege of bringing new OTC drugs to

market *without* applying for FDA approval, certain conditions must be met. If a manufacturer is

unable to meet those conditions, then it must follow the FDA's more burdensome procedure of

submitting an application for FDA approval. If a manufacturer who does not meet the conditions nevertheless brings its drug to market, it is rendered an illegal unapproved new drug.

89.     Among those requirements are that the OTC drug is "in conformity with the requirements for nonprescription use of [any applicable] final monograph [and] the general requirements for nonprescription drugs" provided at 21 C.F.R. § 330.1. 21 C.F.R. § 355h(a)(1)(A)(i).

90.     As explained above, one or more of the portions of 21 C.F.R. § 330.1 dealing with misbranding and adulteration were violated by Defendant. *See supra* ¶¶ 45, 83-84 (discussing 21 C.F.R. §§ 330.1(a), (c)(1), (f)).

91.     Further, 21 C.F.R. § 330.1 provides another requirement for OTC drugs implicated here, that "[t]he product contains only suitable inactive ingredients which are safe in the amounts administered[.]" 21 C.F.R. § 330.1(e). A suitable inactive ingredient generally provides a benefit in terms of the drug formulation (such as a delayed-release mechanism in a prescription drug).

92.     As discussed herein, *supra* ¶¶ 53-59, the benzene was an inactive ingredient in Defendant's Product, warranting its inclusion on the ingredients panel (with a 'may contain this ingredient' qualifier at best).

93.     Benzene is not a 'suitable' inactive ingredient. Upon information and belief, the benzene serves no beneficial purpose in the drug.

94.     Nor is benzene a 'safe' inactive ingredient given its carcinogenic properties and its status as a Class I solvent that should not be used where, as here, a non-carcinogenic substitute was available.

95.     Therefore, Defendant's Product is an unapproved new drug marketed in violation of 21 U.S.C §§ 355(a) and 331(d).

**(iv)   The sunscreen monograph**

96.     As noted above, both the general conditions for OTC drugs to be considered generally safe and not misbranded and requirements for nonprescription drugs to be marketed without a drug application mandate compliance with, *inter alia*, any applicable monograph. *See* 21 C.F.R. §§ 330.1, 355h.

97.     The 'applicable monograph' for sunscreen is OTC Monograph M020, which combines 21 C.F.R. part 352 and 21 C.F.R. 201.327 into one order and includes minor technical amendments to facilitate the combination thereof. *See* FDA, Final Administrative Order OTC000006, *Over-the-Counter Monograph M020: Sunscreen Drug Products for Over-the-Counter Human Use* (Sep. 24, 2021), avail. at https://www.accessdata.fda.gov/drugsatfda_docs/ omuf/OTCMonograph_M020-SunscreenDrugProductsforOTCHumanUse09242021.pdf ("Sunscreen Order"), at 1-2.

98.     The Sunscreen Order does not supplant the statutory provisions and regulations cited in Sections IV(C)(i)-(iii) of this First Amended Complaint, nor does it represent the entire universe of applicable regulations. Rather, its section entitled "Scope" provides that "[a]n over-the-counter (OTC) sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets each condition in this OTC monograph ***and*** each general condition established in 21 CFR 330.1." Sunscreen Order § M020.1-Scope.

99.     Thus, the Sunscreen Order acknowledges that a sunscreen product can meet each condition in the Sunscreen Order and nevertheless not generally be recognized as safe and effective and not misbranded if it fails to meet each general condition established in 21 C.F.R. § 330.1.

Further, the scope of the Sunscreen Order does not reach adulteration, and its labeling provisions are largely focused on efficacy and SPF ratings.

100.    The specific provisions of the Sunscreen Order are largely irrelevant with respect to Plaintiffs' claims, involving permitted active ingredients (Part B), additional labeling requirements specific to sunscreen that supplement (but do not replace) the general OTC regulations (Part C), and SPF testing procedures (Part D).

**D.    Plaintiffs' Purchases of the Product**

101.    Plaintiff Clinger purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, the purchase of Banana Boat Kids Max Protect & Play Sunscreen Spray in late Spring / early Summer of 2020 from a retailer located in Miami, Florida.

102.    He purchased the Product for the purpose of protecting against the sun's harmful rays, including the risk of skin cancer. He therefore purchased the Product with the assumption that it was free of unnecessary carcinogens.

103.    When Plaintiff Clinger made his purchase(s), there was no disclosure on the label (in the ingredients list or otherwise) that the Product contained benzene or may have contained benzene.

104.    In the course of said purchase, Plaintiff Clinger was unaware that the Product he was buying either contained or had the risk of containing benzene, or that it was possibly contaminated with benzene. Plaintiff does not want to be exposed to benzene or risk being exposed to benzene. Had he known that any amount of benzene was or risked being contained in the Product he purchased, he would have purchased a different sunscreen that did not have the risk of containing benzene.

105.    Plaintiff Barba purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, the purchase of two bottles of Banana Boat Protective Dry Oil Sunscreen Spray in June 2021 from Amazon.

106.    She purchased the Product for the purpose of protecting against the sun's harmful rays, including the risk of skin cancer. She therefore purchased the Product with the assumption that it was free of unnecessary carcinogens

107.    When Plaintiff Barba made her purchase(s), there was no disclosure on the label (in the ingredients list or otherwise) that the Product contained benzene or may have contained benzene.

108.    In the course of said purchase, Plaintiff Barba was unaware that the Product she was buying either contained or had the risk of containing benzene, or was possibly contaminated with benzene. Plaintiff does not want to be exposed to benzene or risk being exposed to benzene. Had she known that any amount of benzene was or risked being contained in the Product she purchased, she would have purchased a different sunscreen that did not have the risk of containing benzene.

109.    Plaintiff Rudy purchased numerous Banana Boat sunscreens in Illinois, including, *inter alia*, the purchase of Banana Boat Kids Max Protect & Play Sunscreen Spray in June 2021 from Walgreens in Gurnee, Illinois.

110.    She purchased the Product for the purpose of protecting against the sun's harmful rays, including the risk of skin cancer. She therefore purchased the Product with the assumption that it was free of unnecessary carcinogens

111.    In the course of said purchase, Plaintiff Rudy was unaware that the Product she was buying either contained or had the risk of containing benzene, or was possibly contaminated with

benzene. Plaintiff does not want to be exposed to benzene or risk being exposed to benzene. Had she known that any amount of benzene was or risked being contained in the Product she purchased, she would have purchased a different sunscreen that did not have the risk of containing benzene.

112.    Upon information and belief, Defendant is the entity responsible for omitting the material information regarding from its Product label (in the ingredients list or otherwise) and is also the entity responsible for the FFDCA violations described herein. The identity of individual employees of Defendant who had a part in these activities are currently unknown to Plaintiff, but they will be acquired through discovery.

113.    Plaintiffs and the Classes have suffered injury in fact and have lost money as a result of Defendant's unlawful sale of the Product. No reasonable consumer, including Plaintiffs, would have purchased the Product had they known it was adulterated, misbranded, contained benzene or *may* have contained benzene.

114.    Defendant's egregious conduct in selling a drug that is unlawfully adulterated and/or misbranded aside, Defendant engaged in further fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its omissions surrounding the presence or potential presence of benzene, or benzene contamination affecting the Product.

115.    No reasonable consumer, including Plaintiffs, would have purchased Defendant's Product had they known the truth of the representations and omissions described herein. Accordingly, Plaintiffs and the Classes suffered injury in fact and lost money as a result of Defendant's misleading representations and omissions and did not receive the benefit-of-the-bargain.

116.    Plaintiffs and the Classes' injury is underscored by the fact that numerous other products offering the same therapeutic benefit at comparable prices exist that are not prone to benzene contamination.

117.    In the alternative, Plaintiffs and the Classes suffered injury by purchasing a Product wherein lawfully required disclosures were not made; namely, particular information that was required by the FFDCA with respect to the ingredients panel. In failing to provide the legally mandated disclosures, Defendants illegally sold the Product to Plaintiffs and the Classes, thereby causing Plaintiffs and the Class Members' ascertainable loss of money.

118.    Plaintiffs and the Classes may be harmed again in the future because they want to purchase the Product in the future; however, without injunctive relief Plaintiffs would not be able to know or trust that Defendant will truthfully and legally label the Product and would be likely to be misled again.

## V.    CLASS ALLEGATIONS

119.    In accordance with Fed R. Civ. P. 23(b)(3) and 23(b)(2), Plaintiffs bring this action on behalf of the following class of persons (the "Class"):

> All natural persons residing in the United States who purchased the Product in the United States for personal use and not for re-sale.

120.    Further, in accordance with Fed R. Civ. P. 23(b)(3) and 23(b)(2), Plaintiffs Clinger and Barba bring this action on behalf of the following class of persons (the "Florida Sub-Class"):

> All natural persons residing in the State of Florida who purchased the Product in Florida for personal use and not for re-sale.

121.    Further, in accordance with Fed R. Civ. P. 23(b)(3) and 23(b)(2), Plaintiff Rudy brings this action on behalf of the following class of persons (the "Illinois Sub-Class"):

> All natural persons residing in the State of Illinois who purchased the Product in Illinois for personal use and not for re-sale.

122.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is proper, as more information is gleaned in discovery.

123.     Excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

124.     **Numerosity.** The members of the Class and Sub-Classes are so numerous that joinder of all members is impracticable. On information and belief, there are in excess of a hundred thousand members of the Class and Sub-Classes. Discovery will reveal, through Defendant's records, the approximate number of Class and Sub-Class members.

125.     **Commonality.** Common questions of law and fact apply to the claims of all Class and Sub-Class Members and include (but are not limited to) the following:

  a.     Whether the source of benzene in the Product was by design, an impurity by-product, or the result of contamination;

  b.     Whether Defendant omitted, in connection with the sale of the Product, whether the Product contained or may have contained benzene;

  c.     Whether Defendant was aware, or should have known, that the Product contained benzene (or, alternatively, a significant risk of benzene contamination) when it marketed and sold the Product to Plaintiffs and the other members of the Class;

  d.     Whether the Product was adulterated, misbranded, and/or an unapproved new drug under the FFDCA and/or FLDCA (for the Florida Sub-Classes);

  e.     Whether Defendant violated the FFDCA and/or FLDCA (for the Florida Sub-Classes);

f.      Whether Defendant's violations of the FFDCA and/or FLDCA constitute violations of FDUTPA (for the Florida Sub-Classes);

g.     Whether, independent of whether Defendant's conduct violated the FFDCA, Defendant's conduct constitutes an unfair act or practice in violation of FDUTPA and/or ILCFA (for the Sub-Classes);

h.     Whether, independent of whether Defendant's conduct violated the FFDCA, Defendant's conduct constitutes a deceptive act or practice in violation of FDUTPA and/or ILCFA (for the Sub-Classes);

i.      Whether Defendant's conduct and/or omissions in the marketing, advertising, labeling, and/or packaging of the Product in the manner discussed herein is likely to deceive reasonable consumers;

j.      Whether Defendant's Product is worthless;

k.     Whether Plaintiffs and the Class and Sub-Class Members are entitled to damages, and the proper measure of the loss;

k.     Whether Plaintiffs and the Class and Sub-Class Members are entitled to attorney's fees and expenses, and in what amount; and

m.    Whether Plaintiffs and the Class and Sub-Class Members are entitled to declaratory, injunctive, and/or other equitable relief.

126.   **Typicality.**  Plaintiffs' claims are typical of the claims of all Class and Sub-Class Members. The harm suffered by Plaintiffs and the Classes was and is caused by the same misconduct by Defendant.

127.   **Adequacy.**  Plaintiffs have retained counsel highly experienced in complex consumer class action litigation and intends to prosecute this action vigorously. Plaintiffs are members of the Class and Sub-Classes described herein and do not have interests antagonistic to, or in conflict with, the other members of the Class or Sub-Classes.

128.   **Predominance and Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Sub-Class members are relatively small, the expense and burden of individual litigation make it impossible for individual Class and Sub-Class members to seek

redress for the wrongful conduct asserted herein. If class treatment of these claims is not available, Defendant would likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, and/or otherwise escape liability for its wrongdoing.  Further, common questions of law and fact predominate.

129.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

130.    The prosecution of separate actions by individual members of the Class and Sub-Classes would run the risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for the Defendant. Prosecution as a class action will eliminate the possibility of repetitious litigation.

131.    **Class Certification Pursuant to Fed. R. Civ. P. 23(b)(2).** Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendant's actions are generally applicable to the Class and Sub-Classes as a whole, and Plaintiffs seek equitable remedies with respect to the Class and Sub-Classes as a whole. Defendant has acted or refused to act on grounds generally applicable to the Class and Sub-Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole. Moreover, Plaintiffs continue to have use for sunscreen products. If the Court were to enjoin Defendant from making misrepresentations and omissions described above, and refrain from producing sunscreen products with benzene, then Plaintiffs would consider purchasing Defendant's Product in the future. Without an injunction, Plaintiffs would be unable to trust Defendant's representations and would not purchase the Product.

## CLAIMS FOR RELIEF

132.     Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

### COUNT I
### Fraud By Omission
### (On Behalf of the Nationwide Class)

133.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

134.     Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class ("Class," for purposes of this Count).

135.     Defendant omitted material facts, including that the Product contained benzene, may contain benzene, and/or was subject to contamination by benzene, a known human carcinogen, in connection with the sale of the Product, or that the Product was manufactured, packaged, handled and/or stored in such a way unreasonably subjecting it to harmful contamination or residual impurities.

136.     Defendant was aware, or at least should have known, that the Product contained benzene (or, alternatively, a significant risk of benzene existing due to impurities or contamination) when it marketed and sold the Product to Plaintiffs and the other members of the Class.

137.     Having been aware of the presence (or, alternatively, the significant risk thereof) of benzene in the Product, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know thereof, Defendant had a duty to disclose this defect to Plaintiffs and the other members of the Class in connection with the sale of the Product.

138.     Moreover, as the disclosure of this issue is directly related to the safety of the Product, and applicable law requires the disclosure of the presence of chemicals such as benzene,

Defendant had an affirmative duty and was bound to disclose the presence of benzene in its Products, which it omitted from disclosure.

139.    In purchasing the Product, Plaintiffs and the other members of the Class justifiably relied on Defendant to disclose the presence (or, alternatively, the significant potential presence) of benzene in the Product.

140.    Defendant's omissions of material fact were intended to induce and in fact induced Plaintiffs and Class members to purchase Defendant's Products, which Defendant knew or reasonably should have known were subject to benzene contamination and thus were unreasonably hazardous to health.

141.    Had Plaintiffs and the other members of the Class known the truth of these omissions, they would not have purchased the Products or would have paid less for the Products.

142.    As a direct and proximate result of Defendant's omissions, Plaintiffs and the other members of the Class either overpaid for the Products or would not have purchased the Products at all, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT II**
**Breach of Express Warranty**
**(On Behalf of the Nationwide Class)**

143.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

144.    In connection with the sale of the Product, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Product was sunscreen that contained only those active and inactive ingredients listed on the Product's labels. Those active and/or inactive ingredients do not include benzene, a known human carcinogen dangerous to humans. Defendant further expressly warrants that the Product is

sunscreen used for sun protection, rather than adulterated sunscreen containing—or potentially containing—a dangerous carcinogen.

145.    As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and the Class members have been injured and harmed because they would not have purchased the Product on the same terms—or at all—if they knew that the Product contained or potentially contained benzene.

146.    Prior to the filing of this Amended Complaint, on November 12, 2021, Defendant was served with a notice letter. Plaintiffs' counsel sent Defendant a letter advising them that they breached an express warranty and demanded that they cease and desist from such breaches and make full restitution by refunding the monies received therefrom. A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit A**.

**COUNT III**
**Breach of Implied Warranty**
**(On Behalf of the Nationwide Class)**

147.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

148.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Product (i) would not contain elevated levels of benzene and (ii) is generally recognized as safe for human use.

149.    Defendant breached the warranty implied in the contract for the sale of the defective Product because they could not pass without objection in the trade under the contract description, the Products was not of fair or average quality within the description, and the Product was unfit for their intended and ordinary purpose because the Product manufactured, distributed, and sold by Defendant was defective in that it contained elevated levels of carcinogenic and toxic benzene,

and as such are not generally recognized as safe for human use. As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

150.    Plaintiffs and Class members purchased the Product in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

151.    The Product was not altered by Plaintiffs or Class members.

152.    The Product was defective when it left the exclusive control of Defendant.

153.    Defendant knew that the Product would be purchased and used without additional testing by Plaintiffs and Class members.

154.    The Product was defectively manufactured and unfit for its intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

155.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased the Product on the same terms—or at all—if they knew that the Product contained benzene; and (b) the Product does not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

## <u>COUNT IV</u>
### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*
### (On Behalf of the Nationwide Class)

156.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

157.    The Magnuson-Moss Warranty Act provides a federal remedy for consumers who have been damages by the failure of a supplier or warrantor to comply with any obligation under a written warranty or implied warranty, or other various obligations established under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

158.    The Product is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

159.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

160.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4) & 2301(5).

161.    Defendant represented in writing that the Product consisted of the active and inactive ingredients on the Product labels.  These statements were made in connection with the sale of the Product, relate to the nature of the Product, and affirm and promise that the Product is as represented and defect free, and as such are "written warranties" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)(A).

162.    Defendant breached its written warranties by selling consumers Product that contains—or risks containing—benzene.

163.    The Product does not conform to Defendant's written warranty and therefore violates the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.  Consequently, Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

### COUNT V
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

164.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

165.    This count is plead in the alternative, insofar as Plaintiffs do not have an adequate remedy at law.

166.     Regardless of whether the label contained a benzene disclosure or not, Defendant should have never sold that Product (and was actually legally precluded therefrom). The drug comprising the Product *itself*, regardless of any disclosures made or not made on the label, was illegal, as the drug: (a) contained unsuitable inactive ingredients, (b) contained unsafe inactive ingredients, (c) was manufactured utilizing a harmful Class I solvent resulting in residual impurity, and/or (d) was contaminated with benzene.

167.     As a result of Defendant's selling its Product, Defendant receives a benefit which was conferred upon it by Plaintiffs and the Classes (and/or at their expense), and it is unjust for Defendant to retain that benefit.

168.     Further and/or in the alternative to the theory espoused in paragraphs 166-167, despite the serious risks of harm inherent in potentially exposing consumers to benzene, Defendant has not disclosed these risks, and in fact has actively obfuscated the dangers of the Products by promising consumers the Product is safe. Plaintiffs and Class members would not have bought the Product if they had known the Product contained benzene (or, alternatively, a significant risk of benzene existing due to impurities or contamination).

169.     As a result of Defendant's deceptive marketing and labeling of its Product, Defendant receives a benefit which was conferred upon it by Plaintiffs and the Classes (and/or at their expense), and it is unjust for Defendant to retain that benefit.

170.     Under the circumstances, it is against equity and good conscience to permit Defendant to retain the ill-gotten benefits that it received from Plaintiffs and Class members.

171.     Thus, it is unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiffs and Class members.

172.     As a direct and proximate result of Defendant's actions, Defendant has been unjustly enriched. Plaintiffs and Class members have a right to restitution in an amount to be proven at trial.

**COUNT VI**
**Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.***
**Premised on Violations of the FFDCA and FLDCA**
**(On Behalf of the Florida Sub-Class)**

173.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

174.     Plaintiffs Clinger and Barba ("Plaintiffs," for purposes of this Count) bring this Count individually and on behalf of the other members of the Florida Sub-Class ("Sub-Class," for purposes of this Count).

175.     Plaintiffs and the Sub-Class are "consumers" within the meaning of Part II of Chapter 501, Florida Statutes, relating to Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

176.     Defendant is a "person" or "entity" as used in FDUTPA.

177.     Defendant's conduct alleged herein relating to the distribution and/or sale of the Product constitutes "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

178.     FDUTPA declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204(1).

179.     Further, FDUTPA violations may be predicated on the violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).

32

180.    Violations of the FFDCA and FLDCA constitute unfair, unconscionable, and/or deceptive acts or practices in violation of FDUTPA.

181.    By violating 21 U.S.C. § 331 (and other provisions of the FFDCA and its implementing regulations cited herein), and Fla. Stat. § 499.005, Defendant has violated the FFDCA and FLDCA and engaged in unfair competition and/or unconscionable / unfair acts or practices in violation of FDUTPA.

182.    Further, by violating 21 U.S.C. § 331 and Fla. Stat. § 499.005, Defendant violated a statute proscribing an unfair method of competition.

183.    Further, by violating 21 U.S.C. § 331 and Fla. Stat. § 499.005, Defendant has engaged in an unfair practice. Defendant's violations of these provisions offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

184.    Defendant violations of 21 U.S.C. § 331 and Fla. Stat. § 499.005 stem from the Product being adulterated and/or misbranded, and/or containing unsafe and/or unsuitable inactive ingredients such that it is rendered an unapproved new drug.

185.    The Product is adulterated under both the FFDCA and FLDCA for at least one of the violations described in Section IV(C)(ii) of this First Amended Complaint.

186.    The Product is misbranded under both the FFDCA and FLDCA for at least one of the violations described in Section IV(C)(i) of this First Amended Complaint.

187.    The Product contains unsafe and/or unsuitable inactive ingredients, rendering it an unapproved new drug, for the reasons provided in Section IV(C)(iii) of this First Amended Complaint.

188.    As a direct and proximate result of Defendant's violations of the FFDCA and FLDCA (and hence FDUTPA), Plaintiffs and the Sub-Class have lost money and suffered actual damages. Since the Product was adulterated, misbranded and/or an unapproved new drug, Defendant illegally sold the Product to Plaintiffs and the Sub-Class, thereby causing Plaintiffs and the Sub-Class Members' loss of money as measured by the full purchase price.

189.    Alternatively, the Product as it was presented for sale—which is *per se* neither adulterated or misbranded—is inherently worth more than an adulterated, misbranded, and/or unapproved new drug product, which is what the consumers actually received.

190.    This injury is of the type Fla. Stat. § 501.201, *et seq*., was designed to prevent and directly results from Defendant's conduct violating a law which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

191.    There is no federal or state law which affirmatively authorizes Defendant to engage in the harmful conduct alleged throughout this Complaint.

192.    In addition to actual damages, Plaintiffs and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

<u>**COUNT VII**</u>
**Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.***
**Unfair Acts or Practices**
**(On Behalf of the Florida Sub-Class)**

193.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

194.    Plaintiffs Clinger and Barba ("Plaintiffs," for purposes of this Count) bring this Count individually and on behalf of the other members of the Florida Sub-Class ("Sub-Class," for purposes of this Count).

195.    Independent of whether Defendant's conduct violated the FFDCA or FLDCA, Defendant's conduct, as described throughout the complaint, are unfair acts or practices in violation of FDUTPA.

196.    Defendant's practices, as described herein, offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The Product label instructs consumers to regularly apply substantial amounts of sunscreen to achieve the therapeutic benefit, and consumers (including Plaintiffs and the Sub-Class) do so without knowledge that the product is contaminated with a known human carcinogen (or, alternatively, there is a substantial risk thereof).

197.    Further, the benzene serves no benefit, therapeutic or otherwise. Defendant subjected consumers, including Plaintiffs and the Sub-Class, to a harmful carcinogen which served no benefit when other sunscreen products without benzene contamination were available at comparable prices.

198.    Alternatively, or in addition, Defendant's *modus operandi* constitutes an unfair practice in that it knew (or should have known) it was selling a topical sunscreen without reasonable controls in place to prevent the type of contamination leading to the benzene detected in the Product, and/or contained an inactive ingredient that was unsafe and/or unsuitable.

199.    The practices complained of herein are not limited to a single instance but rather were done pervasively and uniformly against Plaintiffs and the Classes.

200.    Defendant's unfair conduct, which caused substantial injury to Plaintiffs and the Class due to Defendant's common omissions and/or unscrupulous practices, and which lacks any reasonable or legitimate justification, could not have been avoided by reasonable consumers.

201.    As a direct and proximate result of Defendant's unfair practices (which violate FDUTPA), Plaintiffs and the Sub-Class have lost money and suffered actual damages. Absent Defendant's immoral and unscrupulous business practice of selling a topical sunscreen not free of benzene contamination, Defendant would not have sold the Product, and Plaintiffs and the Class would not have lost funds purchasing it.

202.    Defendant has benefitted from the conduct complained of herein while Plaintiffs and the Class and Sub-Class Members have been misled as to the nature and integrity of the Product and have lost money, in the form of the purchase price of the Product (or, alternatively, by receiving a Product that was worth far less than the Product as represented).

203.    This injury is of the type Fla. Stat. § 501.201, *et seq*., was designed to prevent and directly results from Defendant's unfair conduct.

204.    In addition to actual damages, Plaintiffs and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

## COUNT VIII
**Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.***
**Deceptive Acts or Practices**
**(On Behalf of the Florida Sub-Class)**

205.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

206.    Plaintiffs Clinger and Barba ("Plaintiffs," for purposes of this Count) bring this Count individually and on behalf of the other members of the Florida Sub-Class ("Sub-Class," for purposes of this Count).

207.     Independent of whether Defendant's conduct violated the FFDCA or FLDCA, Defendant's conduct, as described throughout the complaint, are deceptive acts or practices in violation of FDUTPA.

208.     Defendant engaged in deceptive conduct in violation of FDUTPA when it made omissions regarding benzene (or, alternatively, the potential for benzene) in the Product. These omissions are likely to mislead consumers acting reasonably under the circumstances, to the consumer's detriment (including Plaintiffs).

209.     Reasonable consumers such as Plaintiffs do not expect carcinogens to be present in a topical sunscreen, and at the very least expect the presence or potential presence of carcinogens to be brought to their attention on the product label. By failing to disclose this information, Defendant has engaged, and continues to engage, in conduct likely to deceive members of the public.

210.     Defendant's omissions (as detailed herein) are likely to mislead reasonable consumers and cause them injury.

211.     As a direct and proximate result of Defendant's deceptive acts or practices (which violate FDUTPA), Plaintiffs and the Sub-Class have lost money and suffered actual damages. But for the omissions, reasonable consumers would not have purchased the Product, thereby injuring them financially as measured by the full purchase price.

212.     Alternatively, the Product as it was presented for sale—without disclosures as to the presence of (or alternatively, risk of) carcinogens—is inherently worth more than a sunscreen product containing (or, alternatively, potentially containing) benzene, which is what consumers actually received. Defendant was able to charge more for the Product due to their deceptive acts violating FDUTPA.

213.     This injury is of the type Fla. Stat. § 501.201, *et seq*., was designed to prevent and directly results from Defendant's deceptive conduct.

214.     In addition to actual damages, Plaintiffs and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

**COUNT IX**
**Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.**
**Unfair Acts or Practices**
**(On Behalf of the Illinois Sub-Class)**

215.     Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

216.     Plaintiff Rudy ("Plaintiff," for purposes of this Count) brings this Count individually and on behalf of the other members of the Illinois Sub-Class ("Sub-Class," for purposes of this Count).

217.     Plaintiff and the Sub-Class are "consumers" within the meaning of 815 ILCS 505/1(e).

218.     Defendant is a "person" within the meaning of 815 ILCS 505/1(c).

219.     Defendant's conduct alleged herein relating to the distribution and/or sale of the Product constitutes "trade" and/or "commerce" within the meaning of 815 ILCS 505/1(f).

220.     ILCFA prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'" 815 ILCS 505/2.

221.    An act or practice is unfair where it offends public policy, is immoral, unethical, oppressive, or unscrupulous, and/or causes substantial injury to consumers.

222.    As noted herein, Defendant violated the FFDCA (and by extension the ILFDCA) in numerous ways, as described in Count VI and Section IV(C) of this First Amended Complaint. Therefore, there is no statute that permits the conduct complained of herein.

223.    Independent of whether Defendant's conduct violated the FFDCA or ILFDCA, Defendant's conduct, as described throughout the complaint, are unfair business practices in violation of ILCFA.

224.    Defendant's practices, as described herein, offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The Product label instructs consumers to regularly apply substantial amounts of sunscreen to achieve the therapeutic benefit, and consumers (including Plaintiff and the Sub-Class) do so without knowledge that the product is contaminated with a known human carcinogen (or, alternatively, there is a substantial risk thereof).

225.    Further, the benzene serves no benefit, therapeutic or otherwise. Defendant subjected consumers, including Plaintiff and the Sub-Class, to a harmful carcinogen which served no benefit when other sunscreen products without benzene contamination were available at comparable prices.

226.    Alternatively, or in addition, Defendant's *modus operandi* constitutes an unfair practice in that it knew (or should have known) it was selling a topical sunscreen without reasonable controls in place to prevent the type of contamination leading to the benzene detected in the Product, and/or contained an inactive ingredient that was unsafe and/or unsuitable.

227.    The practices complained of herein are not limited to a single instance but rather were done pervasively and uniformly against Plaintiff and the Classes.

228.    Defendant's unfair conduct, which caused substantial injury to Plaintiff and the Class due to Defendant's common omissions and/or unscrupulous practices, and which lacks any reasonable or legitimate justification, could not have been avoided by reasonable consumers.

229.    Defendant has benefitted from the conduct complained of herein while Plaintiff and the Class and Sub-Class Members have been misled as to the nature and integrity of the Product and have lost money, in the form of the purchase price of the Product.

230.    Defendant acquired money from Plaintiff and the Sub-Class by way of the unfair acts or practices alleged herein.

231.    As a direct and proximate result of Defendant's unfair practices (which violate ILCFA), Plaintiff and the Sub-Class have lost money and suffered actual damages. Absent Defendant's immoral and unscrupulous business practice of selling a topical sunscreen not free of benzene contamination, Defendant would not have sold the Product, and Plaintiff and the Class would not have lost funds purchasing it.

232.    Alternatively, Plaintiff and the Sub-Class have suffered actual loss by being deprived of the benefit-of-the-bargain as a result of Defendant's unfair acts or practices as alleged herein. Plaintiff and the Sub-Class paid more for the Product than its actual worth.

233.    This injury is of the type the ILCFA was designed to prevent and directly results from Defendant's unfair conduct.

234.    In addition to actual damages, Plaintiff and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a.

## <u>COUNT X</u>
**Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.***

**Deceptive Acts or Practices**
**(On Behalf of the Illinois Sub-Class)**

235.    Plaintiffs incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

236.    Plaintiff Rudy ("Plaintiff," for purposes of this Count) brings this Count individually and on behalf of the other members of the Illinois Sub-Class ("Sub-Class," for purposes of this Count).

237.    Defendant's conduct, as described throughout the complaint, are deceptive acts or practices in violation of ILCFA.

238.    Defendant engaged in deceptive conduct in violation of ILCFA when it made omissions regarding benzene contamination (or, alternatively, the potential for benzene contamination) in the Product. These omissions are likely to mislead consumers acting reasonably under the circumstances, to the consumer's detriment (including Plaintiff).

239.    Defendant further violated ILCFA by engaging in deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act by: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods are original or new if they are deteriorated or altered; and/or representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another. 815 ILCS 510/2(5)-(7).

240.    Reasonable consumers such as Plaintiff do not expect carcinogens to be present in a topical sunscreen, and at the very least expect the presence or potential presence of carcinogens to be brought to their attention on the product label. By failing to disclose this information, Defendant has engaged, and continues to engage, in conduct likely to deceive members of the public.

241.     Defendant's omissions (as detailed herein) are likely to mislead reasonable consumers and cause them injury.

242.     In its advertising, packaging, and labeling of the Product, Defendant made the material omissions complained of herein in order to induce consumers, including Plaintiff and the Sub-Class, into purchasing the Product.

243.     Defendant failed and continues to fail to make these material disclosures, including (among others) a disclosure as to the presence or potential presence of benzene in the Product, or benzene contamination affecting the drug, even though Defendant knew or should have known about the issue.

244.     Defendant acquired money from Plaintiff and the Sub-Class by way of the deceptive acts or practices alleged herein.

245.     As a direct and proximate result of Defendant's deceptive acts or practices (which violate ILCFA), Plaintiff and the Sub-Class have lost money and suffered actual damages. But for the omissions, reasonable consumers including Plaintiff would not have purchased the Product, thereby injuring them financially as measured by the full purchase price.

246.     Alternatively, the Product as it was presented for sale—without disclosures as to the presence of (or alternatively, risk of) carcinogens—is inherently worth more than a sunscreen product containing (or, alternatively, potentially containing) benzene, which is what consumers actually received. Defendant was able to charge more for the Product due to their deceptive acts violating FDUTPA, and Plaintiff and the Sub-Class were denied their benefit of the bargain.

247.     This injury is of the type ILCFA was designed to prevent and directly results from Defendant's deceptive conduct.

248.     In addition to actual damages, Plaintiff and the Sub-Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, individually and on behalf of the members of the Classes defined herein, pray for judgment and relief on all Claims for Relief as follows:

A.     An order certifying that the action may be maintained as a Class Action and that Plaintiffs be appointed the Class Representatives and their undersigned counsel as Class Counsel;

B.     An order enjoining Defendant from pursuing the policies, acts, and practices complained of herein;

C.     Damages;

D.     Restitution;

E.     Pre-judgment interest from the date of filing this suit;

F.     Declaratory relief;

G.     Reasonable attorneys' fees;

H.     Costs of this suit; and,

I.     Such other and further relief as the Court may deem necessary or appropriate.

## **JURY DEMAND**

Plaintiffs and the Members of the Classes hereby request a trial by jury.

November 12, 2021                                    Respectfully submitted,

                                    **CARNEY BATES & PULLIAM, PLLC**

                              By:  */s/* David Slade
                                    David Slade (*pro hac vice*)
                                    dslade@cbplaw.com
                                    Hank Bates (*pro hac vice*)
                                    hbates@cbplaw.com

Sam Jackson (*pro hac vice*)
519 West 7th St.
Little Rock, AR 72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

*and*

**SCOTT+SCOTT ATTORNEYS AT LAW
LLP**
Joseph P. Guglielmo (ct27481)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel: 212-223-6444
Fax: 212-223-6334
jguglielmo@scott-scott.com

*and*

**MILSTEIN JACKSON FAIRCHILD &
WADE, LLP**
Gillian L. Wade (*pro hac vice*)
gwade@mjfwlaw.com
Marc A. Castaneda (*pro hac vice*)
mcastaneda@mjfwlaw.com
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Tel: (310) 396-9600
Fax: (310) 396-9635

*and*

**CASEY LAW FIRM, LLC**
Ryan Casey (to apply *pro hac vice*)
ryan@rcaseylaw.com
PO Box 4577
Frisco, CO 80443
Tel: (970) 372-6509
Fax: (970) 372-6482

*Attorneys for Plaintiffs*

44

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 12, 2021, this document was served on all parties of record via email through the Court's CM/ECF system.

November 12, 2021                          By: _/s/_ David Slade_____

*Attorney for Plaintiffs*