IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRYAN CLINGER, MONICA BARBA, and HEATHER RUDY, on behalf of themselves and all others similarly situated, | Case No.: 3:21-cv-01040-JAM |
| Plaintiffs, | |
| v. | January 7, 2022 |
| EDGEWELL PERSONAL CARE BRANDS, LLC, a Delaware Limited Liability Company; and | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

I.    INTRODUCTION AND BACKGROUND ........................................................................ 1

    A.  Plaintiffs' Claims and Theories of Liability ..................................................... 2

    B.  Defendant's Conduct Also Contravenes FDA Regulations and Guidance ....................... 3

        1.  The Product is 'misbranded' under the FDCA ................................................ 4

            (a)  The Product fails to list benzene as an inactive ingredient ...................... 4

            (b)  Alternatively, the Product is dangerous when used in the manner and frequency
                 recommended ............................................................................... 5

            (c)  Alternatively, the Product's label is otherwise misleading ..................... 6

        2.  The Product is 'adulterated' under the FDCA ............................................. 6

        3.  The Product is an illegal unapproved new drug under the FDCA ........................... 8

II.   ARGUMENT ........................................................................................ 9

    A.  The Court Should Not Consider the FOIA Documents ........................................ 9

        1.  Extrinsic Evidence is Improper in This Context ......................................... 9

        2.  Impropriety Aside, Defendant Mischaracterizes the FOIA Documents, which are also
            Irrelevant ............................................................................ 11

    B.  Plaintiffs Have Article III Standing .................................................. 12

        1.  Plaintiffs Adequately Allege Injury-in-Fact ........................................ 12

        2.  Plaintiffs Have Standing to Pursue an Injunction .................................. 14

    C.  Plaintiffs' Claims Are Not Preempted .................................................. 17

        1.  Plaintiffs' Claims are not Expressly Preempted ...................................... 18

            (a)  Plaintiffs' 'disclosure claims' do not seek to impose any requirement incompatible
                 with FDCA's labeling requirements ................................................. 18

            (b)  Plaintiffs' 'non-disclosure claims' do not seek to impose any requirement beyond
                 what FDCA already required of Defendant ............................................ 21

            (c)  The FOIA documents do not preempt Plaintiffs' claims. ........................... 24

i

2.   Plaintiffs' Claims are not Impliedly Preempted ........................................................... 26

3.   Plaintiffs are not Bringing a Private Enforcement Action ......................................... 27

4.   Plaintiffs' Claims are not Barred by the Doctrine of Primary Jurisdiction ............... 27

D.   Plaintiffs Have Sufficiently Stated Plausible Claims ........................................................ 30

1.   Plaintiffs Satisfy Rule 9(b)'s Pleading Standard ......................................................... 30

2.   Plaintiffs' Claims Meet the Reasonable Consumer Standard ................................... 33

3.   The FDUTPA Safe Harbor Is Inapplicable ................................................................ 35

4.   The Express Warranty Claim is Properly Pled............................................................ 36

5.   Plaintiffs Adequately Allege Their Magnuson-Moss Claim. ................................... 38

6.   Unjust Enrichment Is Properly Pled ........................................................................ 38

E.   Plaintiffs May Seek Restitution................................................................................ 40

III.    CONCLUSION.................................................................................................... 40

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Ackerman v. Coca-Cola Co.*,
   2013 WL 7044866, at *15 (E.D.N.Y. July 18, 2013) .................................................. 13, 17, 30

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008) ........................................................................................................ 26

*Anglin v. Edgewell Personal Care Co.*,
   2018 WL 6433324 (E.D. Mo. Dec. 7, 2018) ................................................................ 25

*ArtSkills, Inc. v. Royal Consumer Prods., LLC*,
   2018 WL 6304348 (D. Conn. Dec. 3, 2018) ................................................................. 31

*Atik v. Welch Foods, Inc.*,
   2016 WL 5678474 (E.D.N.Y.) ...................................................................................... 17

*Ault v. J.M. Smucker Co.*,
   2014 WL 1998235 (S.D.N.Y. May 15, 2014) ............................................................. 23

*Axon v. Citrus World, Inc.*,
   354 F. Supp. 3d 170 (E.D.N.Y. 2018) .......................................................................... 35

*Axon v. Florida's Nat. Growers, Inc.*,
   813 F. App'x 701 (2d Cir. 2020) .................................................................................. 15

*Bartone v. Robert L. Day Co., Inc.*,
   232 Conn. 527 (1995) .................................................................................................. 33

*Basko v. Sterling Drug, Inc.*,
   416 F.2d 417 (2d Cir. 1969) ......................................................................................... 36

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003) ......................................................................................... 14

*Belfiore v. Procter & Gamble Co.*,
   94 F. Supp. 3d 440 (E.D.N.Y. 2015) ...................................................................... 16, 17

*Biffar v. Pinnacle Foods Grp., LLC*,
   2016 WL 7429130 (S.D. Ill. Dec. 26, 2016) ............................................................... 34

*Bonfield v. AAMCO Transmissions, Inc.*,
    708 F. Supp. 867 (N.D. Ill. 1989) .......................................................... 32

*Campaniello Imports, Ltd. V. Saporiti Italia S.p.A.*,
    117 F.3d 655 (2d Cir. 1997)................................................................... 40

*Carriuolo v. Gen. Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) ............................................................... 33

*Carriuolo v. Gen. Motors LLC*,
    72 F. Supp. 3d 1323 (S.D. Fla. 2014) .................................................... 40

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016)..................................................................... 11

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir.2002).................................................................... 10

*Chang v. Fage USA Dairy Indus., Inc.*,
    2016 WL 5415678 (E.D.N.Y. Sept. 28, 2016) ...................................... 17

*Ciampi v. Ogden Chrysler Plymouth*,
    262 Ill. App. 3d 94 (1994) ..................................................................... 33

*Corra v. Energizer Holdings, Inc.*,
    962 F. Supp. 2d 1207 (E.D. Cal. 2013).................................................. 28

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
    432 F.3d 286 (3d Cir.2005).................................................................... 12

*Dapeer v. Neutrogena Corp.*,
    95 F. Supp. 3d 1366 (S.D. Fla. 2015) .................................................... 28

*Dayan v. Swiss-Am. Prod., Inc.*,
    2017 WL 1214485 (E.D.N.Y. Mar. 31, 2017) ...................................... 27

*Dunford v. Muscle Pharm Corp.*,
    907 F.3d 595, 603 n.8 (9th Cir. 2018) ................................................... 26

*Ellis v. Tribune Television Co.*,
    443 F.3d 71 (2d Cir. 2006)............................................................... 29, 30

*Eng. v. Gen. Elec. Co.*,
    496 U.S. 72 (1990)................................................................................. 27

*Est. of Axelrod v. Flannery*,
476 F. Supp. 2d 188 (D. Conn. 2007) .......................................................... 10

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
375 F.3d 158 (2d Cir. 2004) ........................................................................ 31

*Ezcurra v. Monsanto Corp.*,
2020 U.S. Dist. LEXIS 167830 (S.D. Fla. Aug. 7, 2020) ........................... 36

*Fagan v. Neutrogena Corp.*,
2014 WL 92255 (C.D.Cal.2014) ................................................................. 30

*Fisher v. APP Pharmaceuticals, LLC*,
783 F. Supp. 2d 424 (S.D.N.Y. 2011) ......................................................... 38

*Forouzesh v. CVS Pharm., Inc.*,
2019 WL 652887 (C.D. Cal. Feb. 15, 2019) ............................................... 25

*Fraser v. Wyeth*,
857 F. Supp. 2d 244 (D. Conn. 2012) .......................................................... 36

*Friends of the Earth v. Sanderson Farms, Inc.*,
2018 WL 7197394 (N.D. Cal. Dec. 3, 2018) ............................................... 34

*Gelboim v. Bank of Am. Corp.*,
135 S. Ct. 897 (2015) .................................................................................... 40

*Glob. Network Communications, Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006) ........................................................................ 10

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
317 F.R.D. 374 (S.D.N.Y. 2016) ......................................................... passim

*Goya Foods, Inc. v. Tropicana Prods., Inc.*,
846 F.2d 848 (2d Cir. 1988) ................................................................... 28, 30

*Granito v. IBM*,
34 Conn. L. Rptr. 485 (Conn. Supr. Ct. 2003) ....................................... 39, 40

*Gubala v. CVS Pharmacy, Inc.*,
2016 WL 1019794 (N.D. Ill. Mar. 15, 2016) .............................................. 26

*Guinn v. Hoskins Chevrolet*,
361 Ill. App. 3d 575 (Ill. App. 3d 2005) ..................................................... 40

*Guzman v. Polaris Indus.*,
    2021 WL 2021454 (C.D. Cal. May 12, 2021) ........................................................................ 35

*Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*,
    231 Conn. 276 (Conn. 1994) .................................................................................... 38, 40

*Hughes v. Ester C Co.*,
    930 F. Supp. 2d 439 (E.D.N.Y. 2013) .......................................................................... 12, 13

*Ignacuinos v. Boehringer Ingelheim Pharms. Inc*,
    8 F.4th 98 (2d Cir. 2021) ........................................................................................ 23

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*,
    701 F. Supp. 2d 356, 369 (E.D.N.Y. 2010) ................................................................... 25, 27

*In re Edgewell Personal Care Co. Litig.*,
    2018 WL 7858623 (E.D.N.Y. Sept. 4, 2018) ..................................................................... 17

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
    2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) .................................................................... 23

*In re Herbal Supplements Mktg. & Sales Practices Litig.*,
    2017 WL 2215025 (N.D. Ill. May 19, 2017) ..................................................................... 26

*In re Sunrise Sec. Litig.*,
    793 F. Supp. 1306 (E.D. Pa. 1992) ............................................................................. 32

*Jackson-Mau v. Walgreen Co.*,
    2019 WL 5653757 (E.D.N.Y. Oct. 31, 2019) .................................................................... 25

*King v. Rell*,
    2008 WL 792818 (D. Conn. Mar. 20, 2008) ...................................................................... 17

*Kommer v. Bayer Consumer Health*,
    252 F. Supp. 3d 304 (S.D.N.Y. 2017) ........................................................................... 16

*Kuenzig v. Hormel Foods Corp.*,
    505 F. App'x 937 (11th Cir. 2013) .............................................................................. 36

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017) ................................................................................ 17

*LaBounty v. Adler*,
    933 F.2d 121 (2d Cir. 1991) ...................................................................................... 9

*LaFleur v. Whitman*,
    300 F.3d 256 (2d Cir. 2002) ................................................................................. 15

*Lake v. Kardjian*,
    874 N.Y.S.2d 751 (N.Y. Sup. Ct. 2008) ................................................................. 38

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
    95 F. Supp. 3d 284 (D. Conn. 2015) .......................................................... 28, 29, 30

*Layton v. Lester*,
    2011 WL 522887 (Conn Supr. Ct. Jan. 21, 2011) .................................................. 40

*Lewis v. Hermann*,
    775 F. Supp. 1137 (N.D. Ill. 1991) ....................................................................... 32

*Lewis v. Mercedes-Benz United States*,
    530 F. Supp. 3d 1183 (S.D. Fla. 2021) ................................................................. 33

*Lunney v. U.S.*,
    319 F.3d 550 (2d Cir. 2003) ................................................................................. 12

*Marentette v. Abbott Labs., Inc.*,
    886 F.3d 112 (2d Cir. 2018) ................................................................................. 17

*McConologue v. Smith & Nephew, Inc.*,
    8 F. Supp. 3d 93 (D. Conn. 2014) ......................................................................... 37

*McNulty v. Polar Corp.*,
    2020 WL 5658667 (S.D.N.Y. Sept. 23, 2020) ....................................................... 23

*Mee v. 1 A Nutrition, Inc.*,
    2015 WL 2251303 (N.D. Cal. May 13, 2015) ........................................................ 25

*Melendez v. ONE Brands, LLC*,
    2020 WL 1283793 (E.D.N.Y. Mar. 16, 2020) ....................................................... 25

*Michaels Bldg. Co. v. Ameritrust Co., N.A.*,
    848 F.2d 674 (6th Cir. 1988) ............................................................................... 32

*Napoli-Bosse v. Gen. Motors LLC*,
    453 F. Supp. 3d 536 (D. Conn. 2020) ................................................................... 38

*Nature's Prods., Inc. v. Natrol, Inc.*,
    990 F. Supp. 2d 1307 (S.D. Fla. 2013) ................................................................. 34

*New York State Rest. Ass'n v. New York City Bd. of Health*,
    556 F.3d 114 (2d Cir. 2009)................................................................... 18

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)............................................... 14, 15, 16, 17

*O'Neill v. Standard Homeopathic Co.*,
    346 F. Supp. 3d 511 (S.D.N.Y. 2018)..................................................... 13

*Onesti v. Thomson McKinnon Sec., Inc.*,
    619 F. Supp. 1262 (N.D. Ill. 1985) ......................................................... 32

*Organic Consumers Ass'n v. Bigelow Tea Co.*,
    2018 D.C. Super. LEXIS 11 (D.C. Super. Ct. Oct. 31, 2018) .................. 34

*Parker v. Colgate-Palmolive Co.*,
    2003 WL 22205061 (Conn. Supr. Ct. Aug. 8, 2003)........................ 39, 40

*Parks v. Ainsworth Pet Nutrition, LLC*,
    377 F. Supp. 3d 241 (S.D.N.Y. 2019)..................................................... 35

*Patane v. Nestle Waters N. Am., Inc.*,
    314 F. Supp. 3d 375 (D. Conn. 2018).......................................... 12, 13, 17

*Philadelphia Indemnity Ins. Co. v. Lennox Industries, Inc.*,
    2019 U.S. Dist. LEXIS 44055 (D. Conn. Mar. 18, 2019)........................ 38

*Prohias v. AstraZeneca Pharms., L.P.*,
    958 So.2d 1054 (Fla. Dist. Ct. App. 2007) .............................................. 36

*Sciortino v. Pepsico, Inc.*,
    108 F. Supp. 3d 780 (N.D. Cal. 2015) .................................................... 26

*Smith v. Allmax Nutrition, Inc.*,
    2015 WL 9434768 (E.D. Cal. Dec. 24, 2015) ........................................ 26

*Stefan v. P.J. Kids, LLC*,
    2005 WL 834208 (Conn. Supr. Ct. Mar. 1, 2005) ................................... 40

*Stemm v. Tootsie Roll Indus., Inc.*,
    374 F. Supp. 3d 734 (N.D. Ill. Mar. 19, 2019) ....................................... 33

*The Pantry, Inc. v. Stop-N-Go Foods, Inc.*,
    777 F. Supp. 713 (S.D. Ind. 1991) ......................................................... 40

*Tran v. Sioux Honey Ass'n, Coop*,
   2018 WL 10612686 (C.D. Cal. Aug. 20, 2018) ........................................................ 34

*U.S. ex rel. Johnson v. Shell Oil Co.*,
   183 F.R.D. 204 (E.D. Tex. 1998) ........................................................................... 32

*Vanalstine v. Diversified Farms, LLC*,
   2021 WL 1711607 (Mich. Ct. App. Apr. 29, 2021) ................................................ 37

*Victor v. R.C. Bigelow, Inc.*,
   2014 WL 1028881 (N.D. Cal. Mar. 14, 2014) ........................................................ 35

*Warren v. Whole Foods Market Group, Inc.*,
   2021 WL 5759702 (E.D.N.Y. Dec. 3, 2021) .................................................... 25, 27

*Wiegel v. Stork Craft Mfg., Inc.*,
   780 F. Supp. 2d 691 (N.D. Ill. 2011) ...................................................................... 40

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008) .................................................................................. 34

*Young v. Johnson & Johnson*,
   2012 U.S. Dist. LEXIS 55192 (D.N.J. Apr. 19, 2012) ........................................... 35

*Zeigler v. Sony Corp. of Am.*,
   48 Conn. Supp. 397 (Conn. App. 2004) ............................................................ 39, 40

## Federal Statutes

15 U.S.C. § 2301 ............................................................................................................. 2, 38
21 U.S.C. § 351 ...................................................................................................................... 6, 7
21 U.S.C. § 352 ............................................................................................................... 4, 5, 6, 18
21 U.S.C. § 355 ........................................................................................................................... 8
21 U.S.C. § 379 ......................................................................................................................... 18

## Statutes

410 Ill. Comp. Stat. 620 ......................................................................................................... 4, 6, 9
815 Ill. Comp. Stat. 505/1 ............................................................................................................ 3
Conn. Gen. Stat. § 42a-2-313(1) ................................................................................................. 37
Fla. Stat. § 499.001 ....................................................................................................................... 2
Fla. Stat. § 499.006 ....................................................................................................................... 6
Fla. Stat. § 499.007 ....................................................................................................................... 4
Fla. Stat. § 499.023 ....................................................................................................................... 9
Fla. Stat. § 501.201 ....................................................................................................................... 2

Fla. Stat. § 501.212 ........................................................................................... 36


**Regulations**

21 C.F.R. Part 201........................................................................................... 4, 8
21 C.F.R. Part 210........................................................................................... passim
21 C.F.R. Part 211........................................................................................... 8, 25, 26
21 C.F.R. Part 330........................................................................................... 4, 18, 24


**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................... 10, 11
Fed. R. Civ. P. 12(b)(6)................................................................................... 9
Fed. R. Civ. P. 8(d)(2)..................................................................................... 40
Fed. R. Civ. P. 9(b) ......................................................................................... 30, 31, 32, 33


**Other Authorities**

FDA, *Final Administrative Order OTC000006, Over-the-Counter Monograph M020*
   *Sunscreen Drug Products for Over-the-Counter Human Use* (Sep. 24, 2021) ......................... 8
FDA, *Guidance for Industry: Labeling OTC Human Drug Products* (May 2009) ...................... 5
FDA, *Guidance for Industry: Limiting the Use of Certain Phthalates as Excipients in*
   *CDER-Regulated Products* (Dec. 2012) ............................................................... 9
FDA, *Guidance for Industry: Q3C Impurities: Residual Solvents* (Dec. 1997)........... 7, 23, 24, 27
FDA, *Inactive Ingredients in Approved Drug Products Search:*
   *Frequently Asked Questions* .......................................................................... 4, 20
FDA, *Warning Letter to MB Solutions, LLC* (July 22, 2021)..................................... 5, 9

## I.   INTRODUCTION AND BACKGROUND

Sunscreen is a critical health- and personal-care product, offering unique protection from the Sun's ultraviolet (UV) radiation. FAC ¶¶ 11, 17. Given the risk UV rays pose in developing cancer, healthcare professionals recommend at least daily application of sunscreen (*id*. ¶ 18), while many labels instruct the user to apply the product every 2-3 hours (*id*. ¶ 19). Demand for sunscreen is extensive, with a projected market size of over $24 billion by the end of this decade. *Id.* ¶ 16. Defendant manufactures Banana Boat sunscreen products. *Id.* ¶ 10. In March 2021, testing on various products by the analytical pharmacy and patient advocacy organization Valisure revealed that the Banana Boat products contained the toxic chemical benzene.[1] *Id.* ¶¶ 27-29. Most commonly used in industrial settings—and found in products such as gasoline, plastics, detergents, and pesticides (*id.* ¶ 25)—benzene is a known carcinogen and also poses risks to the immune system, bone marrow, and the production of red blood cells. *Id.* ¶¶ 20-23. Benzene's principal vectors for exposure in humans are inhalation, skin absorption, ingestion, and skin or eye contact. *Id*. ¶ 24. Critically, exposure to low concentrations is dangerous, and protective equipment is recommended to prevent exposure to concentrations as low as 0.1 ppm. *Id*. ¶ 24. Detected concentrations of benzene in the Product ran from <0.1 ppm to 0.43 ppm. *See,* Dkt. 51-1 at 18-20.

Following the Valisure report, other sunscreen manufactures instituted voluntary recalls, including Johnson & Johnson. FAC ¶ 35. While Defendant has recalled its Product in Australia and New Zealand[2]  no such recall has occurred in the United Stated. *Id*. ¶ 36.

---

[1] The Valisure testing revealed benzene in Defendant's Kids Max Protect & Play Sunscreen Spray, Kids Sport Sunscreen, Protective Dry Oil Clear Sunscreen Spray, Simply Protect Kids (a/k/a Kids Mineral Enriched) Sunscreen Spray, Ultra Defense Ultra Mist Clear Sunscreen Spray, Ultra Sport Clear Sunscreen Spray, and UltraMist Deep Tanning Dry Oil Continuous Clear Spray (collectively, the "Product"). *Id*. ¶ 29.

[2] E. Daoud, *Popular sunscreen recalled after cancer-causing substance is detected in products*, Channel 7 News Australia (Dec. 22, 2021), https://7news.com.au/lifestyle/recalls/popular-sunscreen-recalled-after-cancer-causing-substance-is-detected-in-products-c-5059141; Banana Boat Australia, *Banana Boat Aerosol Sunscreen Recall Statement*, https://www.bananaboat.com.au/sunscreen-recall/; D. Smith, *Banana Boat aerosol sunscreen products recalled over health concerns*, Stuff (Dec. 29, 2021), https://www.stuff.co.nz/business/127400712/banana-boat-

A.      **Plaintiffs' Claims and Theories of Liability**

On November 12, 2021, Plaintiffs filed their First Amended Complaint on behalf of a national class and Florida and Illinois sub-classes. Therein, Plaintiffs alleged violations of state and federal law, as well as claims under common law, warranty, and equitable theories. **Plaintiffs' first cause of action** alleges fraud by omission on behalf of the National Class. FAC ¶¶ 133-142 ("COA 1"). Plaintiffs allege, *inter alia*, that Defendant knew or should have known the Product contained or may contain benzene, and breached its duty to disclose same to induce Plaintiffs to purchase the Product. *Id.* ¶¶ 135-137, 140. Plaintiffs would not have purchased (or would have paid less for) the Product had they known this information. *Id.* ¶¶ 139-142. **Plaintiffs' second cause of action** alleges Defendant breached its express warranty to the National Class. *Id.* ¶¶ 143-146 ("COA 2"). The label's ingredients list was a written warranty that the Product consisted of those ingredients, but the Product contained or may have contained benzene as an inactive ingredient. *Id.* ¶ 144. **Plaintiffs' fourth cause of action** alleges the same, resulting in violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* ("MMWA"), since these statements were made in connection with the Product's sale, relate to the nature of the Product, and (falsely) affirm that the Product is as represented. FAC ¶¶ 156-163 ("COA 4"). **Plaintiffs' fifth cause of action** alleges (in the alternative Plaintiffs lack an adequate legal remedy) unjust enrichment on behalf of the National Class. *Id.* ¶¶ 164-172 ("COA 5"). Plaintiffs Clinger and Barba bring the **sixth cause of action** on behalf of the Florida Sub-Class, alleging violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA") which are premised of violations of the FDCA and Florida's Drug and Cosmetic Act, Fla. Stat. § 499.001, *et seq*. ("FLDCA"). FAC ¶¶ 173-192 ("COA 6"). Defendant violated both predicate statutes—which

---

aerosol-sunscreen-products-recalled-over-health-concerns; Banana Boat NZ, *Aerosol Sunscreen Recall Statement*, https://www.bananaboat.co.nz/sunscreen-recall/.

proscribe unfair methods of competition—by selling a product that is misbranded, adulterated, and/or constituted an unapproved new drug under both the FDCA and FLDCA. *Id.* ¶¶ 185-187. On behalf of the Sub-Classes, Plaintiffs bring the **seventh and ninth causes of action** alleging violations of their states' deceptive trade practices statutes' 'unfair' prongs (and not premised on FDCA). These include FDUTPA's 'unfair' prong (*id.* ¶¶ 193-204) ("COA 7) and unfair acts under Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ILCFA") (*id.* ¶¶ 215-234) ("COA 9"). Finally, on behalf of the Sub-Classes, Plaintiffs bring the **eighth and tenth causes of action** alleging violations of those statutes' 'deceptive' prongs (and not premised on FDCA). *Id.* ¶¶ 205-214 (FDUTPA) ("COA 8"); ¶¶ 235-248 (ILCFA) ("COA 10").

Notably, Plaintiffs' claims alleging deceptive conduct allege liability regardless of whether benzene is present in every bottle, for Defendant's failure to disclose (as required under the FDCA) that the Product *may* contain benzene. Further, many claims—such as those alleging unfair conduct by, *inter alia*, selling an inferior or poor-quality product—allege liability (consistent with FDCA violations) regardless of whether Defendant was required to disclose benzene on the label.

## B.   Defendant's Conduct Also Contravenes FDA Regulations and Guidance

Though Plaintiffs' claims are not brought to enforce the FDCA, the conduct establishing liability under their claims also runs afoul of the FDCA (as well as FLDCA and ILFDCA), FDCA's regulations, and agency guidance. Since (absent discovery) Plaintiffs cannot pinpoint *how* the benzene came to be in the Product, they plead theories (and corresponding regulatory violations) in the alternative. FAC ¶ 33. Plaintiffs allege that the presence of benzene occurred due to being (1) added intentionally; (2) a contaminant; or (3) a leftover impurity. *Id.* ¶ 32. As explained below, under any scenario,[3] Defendant's conduct not only triggers liability under Plaintiffs' causes of

---

[3] Defendant asserts its theories as to the benzene's source, which correspond with theories pled by Plaintiffs, and Defendants do not challenge the allegation that the benzene must have come from one of these three alternatives.

action but likewise is contrary to the FDCA, federal regulations, and agency guidance.

### 1.     The Product is 'misbranded' under the FDCA

The Product is misbranded for numerous reasons under the FDCA,[4] in some instances *regardless* of whether every individual bottle contains benzene. It is similarly misbranded under FLDCA and ILFDCA. *See* Fla. Stat. § 499.007(1), (10); 410 Ill. Comp. Stat. 620/15 (a), (j).

#### (a)     The Product fails to list benzene as an inactive ingredient

The Product is misbranded for failing to list benzene as an 'inactive ingredient.' 21 U.S.C. § 352(e)(1)(A)(iii); FAC ¶¶ 53-63. The regulations treat what constitutes an 'ingredient' slightly differently in the context of labeling (governed by 21 C.F.R. Part 201) or manufacturing (21 C.F.R. Part 210). Part 201 (governing labeling) defines "active ingredient" as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans." 21 C.F.R. § 201.66 (b)(2).[5] "Inactive ingredient means any component other than an active ingredient." 21 C.F.R. § 201.66(b)(8). While 'component' as it is used in Part 201 is not defined, Part 201 specifies that with respect to the final dosage form's label ingredient list, "[t]he term ingredient applies to *any substance in the drug*[.]" 21 C.F.R. § 201.10 (b) (emphasis added).[6]

As FDA recently noted, "[d]rug products only contain 'active ingredients' or 'inactive

---

[4] It is similarly misbranded under the applicable regulations, which state, in part, that an OTC drug "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in [21 C.F.R. §§ 330.1 – 330.15] and each of the conditions contained in any applicable monograph." 21 C.F.R. § 330.1. The general regulations also incorporate the statutory language, providing that a drug is misbranded if it is not "labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act[.]" 21 C.F.R. § 330.1(c)(1).

[5] Plaintiffs allege benzene is *not* an active ingredient (FAC ¶ 62), which Defendant concedes.

[6] While the regulations do not define "substance", FDA guidance on its Inactive Ingredient Database explains that "[i]n order to receive a [Unique Ingredient Identifier], an ingredient must be a 'substance', which is defined as 'Any physical material that has a discrete existence, irrespective of origin.'" FDA, *Inactive Ingredients in Approved Drug Products Search: Frequently Asked Questions*, https://www.fda.gov/drugs/drug-approvals-and-databases/inactive-ingredients-approved-drug-products-search-frequently-asked-questions#contaminants. Benzene has the Unique Ingredient Identifier J64922108F; thus FDA considers benzene a 'substance.' FDA, *Substance Registration System*, https://fdasis.nlm.nih.gov/srs/auto/benzene.

4

ingredients.'"[7] Even if a product is utilized as a manufacturing solvent, if it is still present in the finished drug product, it is a 'substance in the drug' and must be included in the ingredients list. Further, a substance that is present in some bottles, but not all, must still be listed as an 'inactive ingredient' on every bottle (if the manufacturer chooses to use a uniform ingredients list across batches). *Id.* ¶¶ 57-59. In its OTC Labeling Guidance, FDA advises:

> **E. Inactive ingredients: "contains one or more of these ingredients" labeling.**…[T]his type of inactive ingredient labeling can be accomplished best by placing those ingredients that may (or may not) be contained in an OTC drug product in the inactive ingredient listing, as set forth in § 201.66(c)(8), with an asterisk placed next to those ingredients (e.g., acacia*, dextrose*, sucrose, xanthum gum*). The asterisk would then be reprinted at the bottom or end of the inactive ingredient section in the Drug Facts box with the notation …"* may contain this ingredient"[.].

FDA, *Guidance for Industry: Labeling OTC Human Drug Products* (May 2009) at 9, 12-13, avail. at https://www.fda.gov/media/76481/download. The Product is mislabeled since benzene is not listed as a 'may contain' inactive ingredient, but is a 'substance in the drug.'

### (b)   Alternatively, the Product is dangerous when used in the manner and frequency recommended

In the alternative, Plaintiffs allege that even if the label was not required to disclose benzene as an 'inactive ingredient,' the Product is misbranded under the FDCA since "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 352(j); FAC at ¶¶ 64-70. Sunscreen product labels (including Defendant's Product) instruct consumers to apply sunscreen liberally and reapply often. FAC ¶¶ 19, 66; Dkt. No. 44-2 at 7 (Product label). Given the absorption in the blood of sunscreen ingredients, the suggested frequent application of the Product, and the existence of equally therapeutic non-carcinogenic sunscreens, Defendant's Product is misbranded

---

[7]   FDA, *Warning Letter to MB Solutions, LLC* (July 22, 2021), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mb-solutions-llcbiospectrum-cbd-610649-07222021.

under 21 U.S.C. § 352(j). FAC ¶¶ 16-26, 64-68. Defendant—unable to dispute these allegations—relies on a misreading of FDA's *Residual Solvents* guidance, which underscores why benzene should *not* have been used *at all* in the Product (as a solvent or otherwise).

### (c)   Alternatively, the Product's label is otherwise misleading

Plaintiffs alternatively allege that the Product is still misbranded since the label is "false or misleading in any particular." 21 U.S.C. § 352(a)(1); *see also* FAC ¶¶ 46-52. In addition to the benzene (or 'may contain benzene') omission, Plaintiffs also point to Defendant's discretionary marketing of the Product, such as claiming or implying it offers 'maximum' protection. FAC ¶ 51. It is axiomatic that a Product meant to protect against cancer is not offering the 'maximum' protection where it needlessly utilizes a chemical that causes cancer. *Id.*

### 2.   The Product is 'adulterated' under the FDCA

In addition to (or in the alternative to) being 'misbranded' under 21 U.S.C. § 352, Defendant's Product is 'adulterated' under 21 U.S.C. § 351 and related regulations.[8] *See* FAC ¶¶ 72-85. Regardless of whether the benzene was added intentionally, is a residual impurity, or exists due to contamination, the Product is adulterated under the FDCA in numerous ways. **First**, the Product is adulterated as "it consists in whole or in part of any filthy, putrid, or decomposed substance[.]" 21 U.S.C. § 351(a)(1). It consists in part of benzene, a volatile and unstable compound subject to decomposition. FAC ¶ 74. The inherent nature of benzene aside, insofar as the benzene exists as an impurity or contaminant (rather than an intentional ingredient), its presence in the Product exists as a filthy, putrid, and/or decomposed substance. *Id.* ¶ 75. **Second**, if the benzene was not added intentionally to the sunscreen formulation, it follows that the benzene exists due to either contamination or the failure to remove impurities. *Id.* ¶ 77. Under 21 U.S.C. §

---

[8] The Product is also adulterated under the FLDCA and ILFDCA. *See* Fla. Stat. § 499.006(1)-(3) (adulteration provisions substantively identical to FDCA); 410 Ill. Comp. Stat. 620/2.15, 620/14(a)(1), et seq. (same).

351(a)(2)(A), a drug is adulterated "if it has been prepared, packed, or held under insanitary conditions…whereby it may have been rendered injurious to health[.]" Similarly, a drug is also adulterated "if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health[.]" 21 U.S.C. § 351(a)(3).

Insofar as the benzene is a product of contamination, the undisputed discovery of benzene in Defendant's Product evidences that the Product was either manufactured, packaged, or stored under conditions where it, at the very least, *may* have been rendered injurious to health. FAC ¶ 78. This renders the Product adulterated, regardless of whether those conditions resulted in benzene contamination in every single product bottle. *Id.* Alternatively, if the presence of benzene is that of an impurity (left over after its use as a solvent during the manufacturing process), the mere decision to utilize benzene—as opposed to other equally effective, less harmful chemicals— amounts to preparing the Product in a way whereby it *may* be rendered injurious to health, regardless of the impurity level in a particular batch. *Id.* ¶ 79. As FDA's guidance states, benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity."[9] Alternatively, Defendant's failure to utilize adequate procedures to screen for contaminants or remove impurities amounts to preparing the Product in a way that may be rendered injurious to health.

In a third alternative, 21 U.S.C. § 351(a)(2)(B) provides that a drug is also adulterated under the FDCA if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug…has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented

---

[9] FDA, *Guidance for Industry: Q3C Impurities: Residual Solvents* (Dec. 1997), avail. at https://www.fda.gov/media/71736/download, at 6 (emphasis in original) ("FDA Q3C Guidance").

to possess[.]"[10] Insofar as the benzene exists as a contaminant, it follows that it was due to poor quality controls, rendering the Product adulterated. *Id.* ¶ 84. This is true regardless of whether the benzene exists in every particular product batch. Notably, Defendant's competitors have issued recalls following Valisure's testing, acknowledging that contamination should not have happened.

### 3.      The Product is an illegal unapproved new drug under the FDCA

The Product is also an unapproved new drug in violation of the FDCA. 21 U.S.C. § 355h sets forth the requirements for marketing nonprescription OTC drugs without an approved new drug application, and OTC drugs failing to meet those requirements are rendered unapproved new drugs marketed in violation of 21 U.S.C §§ 355(a) and 331(d). Among those requirements are that the OTC drug is "in conformity with the requirements for nonprescription use of [any applicable] final monograph[11] [and] the general requirements for nonprescription drugs" provided at 21 C.F.R. § 330.1h(a)(1)(A)(i). The Product fails to comply with the general requirements for nonprescription drugs in various ways. **First**, as explained herein, one or more of the portions of 21 C.F.R. § 330.1 (those dealing with misbranding and adulteration) were violated by Defendant. *See supra* fn. 4 (discussing 21 C.F.R. § 330.1(c)(1)) and fn. 10 (discussing 21 C.F.R. §§ 330.1(a), (f)). **Second**, the Product does not meet the general requirement that it "contains only suitable inactive ingredients which are safe in the amounts administered[.]" 21 C.F.R. § 330.1(e). There are thus two requirements: safety and suitability. As described *supra*, Plaintiffs pled facts—

---

[10] Similarly, the general OTC drug regulations provide that they must be "manufactured in compliance with current good manufacturing practices, as established by [21 C.F.R.] parts 210 and 211." 21 C.F.R. § 330.1(a); see also 21 C.F.R. § 330.1(f) ("[t]he product container and container components meet the requirements of [21 C.F.R.] § 211.94"). "The failure to comply with any regulation set forth in [Parts 210 and 211] in the manufacture, processing, packing, or holding of a drug shall render such drug to be adulterated under [21 U.S.C. § 351(a)(2)(B)]." 21 C.F.R. § 210.1(b).

[11] The 'applicable monograph' for sunscreen is OTC Monograph M020, which combines 21 C.F.R. part 352 and 21 C.F.R. 201.327 into one order and includes minor technical amendments to facilitate the combination thereof. *See* FDA, *Final Administrative Order OTC000006, Over-the-Counter Monograph M020: Sunscreen Drug Products for Over-the-Counter Human Use* (Sep. 24, 2021), avail. at https://www.accessdata.fda.gov/drugsatfda_docs/omuf/OTCMonograph_M020-SunscreenDrugProductsforOTCHumanUse09242021.pdf ("Sunscreen Order"), at 1-2.

conforming with FDA guidance—that benzene is not safe. Safety aside, benzene is also an unsuitable inactive ingredient because it does not provide a beneficial formulation function. FAC ¶ 93. *See* FDA Warning Letter, *supra* fn. 7 ("[a] suitable inactive ingredient generally provides a beneficial formulation function, such as a tablet binder or preservative, or improves product delivery"). Alternatively, even if the benzene were 'safe' in the amount administered and served a beneficial purpose, it is still unsuitable because safer alternatives exist.[12] FAC ¶¶ 93-94. Therefore, Defendant's Product is an unapproved new drug in violation of 21 U.S.C §§ 355(a) and 331(d).[13]

## II.   ARGUMENT

### A.   The Court Should Not Consider the FOIA Documents

#### 1.   Extrinsic Evidence is Improper in This Context

The Court should not consider the exhibits attached to Defendant's motion to dismiss related to Defendant's FOIA request and the FDA's inspection of Valisure, including the McCurdy Declaration and Exhibits A through E (collectively "FOIA Documents"). When the court is deciding a Rule 12(b)(6) motion to dismiss, "all factual allegations in the complaint must be taken as true and construed favorably to the plaintiff." *LaBounty v. Adler*, 933 F.2d 121 (2d Cir. 1991). "Rule 12(b)(6) does not give the district court authority to consider matters outside the pleadings; it simply delineates the procedures which must be followed in testing the legal sufficiency of a complaint." *Id*. The Court "may only consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference, or matters of which the court may take judicial

---

[12] *See, e.g.,* FDA, *Guidance for Industry: Limiting the Use of Certain Phthalates as Excipients in CDER-Regulated Products* (Dec. 2012), https://www.fda.gov/media/83029/download ("Phthalates Guidance"), at 4 ("Although the current available human data are limited, the Agency has determined that there is evidence that exposure to DBP and DEHP from pharmaceuticals presents a potential risk of developmental and reproductive toxicity. While it is recognized that drug products may carry inherent risks, DBP and DEHP are used as excipients, and safer alternatives are available. Therefore, the Agency recommends that you avoid the use of DBP and DEHP as excipients in CDER-regulated drug and biologic products.").

[13] The Product is likewise an unapproved new drug in violation of the FLDCA and ILFDCA. *See* Fla. Stat. § 499.023; 410 Ill. Comp. Stat. 620/17.

notice." *Est. of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 199 (D. Conn. 2007).

Defendant never petitioned the court to take judicial notice of the FOIA Documents, nor would judicial notice have been appropriate. Further, the FOIA Documents were not in Defendant's possession until their litigation counsel procured them. Accordingly, these documents are not part of the record established in or attached to the pleadings. Neither the FOIA Documents—nor the underlying request establishing the scope of the documents sought—has been produced to Plaintiffs, resulting in an imbalance of information. Though the Second Circuit has acknowledged limited circumstances in which extrinsic evidence may be considered on a Motion to Dismiss, "a necessary prerequisite for that exception is that the 'plaintiff *rel[y]* on the terms and effect of [the] document in drafting the complaint…mere notice or possession is not enough.'" *Glob. Network Communications, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002)). Where this exception has been applied, it most often relates to "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which …was not attached to the complaint." *Id.* at 157. Here, the extrinsic evidence presented by Defendant is not a contract or any other sort of legal document imposing obligations on the Plaintiffs. Nor do Plaintiffs "rely on the terms" of the FOIA Documents in drafting the complaint. Indeed, Plaintiffs were entirely unaware of the existence of such documents at the time of the drafting of the complaint and did not have notice of nor possess the documents, much less "rely on the terms" of same.

Defendant advances a flawed argument via footnote that its claims fall within the scope of Rule 12(b)(1) in an effort to insert its extrinsic evidence. But "[w]hen [a] Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the 'Pleading')," the district court is solely tasked with determining "whether the

Pleading alleges facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotations omitted). Where a Rule 12(b)(1) motion is based in law (i.e., standing) and not in contradiction of fact, extrinsic evidence is improper and cannot be considered by the court. *Id.* at 57. In the present motion, Defendant's arguments are entirely facial and based entirely upon law. Defendant does not advance any fact-based argument contradicting Plaintiffs' claims. Rather, Defendant improperly inserts extrinsic evidence to challenge the legal issue of standing.

### 2. Impropriety Aside, Defendant Mischaracterizes the FOIA Documents, which are also Irrelevant

Even if the Court determines that extrinsic evidence is permissible, Defendant mischaracterizes and misrepresents the information contained within the FOIA Documents. Nothing in those documents casts any doubt—by FDA or otherwise—that benzene was detected in the Product, the crux of Plaintiffs' claims. The documents are a red herring, nothing more.

Defendant's arguments rest on the fact that Valisure does not follow the FDA's Current Good Manufacturing Practices (cGMP) standards. But Valisure is an independent testing laboratory not subject to FDA regulation, as Valisure is not a drug manufacturer. Dkt. No. 44-1 at 46-50. Valisure does not engage in "manufacturing practices," is not subject to cGMP, is not cGMP certified, and does not offer any cGMP-related services. *Id.* Defendant also omits the fact that Valisure is an International Standards Organization (ISO) certified chemical testing laboratory.[14] Defendant did not include Valisure's ISO accreditation certificate or mention this accreditation in its motion. Despite Valisure attaching the certificate as Exhibit 1 to its response letter, Defendant did not include this certificate in the exhibits to its motion. *See* Mot., Ex. D at 3.

---

[14] Valisure, LLC is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017. *See Certificate of Accreditation*, https://www.pjview.com/clients/pjl/viewcert.cfm?certnumber=19766.

Further, nothing in the FOIA Documents suggests that benzene was not detected in Defendant's product, nor that Valisure's procedures are improper. Rather, the FDA's inspection report and letter to Valisure merely indicate that Valisure is not qualified to *manufacture* drugs under the cGMP. But Valisure is a testing laboratory and does not manufacture drugs, and FDA's authority does not extend to independent laboratories. *See* Mot. Ex. D at 2. Valisure's testing laboratory is analytical in nature, as opposed to regulatory, performing "screens" as opposed to product-specific cGMP tests. *See id.* at 1. Defendant has cherry-picked words and phrases from the FOIA Documents in order to make its argument, while ignoring those sections that would undermine its position. This mischaracterizes the FOIA Documents and distorts the factual reality of Valisure's letter and analyses. Defendant's mischaracterization cannot stand, especially at this procedural posture, in which all facts in the Complaint are accepted as true and all inferences drawn in Plaintiffs' favor. *Lunney v. U.S.*, 319 F.3d 550, 554 (2d Cir. 2003).

### B.    Plaintiffs Have Article III Standing

#### 1.    Plaintiffs Adequately Allege Injury-in-Fact

Plaintiffs allege a concrete and particularized injury-in-fact in the form of economic injury. "While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms." *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 453 (E.D.N.Y. 2013) (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 291 (3d Cir.2005)). When plaintiffs allege overpayment for a consumer good that was deceptively labeled, such allegations "easily suffice to meet the requirements for constitutional standing." *Patane v. Nestle Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 380 (D. Conn. 2018) (Meyer, J.). Here, Plaintiffs allege that "[n]o reasonable consumer, including Plaintiffs, would have purchased the Product had they known it was adulterated, misbranded, contained benzene or *may* have contained benzene" (FAC ¶ 113) (emphasis original); that Plaintiffs, specifically, "would not have purchased the Product on the same

12

terms—or at all—if they knew that the Product contained or potentially contained benzene" (*id.* ¶ 145); and that accordingly they "suffered injury in fact and lost money as a result of Defendant's misleading representations and omissions" (*id.* at ¶ 115). *See, also, id.* at ¶¶ 104, 108, 111, 115-116, 141-142, 155, 211, 245.

In an analogous context involving mislabeled bottled water, this Court found that plaintiffs alleged a concrete and particularized economic injury when they stated that they would not have paid for, or paid less for, the defendant's bottled water: "Plaintiffs allege that they relied on Nestlé's representation that Poland Spring water was '100% Natural Spring Water,' and because of this reliance they paid a higher price for Poland Spring water than they would have paid for alternative water products. …The facts alleged plausibly establish an injury-in-fact." *Patane,* 314 F. Supp. 3d at 380; *see, also Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 453-54 (E.D.N.Y. 2013) ("[P]laintiffs state that they purchased Ester–C based on its representations as to immune support, and that '[h]ad [they] known the truth that the statements [they] relied on were false, misleading, deceptive, and unfair, [they] would not have purchased Ester–C or paid the premium price'…This is a sufficient economic injury for purposes of clearing standing's injury bar."); *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 525 (S.D.N.Y. 2018) (standing established where plaintiffs relied on defendant's labeling representations, which "'resulted in the purchase of [the] products,' now allegedly worthless because they are '[i]n reality,...unsafe.'"); *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *15 (E.D.N.Y. July 18, 2013) ("[P]laintiffs allege that they purchased vitamin water because the product labels and defendants' marketing led them to believe this beverage was healthier for them than it actually was, or than other beverages would have been. Under the applicable case law, this is sufficient to confer standing."). The same analysis applies here.

Defendant further challenges Plaintiffs' standing on the grounds that not *all* of its Products contain benzene, but this ignores the fundamental problem: Defendant concedes (as it must) that

13

*some* lots of Defendant's Product contain benzene, and it is unknown *which* of Defendant's bottle

of Product do contain benzene and which do not. Had Plaintiffs known that there was a risk that

the bottle of Product they were buying contained this carcinogen—*i.e.*, had Defendant's label not

contained misrepresentations or omissions—they would have avoided that purchase. This is not

irrational, nor is it a decision fueled by speculation or conjecture. When faced with the option of

either (1) buying a product that potentially contains a known poison, or (2) buying a comparable

product without that risk, a reasonable consumer can be expected to make the latter purchase.

Defendant avers that "Plaintiffs have not alleged the Products they purchased actually

contained benzene," but the only way for Plaintiff to make this determination is either for

Defendant to conduct testing of all of its lots and release those findings—which Defendant has

declined to do, to date[15]—or else for Plaintiffs to send their own bottles of Product off for testing

in a lab. This means that in order for Plaintiffs to be certain that their Products are safe to use, they

would have to spend hundreds of dollars or more for forensic testing of bottles of sunscreen that

retail below ten dollars. This only underscores the economic loss Plaintiffs suffered in buying a

Product that they cannot know is safe to use absent conducting their own clinical testing.

### 2.      Plaintiffs Have Standing to Pursue an Injunction

Defendant's challenge to Plaintiffs' request for injunctive relief is equally meritless. The

Second Circuit recognizes that "threatened harm in the form of an increased risk of future injury

may serve as injury-in-fact for Article III standing purposes," *Baur v. Veneman*, 352 F.3d 625, 633

(2d Cir. 2003), and further holds such injuries are cognizable "where the plaintiff alleges actual

future exposure to that increased risk," *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir.

2016). *See also Baur*, 352 F.3d at 633–35, 640–42 (2d Cir. 2003) (plaintiff had standing to seek

---

[15] It is not credible for Defendant to cast Plaintiffs' claims as "hypothetical, speculative, or uncertain" (Mot. at 10), when Defendant itself has recalled its Product in other countries. *See* fn. 2, *supra*.

injunction to stop defendants from butchering non-ambulatory cows because of plaintiff's enhanced risk of mad cow disease as a consumer of beef); *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (likelihood of exposure to sulfur dioxide emissions qualifies as injury-in-fact). Plaintiffs "allege[d] actual future exposure" to risk of harm from the Product. *Nicosia*, 834 F.3d at 239. The Complaint establishes that each Plaintiff routinely purchases sunscreen, in order to protect against increased risk of cancer. *See*, FAC ¶¶ 101-111. Plaintiffs allege they "continue to have use for sunscreen products" (*id.* at ¶ 131), "they want to purchase the Product in the future" (*id.* at ¶ 118), and absent injunctive relief in the form of accurate labeling, "would not be able to know or trust that Defendant will truthfully and legally label the Product." *Id*.

Admittedly, the Second Circuit most recently stated that "[w]hether plaintiffs seeking injunctive relief for consumer deception have standing where they allege that they would buy the products in the future if not mislabeled is unsettled in this Circuit." *Axon v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701, 703 (2d Cir. 2020). But District courts in the Second Circuit have found standing to pursue injunctive relief at a lower threshold than this. For example, in *Ackerman*, plaintiffs asserted claims under New York and California consumer protection statutes, arguing that the defendant's "vitaminwater" product was misleading in promoting health benefits. 2013 WL at 7044866. The defendant challenges the plaintiffs' standing to seek injunctive relief since "the named plaintiffs are now aware of vitaminwater's sugar content and have stopped drinking it." *Id*. at *15, n. 23. The court disagreed, holding that "courts have consistently held that plaintiffs have standing to seek injunctive relief based on the allegation that a product's labeling or marketing is misleading to a reasonable consumer." *Id.* (collecting cases). There, as here, "defendants' allegedly deceptive conduct is ongoing [and] Plaintiffs seek to be relieved from defendants' misleading and deceptive practices in the future…This is the harm New York's and California's

consumer protection statutes are designed to redress." *Id.* In comparable litigation, the court in *Belfiore v. Procter & Gamble Co*. held that the plaintiff had standing to enjoin the defendant from using the term "flushable" on the label of its product, despite the fact that "it is unlikely he will re-purchase the product again." 94 F. Supp. 3d 440, 445 (E.D.N.Y. 2015).

Here, Plaintiffs go further and allege they *would* purchase Defendant's Product in the future, were they able to know that the label is truthful. FAC ¶¶ 118, 131. "[I]f magic words are required, then the fact that each Plaintiff 'would continue to purchase the Products in the future' if the misleading labeling is corrected…is sufficient to demonstrate an intent to purchase products in the future that subjects them to future harm." *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 397–98 (S.D.N.Y. 2016). The brunt of Defendant's authority is therefore distinguishable, as it rests on facts where plaintiffs did not claim they were likely to repurchase the offending product. For example, *Nicosia* concerned plaintiff's purchase of a weight loss product (called "1 Day Diet") containing a controlled substance that had been removed from the market, on the website of defendant Amazon. 834 F.3d 220, 239 (2d Cir. 2016). In affirming the district court's ruling that the plaintiff did not have standing to pursue an injunction, the Second Circuit held "Amazon has ceased selling 1 Day Diet on its website, and Nicosia has failed to allege that he intends to use Amazon in the future to buy *any* products, let alone food or drug products generally or weight loss products in particular." *Id*. (emphasis original). *Nicosia* does not stand for the proposition that such allegations are insufficient for standing to pursue an injunction—it holds that the *absence* of such allegations means that a plaintiff may not seek injunctive relief. *Id*. Here, Plaintiffs have alleged a non-speculative intent to buy the challenged Product in the future, and *Nicosia* is inapposite, as well as *Kommer v. Bayer Consumer Health*, 252 F. Supp. 3d 304, 309 (S.D.N.Y. 2017) ("Plaintiff essentially concedes that he will not buy the [challenged product]")

16

and *Chang v. Fage USA Dairy Indus., Inc.*, 2016 WL 5415678, at *5 (E.D.N.Y. Sept. 28, 2016) ("Plaintiffs…have not alleged that they will purchase the…Products in the future.").[16]

Defendant's remaining authority misreads Second Circuit law, which does *not* hold that allegations of future purchase fail to confer injunctive standing. *See,* Mot. at 12 (citing *Atik v. Welch Foods, Inc.*, 2016 WL 5678474, at *6 (E.D.N.Y.) and *In re Edgewell Personal Care Co. Litig.*, 2018 WL 7858623, at *16 (E.D.N.Y. Sept. 4, 2018)). Instead, *Nicosia* suggests that the opposite is true and that the FAC's allegations are sufficient. Plaintiff asserts that the better-reasoned outcome is reached in *Ackerman*, *Belfiore*, *Delgado,* and *Goldemberg*, discussed *supra*, and their progeny. *See, e.g., Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 542 (E.D.N.Y. 2017) (citing to *Belfiore* and holding "Public policy, as well as precedent" militates in favor of standing).

## C.      Plaintiffs' Claims Are Not Preempted

"Federal law may preempt state law in various ways. Sometimes Congress expressly preempts state law by statute, and other times state law may be impliedly preempted if Congress has occupied an entire field or if a state law somehow conflicts with or…stands as an obstacle to the purpose of a federal law." *Patane v. Nestle Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 384 (D. Conn. 2018) (citations omitted). "When addressing federal preemption questions, the Second Circuit has long presumed that Congress does not cavalierly pre-empt state-law causes of action[.]" *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quotations omitted). A court "'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* "'In light of this assumption, the party asserting that federal law preempts state law bears the burden of

---

[16] The facts in *King v. Rell* are yet more distinguishable: following the close of briefing, the plaintiff died. 2008 WL 792818, at *2 (D. Conn. Mar. 20, 2008) "At the risk of stating the obvious, [plaintiff] is no longer in danger of suffering a future harm." *Id*.

establishing preemption.'" *Id.* "The presumption against federal law preempting state law is particularly strong when Congress legislates in a field traditionally occupied by states." *Id.* "Given the traditional primacy of state regulation of matters of health and safety…courts assume that state and local regulation related to [those] matters…normally coexist with federal regulations." *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009).

### 1.     Plaintiffs' Claims are not Expressly Preempted

Defendant argues "Plaintiffs' state law claims…would impose state law requirements expressly preempted under § 379 of the FDCA" by "impos[ing] liability…for labeling its product in the fashion required under FDCA[.]" Mot. at 17. Under that provision, states may not establish "any requirement…that is different from or in addition to, or that is otherwise not identical with, a requirement under the [FDCA.]" 21 U.S.C. § 379r(a). Defendant points to: (a) the warning and content labeling requirements found in 21 C.F.R. §§ 201.66 and 201.327 (Mot. at 17-21); (b) 21 U.S.C. § 352(e)'s 'ingredients list' label requirement (*id.* at 21-22); (c) FDA's Q3C Guidance (*id.* at 22-23), and (d) FOIA documents regarding an FDA inspection of Valisure (*id.* at 13-17).[17] However, both categories of Plaintiffs' claims (those relating to disclosures and those that do not) do not impose any requirements beyond those imposed by the FDCA.

### (a)     Plaintiffs' 'disclosure claims' do not seek to impose any requirement incompatible with FDCA's labeling requirements

A number of Plaintiffs' causes of action relate to Defendant's failure to disclose that the

---

[17] Defendant also brings attention to the Sunscreen Order. Mot. at 20-21. The Sunscreen Order does not supplant the statutory provisions and regulations cited in § I(B) herein, nor does it represent the entire universe of applicable regulations. Rather, its section entitled "Scope" provides that "[a]n over-the-counter (OTC) sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets each condition in this OTC monograph ***and*** each general condition established in 21 CFR 330.1." Sunscreen Order § M020.1-Scope (emphasis added). Thus, the Sunscreen Order acknowledges that a sunscreen product can meet each condition in the Sunscreen Order and nevertheless not generally be recognized as safe and effective and not misbranded if it fails to meet each general condition established in 21 C.F.R. § 330.1. Further, the scope of the Sunscreen Order does not reach adulteration, and its labeling provisions are largely focused on SPF efficacy ratings.

Product contains or may contain benzene; namely, COAs 1-2, 4, 6 (in part), 8, and 10. *See supra* § I(A). Defendant *could have* complied with both state law and the FDCA had it disclosed (on the ingredients list) that the Product contained or may contain the inactive ingredient benzene. *See supra* § I(B)(1)(a).[18] Therefore, these claims do not impose a requirement 'different from or in addition to' any FDCA requirement. Also, the FDCA did not oblige Defendant to make label claims that it offered the "maximum" protection; indeed, this claim runs afoul of FDCA's general prohibition against false or misleading claims. *See supra* § I(B)(1)(c); *see also* FAC ¶ 51.

As explained above (§ I(B)(1)(a)), since benzene is a 'substance' in some but not all finished dosage forms of the sunscreen products, the FDCA regulations required Defendant to include benzene as a 'may contain' inactive ingredient on every product bottle. Defendant's failure to do so is an omission that independently gives rise to Plaintiff's state law disclosure claims. With respect to these claims, Plaintiffs have adequately alleged facts that, if true, would require the inclusion of benzene as an 'inactive ingredient' on the Product label. Defendant does not dispute that benzene is a substance in some but not all of the Product, and instead makes three arguments. **First,** Defendant presents extrinsic evidence that purportedly establishes that "[b]enzene is neither an active or inactive ingredient in Plaintiffs' Products." Mot. at 21 (citing Tobias Declaration at ¶¶ 7.a, 7.j, 8). However, this extrinsic evidence is nothing more than Ms. Tobias' declaration that "[t]he front and back labels of this product do not list benzene as an active or inactive ingredient." Tobias Decl. at ¶ 8. This argument does not warrant a response. **Second,** Defendant argues that benzene cannot be an inactive ingredient because it does not meet 21 C.F.R. Part 210's definition

---

[18] *See also* FAC ¶¶ 135 (COA 1: "Defendant omitted material facts, including that the Product contained benzene [or] may contain benzene"); 144 (COA 2: Defendant "issued written warranties by representing that the Product was sunscreen that contained only those active and inactive ingredients listed on the Product's labels"); 161 (COA 4: "Defendant represented in writing that the Product consisted of the active and inactive ingredients on the Product labels"); 208 (COA 8: "Defendant engaged in deceptive conduct in violation of FDUTPA when it made omissions regarding benzene (or, alternatively, the potential for benzene)"); 238 (COA 10, same).

of "component" since the benzene "was never intended for use in the manufacture of the

Products[.]" Mot. at 21. As an initial matter, this argument has no factual basis beyond a conclusory

statement in a legal brief. Ms. Tobias (tellingly) says no such thing, and Defendant elsewhere in

the brief argues at length that benzene *was* utilized as a solvent in the manufacture of the Product.

*See, e.g.,* Mot. at 19 (claiming Defendant cannot include warnings "relating to the possible

presence of trace amounts of residual solvents (like benzene)"). The Complaint alleges (in the

alternative to contamination) that Defendant either intentionally put benzene in the finished dosage

form or utilized it as a solvent during the manufacturing process. FAC ¶¶ 32, 70, 75, 79, 166. Even

if this Court accepted a conclusory briefing statement as extrinsic evidence, Defendant's argument

still fails. As explained above (§ I(B)(1)(a)), the pertinent definitions regarding 'inactive

ingredient' are found in 21 C.F.R. Part 201, which governs labeling. While Part 201 defines

"inactive ingredient" as "any component other than an active ingredient", it does *not* define

component. Rather, Part 201 specifies that with respect to the final dosage form's label, "[t]he term

ingredient applies to *any substance in the drug*[.]" 21 C.F.R. § 201.10(b) (emphasis added). FDA

considers "benzene" a substance. *See supra* fn. 6. FDA also notes the distinction between inactive

ingredients that appear in the final dosage form versus those that do not. In explaining the scope

of its Inactive Ingredient Database, FDA notes that "[o]nly inactive ingredients *in the final dosage

forms* of drug products are in this database."[19]

Defendant incorrectly points to the definitions found in 21 C.F.R. Part 210, which relate

---

[19]  FDA, *Inactive Ingredients in Approved Drug Products Search: Frequently Asked Questions*, https://www.fda.gov/drugs/drug-approvals-and-databases/inactive-ingredients-approved-drug-products-search-frequently-asked-questions#how%20to%20use (emphasis added). The database also does not include those inactive ingredients that are considered contaminants. *Id.* Nor does it include inactive ingredients that are not "present in FDA-approved drug products." FDA, *Guidance for Industry: Using the Inactive Ingredient Database*, avail. at https://www.fda.gov/media/128687/download, at 1. Further, the database only includes those inactive ingredients where "no safety concerns have been identified." *Id.* at 3. Benzene is not listed in the database. *See* https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm.

not to labeling but to manufacturing processes. Defendant focuses on the definition of "component" found in Part 210, which means "'any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product.'" Mot. at 21 (quoting 21 CFR 210.3 (b)(3)). However, that provision specifically provides that "[t]he following definitions of terms apply to this part [Part 210] and to parts 211, 225, and 226 of this chapter." 21 CFR 210.3(b). Those parts deal with manufacturing processes, *not* labeling, which is the focus of Part 201. To apply Defendant's definition of 'component' to labeling would mean Defendant would have to include on the label substances used while manufacturing the Product that don't even make it into the final dosage form, which makes no sense. **Third**, Defendant argues that the "[p]roducts are in compliance with the FDA standard that allows up to 2 ppm of benzene in the Products." Mot. at 22. As explained below, this is not true. But even if it were, it would not relieve Defendant of its obligation to include benzene as an inactive ingredient. Ingredient labels exist so consumers can make informed decisions, regardless of whether FDA deems those ingredients safe.

### (b) Plaintiffs' 'non-disclosure claims' do not seek to impose any requirement beyond what FDCA already required of Defendant

A number of Plaintiffs' causes of action allege liability regardless of whether benzene was included on the label; namely, COAs 3, 5, 6 (in part), 7, and 9.[20] *See supra* § I(A). Defendant's disclosures aside, Plaintiffs were harmed by receiving a product that was of poor quality and/or presented unnecessary health risks by containing benzene or manufactured in a way subjecting it to contamination. *See* FAC ¶¶ 149, 166, 184, 198, 226. Defendant *could have* avoided liability under these theories and complied with FDCA (aside from labeling) had it sold a Product that was neither dangerous when used in the manner and frequency recommended, nor adulterated, nor

---

[20] Many of these causes of action do allege deceptive conduct as an alternative basis for liability. Those are not preempted for the reasons provided in the previous section.

comprised of unsafe and/or unsuitable ingredients. *See supra* §§ I(B)(1)(b), I(B)(2), and I(B)(3). As explained below, an FDA guidance prohibits the use of benzene as a solvent. Plaintiffs' state law claims do not impose a requirement 'different from or in addition to' any FDCA requirement.

As explained above (§ I(C)(1)(b)), the product is misbranded under FDCA since "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 352(j). According to FDA, benzene, as a Class I solvent, is "known to cause unacceptable toxicities [and] should be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment." FDA Q3C Guidance at 2. Benzene serves no therapeutic purpose and is not necessary. FAC ¶¶ 197, 225.

The Product is also 'adulterated' under 21 U.S.C. § 351 and the implementing regulations. *See supra* § I(B)(2). The Product: (a) consists in part of a filthy or decomposed substance; (b) was prepared or held in a way whereby it *may have* been rendered injurious to health; and/or (c) was not manufactured or held in a way to ensure it did not contain contaminants and/or unpermitted residual solvents. *See id; see also* FAC ¶¶ 72-85.

Finally, the Product violates 21 C.F.R. § 330.1(e) in two ways. *See supra* § I(B)(3). First, benzene is an inactive ingredient which is not safe in the amounts administered. *See id.*; *see also* FAC ¶¶ 91, 94. Second, its safety aside, benzene is an unsuitable inactive ingredient because it does not provide a beneficial formulation function. *See id*; *see also* FAC ¶ 93. Alternatively, it is unsuitable because safer alternatives are available. *See id.*; *see also* FAC ¶ 94.

Defendant makes two preemption arguments with respect to Plaintiffs' non-disclosure claims. Defendant contends that benzene is not an inactive ingredient, which Plaintiffs have addressed above. Defendant, citing FDA's Q3C Guidance, also argues that the "[p]roducts are in

compliance with the FDA standard that allows up to 2 ppm of benzene in the Products." Mot. at 22. This argument fails for a number of reasons. **First**, the FDA Guidance "does not create or confer any rights for or on any person and does not operate to bind FDA or the public." FDA Q3C Guidance at 1. For this reason, courts routinely find that FDA guidance documents do not have preemptive effect. *See, e.g., In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *10 (E.D.N.Y. Aug. 29, 2013) ("non-binding [FDA] guidance is not entitled to preemptive effect"); *McNulty v. Polar Corp.*, 2020 WL 5658667, at *4 (S.D.N.Y. Sept. 23, 2020) (FDA notice "cannot preempt Plaintiff's claims additionally because it is non-binding guidance without preemptive effect"); *Ault v. J.M. Smucker Co.*, 2014 WL 1998235, at *3 (S.D.N.Y. May 15, 2014) ("general, informal FDA guidance is not controlling"). While the Second Circuit has not directly addressed the issue, it has noted that while FDA Guidance is persuasive, it "is not binding on this Court[.]" *Ignacuinos v. Boehringer Ingelheim Pharms. Inc*, 8 F.4th 98, 104 (2d Cir. 2021). **Second**, even if the Court were to give it preemptive effect, the Guidance does not 'allow up to 2 ppm of benzene in the Products.' Due to its carcinogenic nature, FDA considers benzene as a "Class 1 Solvent" that "should not be employed in the manufacture of drug substances."[21] The Guidance actually *forbids* manufacturers from using benzene as a solvent in where its use is not unavoidable, stating:

### IV. LIMITS OF RESIDUAL SOLVENTS (4)

#### A. Solvents to Be Avoided (4.1)

Solvents in Class 1…should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1, unless otherwise justified.

FDA Q3C Guidance at 6. Since numerous sunscreens were tested to contain no benzene, its use is

---

[21] Appendix I to FDA Q3C Guidance, avail. at https://www.fda.gov/media/71737/download, at 5.

not unavoidable, and Defendant by its own admission has violated the FDA Guidance on the issue.[22] **Third**, even if the Guidance allows up to 2 ppm of benzene in the Products, this only relates to the *safety* requirement for inactive ingredients. As explained above (§ I(B)(3)), benzene is also an unsuitable inactive ingredient because it does not provide a beneficial formulation function and is therefore not permitted under 21 C.F.R. § 330.1(e). **Finally**, even if the Guidance allows up to 2 ppm of benzene, that only relates to benzene that is present as a residual impurity. It does *not* apply to benzene that was either added intentionally to the formulation or exists due to contamination (two of the alternative theories advanced by Plaintiffs). Residual solvents, by contrast, are "chemicals that are used or produced in the manufacture of drug substances or excipients, or in the preparation of drug products [that] are not completely removed by practical manufacturing techniques." FDA Q3C Guidance at 1.

### (c) The FOIA documents do not preempt Plaintiffs' claims.

Relying primarily on documents obtained via FOIA, Defendant asserts that Plaintiffs' claims are expressly preempted because crediting Valisure's testing for the presence of benzene would purportedly "subject Defendant to standards 'different from' and 'not identical' to FDA testing standards." Mot. at 13-17. First, for the reasons stated above, the FOIA Documents should be excluded as improper extrinsic evidence that are irrelevant and mischaracterized by Defendant. Second, even if the Court were to consider the FOIA Documents *and* construe them as undermining Valisure's testing methodology, the question for purposes this motion to dismiss is not *how* Valisure's testing was conducted, or the *amount* of benzene detected, but rather the underlying result: the presence of benzene in the Products, which Defendant does not dispute.

---

[22] Notably, after Valisure tested its personal care products, Procter & Gamble recalled all lots of its body sprays in which it detected levels of benzene above 0.1 ppm, a level that is 1/20th of what Defendant purports is an FDA standard. *See* P&G, Brief in Support of Mot. to Transfer, MDL No. 3025, Dkt. No. 1-1, at 1, 3. Many of Defendant's Products, including those purchased by the named Plaintiffs, exceeded 0.1 ppm.

Plaintiffs do not allege that Valisure sought to replicate any FDA standards relating to cGMP. To the contrary, and unlike the cases cited by Defendant,[23] Plaintiff does not challenge the labeling accuracy of the Products based on the *level of* any listed ingredient or advertised efficacy. Rather, Plaintiffs allege that benzene exists in at least some batches of the Product (either by design or as an impurity or contaminant), rendering the Products "misbranded" and/or "adulterated." Defendant cannot meet its heavy burden of showing that Plaintiffs' allegations are preempted for failing to allege testing in compliance with FDA testing standards. *See* Mot. at 15. FDA's cGMP standards as set out in 21 C.F.R. parts 210 and 211 *only* govern the FDA's testing of samples to determine compliance with relevant regulations. The method by which the FDA determines whether it should bring an enforcement action does not govern whether Plaintiffs adequately allege violations of consumer protection laws—which is the only issue before this Court.[24]

Even if the standard under which Valisure tested certain lots of Defendant's Products was relevant here, other courts disagree with Defendant that specific compliance with FDA testing is a pleading requirement at the motion to dismiss stage. *See, e.g.*, *Jackson-Mau v. Walgreen Co.*, 2019 WL 5653757, at *2 (E.D.N.Y. Oct. 31, 2019) ("independent testing results … are sufficient to

---

[23] *See Forouzesh v. CVS Pharm., Inc.*, 2019 WL 652887 (C.D. Cal. Feb. 15, 2019) (alleging false and misleading labeling of sunscreens based on independent testing that revealed lower than advertised SPF protection); *Anglin v. Edgewell Personal Care Co.*, 2018 WL 6433324 (E.D. Mo. Dec. 7, 2018) (same); *Melendez v. ONE Brands, LLC*, 2020 WL 1283793 (E.D.N.Y. Mar. 16, 2020) (alleging false and misleading labeling of nutrition bars based on independent testing that showed higher than advertised sugar content); *Mee v. 1 A Nutrition, Inc.*, 2015 WL 2251303 (N.D. Cal. May 13, 2015) (alleging false and misleading labeling of dietary supplements based on independent testing that showed lower than advertised protein levels). Defendant's reliance of this line of cases is misplaced. Here, Plaintiffs allege that the harmful carcinogen benzene does not appear anywhere on the relevant Product labels. FAC ¶ 29. How that occurred is a question to be determined on the merits and not at the pleading stage.

[24] Even assuming that FDA testing standards were somehow relevant here, the FDCA does not preempt all suits involving FDA-regulated products. *Warren v. Whole Foods Market Group, Inc.*, 2021 WL 5759702, at *3 (E.D.N.Y. Dec. 3, 2021). Rather, it preempts only suits that "depend entirely upon[] an FDCA violation." *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 369 (E.D.N.Y. 2010). Claims "premised on conduct that would give rise to liability under traditional common law principles" remain viable. *Id.* Plaintiffs not suing for a violation of the FDCA alone may "incorporate" reference to FDCA violations into their suit. *Id.* Here, as discussed above, Plaintiffs bring claims under various state consumer and warranty theories and are not seeking to enforce any federal statute or regulation. FAC ¶ 37. Plaintiffs' claims would exist even absent the FDCA's enactment.

survive dismissal if they allow the court to reasonably infer the defendant's liability"); *In re Herbal Supplements Mktg. & Sales Practices Litig.*, 2017 WL 2215025, at *12 (N.D. Ill. May 19, 2017) (accepting plaintiff's non-FDA-compliant testing at the motion to dismiss stage and noting that defendants are "free to challenge the efficacy of [the] testing later in the litigation"); *Gubala v. CVS Pharmacy, Inc.*, 2016 WL 1019794, at *11-15 (N.D. Ill. Mar. 15, 2016) (holding defendants were on sufficient notice of the claims they faced despite the complaints not alleging test results based on FDA required standards); *Smith v. Allmax Nutrition, Inc.*, 2015 WL 9434768, at *7 (E.D. Cal. Dec. 24, 2015) (holding that plaintiff's non-conforming testing is merely intended to allow the court to "infer that tests conducted in compliance with the [FDA's] 12-sample methodology would support Plaintiff's allegations that the Product is mislabeled").[25] This line of reasoning applies here and should preclude any finding of preemption because Plaintiffs *do not* allege that Valisure's testing methodology complied with FDA testing standards. Interpreting 21 C.R.F. parts 210 and 211 as a pleading requirement violates the presumption against preemption and effectively forecloses redress. *See Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 798 (N.D. Cal. 2015) (when considering whether a plaintiff's state law claims are expressly preempted under the FDCA, "the Court typically must 'accept the reading that disfavors pre-emption,' if such a reading is plausible.") (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76–77 (2008)). The independent testing alleged by Plaintiffs is enough to establish that, in fact, it is more than plausible that Defendant's Product suffered from benzene contamination. This conclusion is strengthened by the disturbing fact—uncontested by Defendant—that the Products contain a harmful carcinogen.

### 2.    Plaintiffs' Claims are not Impliedly Preempted

---

[25] Discussing preemption based on FDCA testing protocols, a Ninth Circuit panel advised that "plaintiffs are generally not expected to provide evidence in support of their claims at the pleading stage." *Dunford v. Muscle Pharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018).

Defendant also contends (with little argument) that Plaintiffs' claims are impliedly preempted. Mot. at 23. Where "the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede state laws must be clear and manifest." *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Defendant points to no evidence of such intent other than noting that the FDA regulates the Product. Mot. at 23. Further, there is no conflict preemption since it is not "impossible for [Defendant] to comply with both state and federal requirements." *Gen. Elec. Co.*, 496 U.S. at 80. As discussed at length herein, Defendant could have avoided liability under state law had it complied with various provisions of FDCA it violated or followed FDA's Q3C Guidance.

### 3. Plaintiffs are not Bringing a Private Enforcement Action

Defendant argues this suit is an FDCA enforcement action in disguise. And because the FDCA authorizes only the United States to enforce its provisions, FDCA preempts Plaintiffs' suit. However, Since the FAC does not rely entirely on FDA guidance, Plaintiffs' suit is not preempted. The principle that "enforcement of the FDCA is the sole province of the FDA" is "well established." *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig*., 701 F. Supp. 2d 356, 369 (E.D.N.Y. 2010). The FDCA, though, does not preempt all suits involving FDA-regulated products, but only suits that "depend entirely upon[ ] an FDCA violation." *In re Bayer Corp*., 701 F. Supp. 2d at 369. Claims "premised on conduct that would give rise to liability under traditional common law principles" remain viable. *Id*. So long as plaintiffs are not suing for a violation of the FDCA alone, they may "incorporate" reference to FDCA violations into their suit. *Id*. Plaintiffs' claims sound in traditional state tort law and thus are not preempted. *See, e.g., id.; Dayan v. Swiss-Am. Prod., Inc*., 2017 WL 1214485, at *4 (E.D.N.Y. Mar. 31, 2017); *Warren v. Whole Foods Mkt. Grp., Inc.*, 2021 WL 5759702, at *3 (E.D.N.Y. Dec. 3, 2021).

### 4. Plaintiffs' Claims are not Barred by the Doctrine of Primary

### Jurisdiction

The doctrine of primary jurisdiction should not be applied to Plaintiffs' claims in this matter. Defendant's contention that "[f]ederal law bars Plaintiffs' claims," (Mot. at 24) is without merit as the dispute in this matter is not a "technical area in which the FDA has greater expertise." *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 95 F. Supp. 3d 284, 292 (D. Conn. 2015). Instead, the claims hinge on whether the Products' labeling is truthful and non-deceptive, and whether the misrepresentations alleged by Plaintiffs are material to reasonable consumers. "[E]very day courts decide whether conduct is misleading.'" *Id.* As this district determined in *Langan*, the case "'is far less about science than it is about whether a label is misleading,' and the reasonable-consumer inquiry upon which…the claims in this case depend[] is one to which courts are eminently well suited, even well versed.'" *Id.* (internal quotes omitted). The primary jurisdiction doctrine "is usually not applied 'when the issue at stake is legal in nature and lies within the traditional realm of judicial competence.'" *Goldemberg*, 8 F. Supp. 3d at 476 (quoting *Goya Foods, Inc. v. Tropicana Prods., Inc*., 846 F.2d 848, 851 (2d Cir. 1988). Consistent with other opinions that considered and rejected the primary jurisdiction doctrine in similar cases, it should be rejected here. *See e.g., Langan,* 95 F. Supp. 3d at 292 (declining to apply primary jurisdiction doctrine in sunscreen case because determining whether a manufacturer misled consumers and violated state consumer laws with its sunscreen labeling); *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1376 (S.D. Fla. 2015) (declining to apply primary jurisdiction doctrine in sunscreen case because "[d]etermining whether a manufacturer has misled consumers is squarely within the judicial function."); *Corra v. Energizer Holdings, Inc.*, 962 F. Supp. 2d 1207, 1216 (E.D. Cal. 2013) (declining to apply primary jurisdiction doctrine in a sunscreen case where "[t]he gravamen of Plaintiff's claims is that Defendants violated consumer protection statutes by marketing their sunscreen products in a false and/or misleading manner").

The Second Circuit directs this Court to make a case-specific determination about whether to dismiss or stay based on the doctrine of primary jurisdiction, generally considering these factors: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *Ellis v. Tribune Television Co.,* 443 F.3d 71, 82–83 (2d Cir. 2006). Although Defendant attempts to muddy the analyses here, the central question is simply whether the Products' labels are deceptive or misleading. This District addressed similar questions in *Goldemberg* and *Langan,* and in both cases, rejected defendants' primary jurisdiction arguments.

While the labeling of sunscreen "is particularly within the agency's discretion," Defendant's claim that the FDA "clearly intends to update its regulation of OTC sunscreen products" (Def MTD at 26) ignores that the FDA is *highly unlikely* to address the presence of benzene in sunscreen in its regulations. Even Defendant acknowledges in its motion that benzene "was never intended for use in the manufacture of the Products." *Id.* at 21. Important to analyzing the second factor is the FDA's failure to mention benzene at all in its September 27, 2021 proposed order. Instead, the order addresses the safety of the existing "eight sunscreen active ingredients" and requests additional information on those ingredients.[26] The FDA's silence on benzene, thus, confirms that the second factor weighs against applying the primary jurisdiction doctrine.

Considering the low likelihood of new FDA regulations addressing the presence of benzene in sunscreen, and the FDA's omission of it in its recent proposed order, the third factor militates against a stay or dismissal based on primary jurisdiction doctrine. The FDA's discretion over

---

[26] https://www.govinfo.gov/content/pkg/FR-2021-09-27/pdf/2021-20780.pdf.

labeling "does not mean that courts should indefinitely refrain from hearing claims that sunscreen manufacturers and sellers are making deceptive and misleading statements in violation of state law. Invoking the primary jurisdiction doctrine under these circumstances 'would do little more than protract matters.'" *Langan*, 95 F. Supp. 3d at 293; *see also Goldemberg,* 8 F. Supp. 3d at 477-78 (declining to apply primary jurisdiction doctrine in light of evidence that FDA does not wish to determine the meaning of "natural"); *Fagan v. Neutrogena Corp.*, 2014 WL 92255, at *1 (C.D.Cal.2014) (similar claims not barred by the doctrine of primary jurisdiction); *Ackerman,* 2010 WL 2925955, at *14 ("[D]eferral to the FDA is unlikely to result in a timely resolution of plaintiffs' claims")). Moreover, the relief sought by Plaintiffs is "backward looking" yet regulations and orders from the FDA would be directing *future* Product labeling and production practices.

Finally, the fourth factor the Second Circuit considers, "whether a prior application to the agency has been made," might weigh in favor of applying the primary jurisdiction doctrine based upon the Valisure Citizen Petition if not for the different questions and relief being sought. Plaintiffs allege reasonable consumers would be deceived by the Product's labeling and seek damages and restitution, but the Valisure Citizen Petition seeks, *inter alia*, the creation of new regulations, revision of industry guidance, and recall of contaminated products. The fourth factor weighs against applying the primary jurisdiction doctrine.

Based upon the Second Circuit's advice that the doctrine of primary jurisdiction has a "relatively narrow scope," *Goya Foods, Inc.*, 846 F.2d at 851, and consideration of each of the factors as discussed above and outlined in *Ellis,* 443 F.3d at 82–83, Defendant's request for a stay or dismissal under the primary jurisdiction doctrine should be denied.

## D.  Plaintiffs Have Sufficiently Stated Plausible Claims

### 1.  Plaintiffs Satisfy Rule 9(b)'s Pleading Standard

Defendant incorrectly argues Plaintiffs fail to satisfy Rule 9(b)'s heightened pleading standard as to their fraud by omission claim (COA 1), their FDUTPA claims (COA 6-8), and their ILCFA claims (COA 9-10). Mot. at 27-29. To the extent Rule 9(b) actually applies,[27] Defendant mischaracterizes the standard and ignores key allegations that detail "the specific who, what, when, where and how of the alleged fraud." *ArtSkills, Inc. v. Royal Consumer Prods., LLC*, 2018 WL 6304348 at *5 (D. Conn. Dec. 3, 2018) (quotations omitted).  Rule 9(b) requires only that Plaintiffs "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the context of a fraudulent omission claim, Plaintiffs are required to (1) detail the omissions they consider fraudulent; (2) identify the person obligated to speak; (3) state where and when the omissions were made; and (4) explain why the omissions are fraudulent. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 158, 187 (2d Cir. 2004). Plaintiffs clearly identify the speaker—Defendant—and its ongoing omissions (its failure to disclose the Product contains or may contain benzene). The omissions were made on the Product's label, at all relevant times, including at the time of Plaintiffs' purchase. *Id.* at ¶ 103 ("there was no disclosure on the label…that the Product contained benzene or may have contained benzene"), ¶ 107 (same), ¶ 111 (same). The omissions were fraudulent because testing determined the Product contains—or risks containing—benzene. *Id.* at ¶¶ 27-29, 53-63. Defendant's demand for further specificity is inconsistent with the nature of Plaintiffs' claims. Rule 9(b)'s general requirements are less stringent when the plaintiff, as here, alleges fraud by omission. *See Bonfield v. AAMCO Transmissions, Inc.*, 708 F. Supp. 867, 875 (N.D. Ill. 1989) ("[l]ike Sherlock Holmes' dog that did

---

[27] Not all of Plaintiffs' claims are subject to Rule 9(b). Of the claims Defendant is challenging here, only COA 1, 6, 8, and 10 could be characterized as "sounding in fraud," in that they pertain (at least in part) to Defendant's failure to disclose that the Product contains or may contain benzene. COA 7 and 9 do not pertain to Defendant's failure to disclose, but rather, Defendant's unfair conduct in selling a product that was of poor quality and/or presented unnecessary health risks by containing benzene or manufactured in a way subjecting it to contamination.

not bark in the night, an actionable omission obviously cannot be particularized as to 'the time, place and contents of the false representations' or 'the identity of the person making the misrepresentation.'") (*superseded by statute on other grounds* in *Lewis v. Hermann*, 775 F. Supp. 1137, 1153 (N.D. Ill. 1991)). Moreover, "when the transactions are numerous and take place over an extended period of time, less specificity is required." *In re Sunrise Sec. Litig*., 793 F. Supp. 1306, 1312 (E.D. Pa. 1992); *Onesti v. Thomson McKinnon Sec., Inc*., 619 F. Supp. 1262, 1265 (N.D. Ill. 1985); *U.S. ex rel. Johnson v. Shell Oil Co*., 183 F.R.D. 204, 206 (E.D. Tex. 1998) ("[I]t has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied.").

Defendant argues Plaintiffs' allegations fail under Rule 9(b) with respect to the details surrounding their purchase of the Product. Mot. at 28-29. However, Rule 9(b) is directed to allegations of *Defendant's* misconduct, not *Plaintiffs'* behavior. Plaintiffs' own actions are not alleged to constitute fraud and need not be pleaded with particularity. With respect to all facts not "constituting fraud," the operative pleading standard is Rule 8(a). *See Michaels Bldg. Co. v. Ameritrust Co., N.A*., 848 F.2d 674, 679 (6th Cir. 1988) ("Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony."). But even assuming the circumstances pertaining to Plaintiffs' purchase must be pled with particularity, Plaintiffs' allegations are adequate. Plaintiffs identify the particular product each of them purchased, the location and general time of the purchase, the retailer (with respect to Plaintiffs Barba and Rudy), the reason for their purchases, and the significance of Defendant's lack of disclosure on their purchase. FAC ¶¶ 101-11. Plaintiffs' allegations demonstrate they each read the label, as they would not have purchased the Product had it been disclosed that "any amount of benzene was or risked being contained in the Product." *Id.* ¶¶ 104, 108, 111.

Defendant further argues Plaintiffs fail to allege facts supporting the claim that Defendant was aware the Product may contain benzene. Mot. at 29. However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally." Fed. R. Civ. P. 9(b). In any event, "knowledge of a deceptive act is not required to state a claim under FDUTPA." *Lewis v. Mercedes-Benz United States*, 530 F. Supp. 3d 1183, 1232 (S.D. Fla. 2021). Nor is it a requirement of ILCFA. *See Ciampi v. Ogden Chrysler Plymouth*, 262 Ill. App. 3d 94, 111 (1994) (ILCFA "eliminated the requirement of scienter; thus even innocent misrepresentations are actionable as statutory fraud"). With respect to Plaintiffs' fraud by omission claim, Defendant argues Plaintiff failed to demonstrate it had actual awareness of the presence of benzene (as opposed to imputed knowledge). Mot. at 29 (*citing Bartone v. Robert L. Day Co., Inc.*, 232 Conn. 527, 533 (1995)). However, Plaintiffs expressly allege Defendant was "aware of the presence (or, alternatively, the significant risk thereof) of benzene in the Product." FAC at ¶ 26.

### 2.      Plaintiffs' Claims Meet the Reasonable Consumer Standard

Plaintiffs' allegations satisfy the reasonable consumer standard under both FDUTPA and ILCFA, as a reasonable person standing in Plaintiffs' shoes likely would have been misled.[28] *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (Under FDUTPA, "the plaintiff must show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances) (quotations omitted); *Stemm v. Tootsie Roll Indus., Inc.*, 374 F. Supp. 3d 734, 740 (N.D. Ill. Mar. 19, 2019) ("Courts apply a 'reasonable consumer' standard in evaluating the likelihood of deception" in an ILCFA case). Under both statutes, this is a question of fact for the jury to determine, and it is not properly decided on a motion to dismiss. *Nature's Prods., Inc. v.*

---

[28] Only COAs 6, 8, and 10 are subject to the reasonable consumer standard because they involve Defendant's failure to disclose that the Product contains or may contain benzene. Again, COAs 7 and 9 do not pertain to Defendant's failure to disclose, but rather, Defendant's unfair conduct.

*Natrol, Inc.*, 990 F. Supp. 2d 1307, 1322 (S.D. Fla. 2013) ("[w]hether [specific] conduct constitutes an unfair or deceptive trade practice [under FDUTPA] is a question of fact"); *Biffar v. Pinnacle Foods Grp., LLC*, 2016 WL 7429130, at *4 (S.D. Ill. Dec. 26, 2016) (the question of whether a reasonable consumer would be misled by under ILCFA "is a question of fact that cannot be resolved on a motion to dismiss"). A court can only dismiss a complaint for failure to state a claim where it can "conclude as a matter of law that members of the public are not likely to be deceived" by the labeling. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008). Defendant's failure to disclose that the Product contains or may contain benzene could mislead a reasonable consumer into believing that this carcinogen was not present nor could be present.

Defendant argues that consumer fraud actions premised failure to disclose the presence of a "trace" amount of a harmful substance fail to meet the reasonable consumer standard as a matter of law. Mot. at 30-31. This is belied by the weight of authority holding otherwise. *See, e.g., Tran v. Sioux Honey Ass'n, Coop*, 2018 WL 10612686, at *5 (C.D. Cal. Aug. 20, 2018) (holding that reasonable consumer "may interpret '100% Pure' to mean that the final product does not contain any substance (*even in trace amounts*) that is not essential to the honey, particularly synthetic substances") (emphasis added); *Friends of the Earth v. Sanderson Farms, Inc*., 2018 WL 7197394, at *3 (N.D. Cal. Dec. 3, 2018) (holding that reasonable consumer may believe that "100% Natural" and "no additives or artificial ingredients" could also mean no synthetic pharmaceuticals are used *at all* in the entire production process); *Organic Consumers Ass'n v. Bigelow Tea Co*., 2018 D.C. Super. LEXIS 11, at *11 (D.C. Super. Ct. Oct. 31, 2018) (denying motion to dismiss plaintiff's claim that consumers may be misled by "natural" ingredients containing residue of non-ingredient substance).[29]

---

[29] Defendant's case law is distinguishable. In *Axon v. Citrus World, Inc*., 354 F. Supp. 3d 170 (E.D.N.Y. 2018), the plaintiff alleged that the brand name of an orange juice product, "Florida's Natural," was deceptive because the juice

Defendant argues that, because benzene is not an ingredient in the Product and because the amount of benzene detected in the Product does not exceed the 2 ppm threshold permitted by the FDA, no reasonable consumer would believe that the Product would be free of any amount of benzene. As previously discussed herein, the assumptions underpinning this argument are without merit. *See supra* § I(B)(1)(a) (FDCA regulations do indeed require Defendant to include benzene as a 'may contain' inactive ingredient); *see also supra* § II(C)(1)(b) (the FDA Guidance *does not* allow up to 2 ppm of benzene in the Product nor carries the force of law). In any event, a reasonable consumer's expectations are not necessarily informed by FDA regulations. *Victor v. R.C. Bigelow, Inc.*, 2014 WL 1028881, at *17 (N.D. Cal. Mar. 14, 2014) ("the ultimate question in…[consumer] fraud claims is what a reasonable consumer expects, which may have absolutely no relation to FDA regulations"); *Guzman v. Polaris Indus.*, 2021 WL 2021454, at *4 (C.D. Cal. May 12, 2021) ("[t]he 'reasonable consumer' standard does not require consumers to be lawyers with an encyclopedic knowledge of statutes and regulations to rely on warning labels"). Whether a reasonable consumer is misled my Defendant's conduct is a question for the jury.

### 3.      The FDUTPA Safe Harbor Is Inapplicable

Plaintiffs' claims under FDUTPA (COA 6), unfair acts and trade practices (COA 7), and deceptive conduct (COA 8) are not foreclosed by FDUTPA's safe harbor provision, which protects a defendant from being held liable for an "act or practice required or specifically permitted by

---

contained glyphosate residue. *Id.* at 182-83. The court found it implausible that a reasonable consumer would believe the product could not contain a trace amount of glyphosate "[g]iven the widespread use of herbicides." *Id.* at 183. Here, it is inconceivable for a reasonable person to believe there is widespread use of benzene in the manufacturing of sunscreen products, especially given the majority of sunscreen products tested by Valisure did not contain detectable levels of benzene. *See* FAC at ¶ 30. The *Axon* court further noted it *would* be misleading for the defendant to have "introduced unnatural ingredients" as opposed to merely "containing trace amounts of a commonly used pesticide." 354 F. Supp. 3d at 183. That is the case here, as Plaintiff has advanced the alternative theories that benzene was either added intentionally to the formulation or existed due to contamination. FAC at ¶ 32. The court in *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241 (S.D.N.Y. 2019), reached the same findings as *Axon* and is distinguishable for the same reasons. Defendant's reliance on *Young v. Johnson & Johnson*, 2012 U.S. Dist. LEXIS 55192 (D.N.J. Apr. 19, 2012) is further unavailing because it was decided on preemption, not the reasonable consumer standard.

federal or state law." Fla. Stat. § 501.212(a). Defendant claims the safe harbor provision applies because, purportedly, it was not required under federal law to place a benzene warning on the Product and because the FDA permits up to 2 ppm of residual solvents to be present in the finished Product. Mot. at 32. As discussed extensively herein, Defendant is wrong on both points. Since benzene is a 'substance' in some but not all finished dosage forms of the sunscreen products, the FDCA regulations *required* Defendant to include benzene as a 'may contain' inactive ingredient on every product bottle. *See supra* § II(C)(1)(a). Moreover, the FDA Guidance *does not* allow up to 2 ppm of benzene in the Product and, even if it did, the FDA Guidance does not carry the force of law, as it "does not create or confer any rights for or on any person and does not operate to bind FDA or the public." *See supra* § II(C)(1)(b). Thus, Defendant's conduct is not permitted, but actually prohibited under federal law,[30] and FUDTPA's safe harbor provision does not apply.

### 4.    The Express Warranty Claim is Properly Pled

Plaintiffs state a claim for breach of express warranty (COA 2) because the ingredient list constitutes a warranty that the Product consisted exclusively of the ingredients on that list.[31] FAC at ¶¶ 143-46. This warranty was false because benzene was an inactive ingredient omitted from that list. *Id.* at ¶ 144. Plaintiffs would not have purchased the Product had they known the warranty was false, and suffered a loss in the amount of the full purchase price, or alternatively would have

---

[30] Defendant's cases are further distinguishable because they involve scenarios where the defendant's product's label was expressly approved by a federal agency prior to the product's sale in the marketplace—which is not the case here. *See Prohias v. AstraZeneca Pharms., L.P.*, 958 So.2d 1054, 1056 (Fla. Dist. Ct. App. 2007) (safe harbor applies because the promotional and advertising activity attacked in the Complaint is supported by the FDA-approved labeling for NexiumA tm and thus is 'specifically permitted' by federal law"); *Ezcurra v. Monsanto Corp.*, 2020 U.S. Dist. LEXIS 167830, at *14-15 (S.D. Fla. Aug. 7, 2020) ("the language contained on [the product's] label (without any cancer warning) was expressly approved by the EPA and the FDACS"); *Kuenzig v. Hormel Foods Corp.*, 505 F. App'x 937, 938 (11th Cir. 2013) ("labels . . . were approved by FSIS prior to their commercial use").

[31] For purposes of this Opposition, Plaintiffs do not assert that Defendant's breach of warranty stems from its representation that the Product is sunscreen used for sun protection. Accordingly, Defendant's reliance on *Fraser v. Wyeth*, 857 F. Supp. 2d 244 (D. Conn. 2012) and *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 428 (2d Cir. 1969) is inapposite. Plaintiffs' claims are not based on a general affirmation that Defendant's sunscreen was safe but rather that Defendant's ingredient list represents all ingredients within the Product.

paid less for the product. *Id.* at ¶ 145. These allegations satisfy the requisite elements: (1) existence of the warranty; (2) breach of the warranty; and (3) damages proximately caused by the breach. *McConologue v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 93, 114 (D. Conn. 2014).

Defendant wrongly argues Plaintiffs' fail to identify where Defendant expressed a warranty, the precise terms of the warranty, or how they became the basis of any bargain. Mot. at 34. Plaintiffs explicitly allege the written warranty (ingredient list) is "listed on the Product's labels." FAC at ¶ 144. The ingredient list is precise and unambiguous. It is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods [that] becomes part of the basis of the bargain." Conn. Gen. Stat. § 42a-2-313 (1)(a). As discussed herein, the ingredient list must identify every inactive ingredient that may be present in the Product, including benzene, which it does not. *See supra* § I(B)(1)(a). Furthermore, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description"—and the ingredient list is such a description. Conn. Gen. Stat. § 42a-2-313(1). Lastly, the ingredient list is made part of the basis of the bargain because Defendant's warranty that the Product was benzene-free was material to Plaintiffs' purchasing decision. FAC at ¶ 145. Defendant argues the ingredient list does not affirmatively indicate that the only substances on that list are in the Product (Mot. at 34 at n. 20), but cites no case law for this proposition. On the contrary, courts have found that a "reasonable consumer reading such a label would immediately conclude that…a substance not listed in the ingredients…would not be present." *Vanalstine v. Diversified Farms, LLC*, 2021 WL 1711607, at *5 (Mich. Ct. App. Apr. 29, 2021). The *Vanalstine* court accepted the plaintiffs' contention that the ingredient list on a supplement delivered to plaintiffs "would have constituted an express warranty that no significant amount of iodine was

present in the supplement." *Id.*[32] Unlike the cases cited by Defendant,[33] Plaintiffs' express warranty claim is based on a specific statement on every label of the Product.

### 5. Plaintiffs Adequately Allege Their Magnuson-Moss Claim.

Defendant next argues that because Plaintiffs improperly plead an express warranty claim, their claim for relief under the "written warranties" section of the Magnuson-Moss Warranty Act must also fail. Mot. at 36-37. As explained, *supra*, Plaintiffs adequately allege a breach of express warranty and thus their Magnuson-Moss Warranty Act claim also survives dismissal. The Magnuson-Moss Warranty Act is "wholly derivative of any state law claims." *Napoli-Bosse v. Gen. Motors LLC*, 453 F. Supp. 3d 536, 547 (D. Conn. 2020). Thus, if a state-law warranty claim moves forward, the Magnuson-Moss claim also survives. *Id.*

### 6. Unjust Enrichment Is Properly Pled

Unjust enrichment is an equitable doctrine that provides "a broad and flexible remedy" where "in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co*., 231 Conn. 276, 282 (Conn. 1994) (citations omitted). Plaintiffs must prove: "(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiff's detriment." *Id.* at 283 (internal quotation marks omitted). Here, Plaintiffs allege they conferred a benefit upon Defendant by paying for a Product that was unsafe, illegal to sell, and otherwise sold without disclosure that it contains or may contain benzene—and that it is unjust for Defendant to retain such benefit. FAC

---

[32] The court ultimately found there was no express warranty on other grounds, namely, that the defendant was not the party that created the label. *Id.* at *14-15.

[33] Plaintiffs do not contend *Philadelphia Indemnity Ins. Co. v. Lennox Industries, Inc.*, 2019 U.S. Dist. LEXIS 44055 (D. Conn. Mar. 18, 2019), *Lake v. Kardjian*, 874 N.Y.S.2d 751, 755 (N.Y. Sup. Ct. 2008), or *Fisher v. APP Pharmaceuticals, LLC*, 783 F. Supp. 2d 424, 431 (S.D.N.Y. 2011) were wrongly decided, but are distinguishable because the plaintiffs there did not articulate a specific statement constituting the warranty.

at ¶¶ 166-69.

Defendant argues Plaintiffs failed to plead facts showing they did not receive the benefit of the bargain. Mot. at 38. Again, Defendant argues (1) the FDA Guidance permits up to 2 ppm of residual solvents like benzene to be present in the Product, (2) its labeling complied with FDA regulations, and (3) Plaintiffs do not allege the Product was not effective for its intended use (to protect skin from the sun's harmful rays). *Id*. Plaintiffs incorporate by reference their arguments regarding Defendant's mischaracterization of the FDA Guidance, which does not carry the force of law (*supra* § II(C)(1)(b)), and Defendant's violations of FDA regulations (*supra* § I(B)). Defendant's third argument, that Plaintiff *actually received* the benefit of the bargain because the Product worked as intended, ignores Plaintiffs' allegations that Defendant failed to deliver what Plaintiffs believed they would get in return for their payment: a safe product free of benzene or the risk of benzene contamination. *Zeigler v. Sony Corp. of Am.*, 48 Conn. Supp. 397, 405 (Conn. App. 2004) ("It is disingenuous of the defendants to argue that, because the plaintiff got a Sony DVD player, he received the benefit of his bargain when the player he got is alleged to have been defective"). "Because the Court is required to construe the facts alleged in favor of the pleader and because recovery under an unjust enrichment claim is fact driven, a broad reading of [unjust enrichment] arguably supports such a claim." *Id.* Defendant further argues Plaintiffs fail to allege they conferred a benefit directly to Defendant, given Plaintiffs alleged they paid various retailers for the Product, not Defendant. Mot. at 38-39 (citing *Parker v. Colgate-Palmolive Co.*, 2003 WL 22205061 (Conn. Supr. Ct. Aug. 8, 2003); *Granito v. IBM*, 34 Conn. L. Rptr. 485 (Conn. Supr. Ct. 2003); *Layton v. Lester*, 2011 WL 522887 (Conn Supr. Ct. Jan. 21, 2011)). The cases upon which Defendant relies—all trial court level opinions—are not supported by controlling authority. The Connecticut Supreme Court has held unjust enrichment requires only a showing that the defendant was benefited—not that the defendant *alone* was benefited. This Court should follow other courts that have

39

criticized the *Parker* and *Granito* courts for imposing a new requirement onto the claim's list of elements without authority. *See Stefan v. P.J. Kids, LLC*, 2005 WL 834208 at *3 and n.7 (Conn. Supr. Ct. Mar. 1, 2005); *Zeigler*, 48 Conn. Supp. at 404-05. Whether Defendant was benefitted in this case presents a question of fact for the Court in making its equitable determination, *see Hartford Whalers*, 231 Conn. at 283, and Defendant has not shown that under Connecticut law[34] the benefit cannot include income through the stream of commerce.

### E.    Plaintiffs May Seek Restitution

Defendant argues Plaintiffs' request for restitution should be dismissed because there is an adequate remedy at law in the form of damages. Mot. at 39-40 (citing *Campaniello Imports, Ltd. V. Saporiti Italia S.p.A.*, 117 F.3d 655, 662 (2d Cir. 1997)). At this stage in the case, Plaintiffs are permitted to plead remedies in the alternative. See Fed. R. Civ. P. 8(d)(2); *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 902 (2015) (a plaintiff may state "as many separate claims…as it has"). It would be premature for the Court to strike an equitable remedy at this stage. *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 604 (Ill. App. 3d 2005) ("a party may plead claims in the alternative."); *The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 777 F. Supp. 713, 718 (S.D. Ind. 1991) (The "rule that equitable relief may not be granted when adequate legal relief exists does not affect…either type of claim at the pleading stage.").

## III.   CONCLUSION

Defendant's motion should be denied.  Alternatively, leave to amend should be granted.

---

[34] Notably, both Illinois and Florida law have rejected the 'direct-conferral' rule proposed by Defendant. *See Wiegel v. Stork Craft Mfg., Inc.*, 780 F. Supp. 2d 691, 695 (N.D. Ill. 2011) (allowing unjust enrichment claim against manufacturer when product purchased from third-party retailer); *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1326 (S.D. Fla. 2014) (denying motion to dismiss under Florida law where plaintiffs adequately alleged that they "conferred the required direct benefit upon Defendant" by purchasing deceptively marketed Cadillacs, notwithstanding that "the benefit passed through independent dealerships").

January 7, 2022

Respectfully submitted,

**CARNEY BATES & PULLIAM, PLLC**

By:   */s/* David Slade
David Slade (*pro hac vice*)
dslade@cbplaw.com
Hank Bates (*pro hac vice*)
hbates@cbplaw.com
Sam Jackson (*pro hac vice*)
sjackson@cbplaw.com
519 West 7th St.
Little Rock, AR 72201
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*and*

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Gillian L. Wade (*pro hac vice*)
gwade@mjfwlaw.com
Marc A. Castaneda (*pro hac vice*)
mcastaneda@mjfwlaw.com
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Telephone: (310) 396-9600
Facsimile: (310) 396-9635

*and*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (ct27481)
jguglielmo@scott-scott.com
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334

*and*

**CASEY LAW FIRM, LLC**
Ryan Casey (to apply *pro hac vice*)
ryan@rcaseylaw.com

P.O. Box 4577
Frisco, CO 80443
Telephone: (970) 372-6509
Facsimile: (970) 372-6482

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 7, 2022, this document was served on all parties of record via email through the Court's CM/ECF system.

January 7, 2022                    By:    /s/ David Slade