# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRYAN CLINGER and MONICA BARBA, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>EDGEWELL PERSONAL CARE BRANDS, LLC,<br><br>                    Defendant. | Case No. 3:21-cv-01040 (JAM)<br><br>January 21, 2022 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. ARGUMENT……….…………………………………………………………..……..2

    A.    The Court may consider the FDA's Report of Inspection and Valisure's Response under Rule 12(b)(1) because they were properly characterized by Defendant and are relevant to Defendant's standing, preemption, and primary jurisdiction arguments ...................................................................................................... 2

    B.    Plaintiffs Lack Article III Standing and standing to pursue injunctive relief ......... 4

        1.    Plaintiffs lack Article III standing because they do not allege a concrete injury in that they fail to allege the products they purchased contain benzene………………………………………………………………… 4

        2.    Plaintiffs lack standing to pursue an injunction because they did not allege a threat of future harm…………………………………………………..6

    C.    Plaintiffs' claims are preempted and subject to this Court's primary jurisdiction.  8

        1.    Benzene is not an ingredient in the products ............................................. 9

        2.    Plaintiffs' claims seek to impose safety standards that are different than those imposed by the FDA ...................................................................... 12

        3.    Plaintiffs' claims mischaracterize the FDA's Q3C Guidelines……………12

        4.    Plaintiffs' claims are subject to this Court's primary jurisdiction ........... 13

    D.    Plaintiffs have not pled claims upon which relief can be granted under Rule 12(b)(6) ............................................................................................................ 14

        1.    Plaintiffs fail to satisfy the heightened 9(b) pleading standard................ 14

        2.    Plaintiffs' claims do not meet the reasonable consumer standard ............ 16

        3.    Plaintiffs lack statutory standing to pursue their ILCFA claims............... 17

        4.    The FDUTPA Safe Harbor precludes Plaintiffs' FDUTPA claims .......... 17

        5.    Plaintiffs' Express Warranty claim fails because they do not identify the terms of any express warranty ................................................................ 18

        6.    Plaintiffs' unjust enrichment claim fails because they do not allege that they directly conferred a benefit on Defendant........................................ 19

    III. CONCLUSION...................................................................................................... 20

CORE/3006951.0087/172041937.8

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                   **Page(s)**

*Ackerman v. Coca-Cola Co.*,
   2013 WL 7044866 (E.D.N.Y. July 18, 2013)...................................................................5, 8

*Axon v. Citrus World, Inc.*,
   354 F.Supp.3d 170 (E.D.N.Y. 2018) ...........................................................................7, 8, 16

*Bartone v. Robert L. Day Co., Inc.*,
   656 A.2d 221 (Conn. 1995) ...................................................................................................15

*Belfiore v. Procter & Gamble Co.*,
   94 F.Supp.3d 440 (E.D.N.Y. Mar. 25, 2015)..........................................................................8

*Bonfield v. AAMCO Transmissions, Inc.*,
   708 F.Supp. 867 (N.D. Ill. 1989) .........................................................................................15

*Carter v. HealthPort Technologies, Inc.*,
   822 F.3d 47 (2d Cir. 2016).................................................................................................2, 3

*Crichton v. Golden Rule Ins. Co.*,
   576 F.3d 392 (7th Cir. 2009) ...............................................................................................17

*Dimuro v. Estee Lauder Companies, Inc.*,
   2013 WL 12080901 (D. Conn. Nov. 22, 2013) ...................................................................4, 6

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of Ny.*,
   375 F.3d 168 (2d Cir. 2004)..................................................................................................15

*First Capital Asset Mgmt., Inc. v. Brickellbush*, 218 F.Supp.2d 369, 378
   (S.D.N.Y. 2002), *aff'd*, 385 F.3d 159 (2d Cir. 2004)).................................................................2

*Fink v. Time Warner Cable*,
   714 F.3d 739 (2d Cir. 2013)..................................................................................................16

*Fraser v. Wyeth*,
   857 F.Supp.2d 244 (D. Conn. 2012)......................................................................................18

*Friends of the Earth v. Sanderson Farms, Inc.*,
   2018 WL 7197394 (N.D. Cal. Dec. 3 2018) .........................................................................17

*Hughes v. Ester C Co.*,
   930 F.Supp.2d 439 (E.D.N.Y. 2013) .......................................................................................5

*Ignacuinos v. Boehringer Ingelheim Pharms. Inc.*,
   8 F.4th 98 (2d Cir. 2021) ......................................................................................................12

*In re Johnson & Johnson Sunscreen Marketing Sales Practices and Product*
    *Liability Litigation*,
    No. 0:21-md-03015-Singhal ...............................................................................16

*King v. Rell*,
    2008 WL 792818 (D. Conn. Mar. 20, 2008) ........................................................7

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
    2017 WL 985640 (D. Conn. Mar. 13, 2017) ........................................................7

*O'Brien v. Nat'l Prop. Analysis Partners*,
    936 F.2d 674 (2d Cir. 1991).................................................................................15

*O'Neill v. Standard Homeopathic Co.*,
    346 F.Supp.3d 511 (S.D.N.Y. 2018)................................................................5, 7

*Organic Consumers Ass'n v. Bigelow Tea Co.*,
    2018 D.C. Super. LEXIS 11 (D.C. Super. Ct. Oct. 31, 2018) ............................17

*Patane v. Nestlé Waters N. Am., Inc.*,
    314 F.Supp.3d 375 (D. Conn. 2018)...........................................................4, 5, 12

*Powell v. Subaru of America, Inc.*,
    502 F.Supp.3d 856 (D.N.J. 2020) .......................................................................15

*Town of New Hartford v. Connecticut Resources Recovery Auth.*,
    291 Conn. 433 (2009) .........................................................................................19

*Tran v. Sioux Honey Assoc., Cooperative*,
    2018 WL 10612686 (C.D. Cal. Aug. 20, 2018)..................................................17

*VanAlstine v. Diversified Farms, LLC*,
    2021 WL 1711607 (Mich. Ct. App. Apr. 29, 2021) ...........................................19

**Statutes**

21 U.S.C. § 379r(a) ......................................................................................................12

Conn. Gen. Stat. § 42a-2-313(1) .................................................................................18

**Regulations**

21 C.F.R. § 201.10(b) ..................................................................................................10

21 C.F.R. § 201.66 ........................................................................................................9

21 C.F.R. § 201.66(c)................................................................................................9, 11

21 C.F.R. § 210.3 .....................................................................................................9, 10

CORE/3006951.0087/172041937.8

21 C.F.R. § 330.1(e)................................................................................................................12

21 C.F.R. 314.3 .......................................................................................................................10

Fed. R. Civ. P. 12(b)(1)......................................................................................................1, 2, 3

Fed. R. Civ. P. 12(b)(6)....................................................................................................1, 2, 14

CORE/3006951.0087/172041937.8

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendant Edgewell Personal Care Brands, LLC, submits this Reply Memorandum in support of its Motion to Dismiss Plaintiffs' First Amended Complaint, Dkt. #43, pursuant to Fed. R. Civ. P. 8, 9, 12(b)(1), and 12(b)(6). This Court should dismiss Plaintiffs' First Amended Complaint with prejudice because its defects—including that Plaintiffs lack standing, Plaintiffs' claims are preempted, and Plaintiffs fail to state any claims upon which relief can be granted—are fatal to their claims and cannot be cured by amendment. For the reasons set forth below, the arguments in Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss (the "Opposition" or "Opp."), Dkt. #60, fail to address the fatal deficiencies identified in Defendant's Memorandum in support of its Motion to Dismiss (the "Memorandum"), Dkt. #44.

**I. INTRODUCTION**

Plaintiffs' attempts to save their defective claims should be rejected. First, the extrinsic documents from the FDA and Valisure attached to Defendant's Motion to Dismiss may be considered by the Court under Fed. R. Civ. P. 12(b)(1), were not mischaracterized, and are relevant to Defendant's standing, preemption, and primary jurisdiction arguments.

Second, Plaintiffs' allegations of economic injury do not establish injury-in-fact so as to confer Article III standing because Plaintiffs do not squarely allege that their products contained benzene. Without alleging that the products contained the substance that allegedly rendered them worthless and deceptively labeled, Plaintiffs cannot establish a concrete or particularized injury-in-fact. Plaintiffs additionally are not at risk of suffering future harm on the face of their pleadings, meaning they lack standing to pursue an injunction.

Third, Plaintiffs' preemption arguments fail because their interpretation of FDA materials is incorrect. Plaintiffs fail to show how their claims, if successful, would not impose standards on

Defendant different from and greater than those imposed by the FDA, and are thus preempted. Plaintiffs also fail to rebut the argument that their claims fall under the FDA's primary jurisdiction because the FDA is actively regulating in the same area in which they seek to litigate.

Fourth, Plaintiffs' claims should be dismissed under Fed. R. Civ. P. 12(b)(6) for the additional reasons set out in Defendant's Memorandum—including that Plaintiffs' claims do not meet the Rule 9(b) or reasonable consumer standards, Plaintiffs lack statutory standing to pursue their ILCFA claims, Plaintiffs' claims are barred by the FDUTPA's safe harbor, Plaintiffs' do not allege a breach of an express warranty, and Plaintiffs do not allege the direct conferral of a benefit on Defendant necessary to support an unjust enrichment claim.

## II. ARGUMENT

### A.    The Court may consider the FDA's Report of Inspection and Valisure's Response under Rule 12(b)(1) because they were properly characterized by Defendant and are relevant to Defendant's standing, preemption, and primary jurisdiction arguments.

Plaintiffs ask the Court to ignore the FDA's "FOIA Documents", not because their validity is questioned, but because the Court supposedly cannot consider them. Plaintiffs argue that under Rule 12(b)(6), the Court may only consider facts as alleged in the pleadings, documents attached as exhibits or incorporated by reference, or information fit for judicial notice. Plaintiffs argue that because the FOIA documents do not fall in any of those categories, they must be ignored.

This argument fails because Defendant is asking the Court to recognize these documents under Rule 12(b)(1), not 12(b)(6). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *First Capital Asset Mgmt., Inc. v. Brickellbush*, 218 F.Supp.2d 369, 378 (S.D.N.Y. 2002), *aff'd*, 385 F.3d 159 (2d Cir. 2004)). Plaintiffs cite to *Carter v. HealthPort Technologies, Inc.*, 822 F.3d 47, 56 (2d Cir. 2016) to support the proposition that extrinsic evidence bearing on the Court's

2

subject matter jurisdiction should be ignored when a defendant's motion to dismiss is based totally in law "and not in contradiction of fact" and then states that Defendant's arguments are "entirely facial." Opp., p. 11. It is true that when a 12(b)(1) motion is "based solely on the allegations of the complaint . . . the plaintiff has no evidentiary burden[,]" and that any extrinsic evidence in that limited context may be ignored. *Carter*, 822 F.3d at 56. However, Defendant's Motion lodges factual attacks on this Court's subject-matter jurisdiction. The FOIA Documents attached to the Motion support a factual attack on the Court's subject matter jurisdiction via its 12(b)(1) standing and preemption arguments. As *Carter* itself makes clear, "a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." *Id.* at 57. Because Plaintiffs' assertion that Defendant's Rule 12(b)(1) arguments are "entirely facial" is incorrect, their argument that the FOIA Documents constitute improper extrinsic evidence fails.

Plaintiffs also argue that Defendant mischaracterized the Report of Inspection and Valisure's Response and that those documents are irrelevant. First, Defendant accurately summarized the Report—Valisure failed to comply with cGMP requirements, failed to properly calibrate its equipment to detect benzene, and failed to adequately validate or verify its testing methods in accordance with cGMP. Plaintiffs argue Valisure was not required to comply with cGMP requirements, and was certified under a different standard, but the point of Defendant's briefing was to establish Valisure's non-compliance with the FDA's cGMP standards. It is Plaintiffs, not Defendant, that "[distort] the factual reality", Opp., p. 12, by attempting to distract the Court from the simple fact that the FDA found Valisure was mis-calibrating the equipment it used to detect benzene and was not complying with cGMP standards. Second, far from being irrelevant, the documents are evidence that Plaintiffs impermissibly seek to impose testing standards different from the FDA's through state law claims. *See* Memo., pp. 6-7, 14, 27-28.

B.     **Plaintiffs lack Article III standing and standing to pursue injunctive relief.**

1.     **Plaintiffs lack Article III standing because they do not allege a concrete injury in that they fail to allege the products they purchased contain benzene.**

Plaintiffs claim they have pled economic injury adequate to constitute Article III injury-in-fact because they have alleged overpayment for a consumer good that was deceptively labeled. Opp., p. 12. Assuming this is true, it is also true that economic injury cannot be established when Plaintiffs have not alleged that the products they purchased contained the material that renders that product deceptively labeled or denies them the benefit of their bargains. Plaintiffs allege that "[n]o reasonable consumer, including Plaintiffs, would have purchased the Product had they known it was adulterated, misbranded, contained benzene or *may* have contained benzene." Compl., ¶ 113 (emphasis original). What Plaintiffs do not allege *is that the bottles they purchased contained benzene*. Plaintiffs completely ignore this critical distinction because it is fatal to their injury-in-fact argument. Courts in this district have found that a plaintiff does not plausibly allege injury-in-fact when they allege that some products in a product line contained a harmful substance but do not allege that the product *they actually purchased* contained that substance. *See, e.g., Dimuro v. Estee Lauder Companies, Inc.,* 2013 WL 12080901, at *3 (D. Conn. Nov. 22, 2013).

Rather than addressing *Dimuro* or the other authorities cited in Defendant's Memorandum, pp. 7-10, Plaintiffs rely on *Patane v. Nestl*é *Waters N. Am., Inc.*, 314 F.Supp.3d 375 (D. Conn. 2018) (Meyer, J.). In *Patane*, this Court was asked to determine whether consumers had alleged injury-in-fact in a claim against the makers of Poland Spring water on the basis that they labeled their product as "spring water" despite the fact that the water it sold did not meet the FDA's definition of "spring water." *Id.* at 378-79. Consumers argued they had been injured because if they had known the product was not spring water they would not have bought it, and thus suffered economic injury. *Id.* at 379. The Court found that the allegations "easily sufficed" to meet the

injury-in-fact requirement because the consumers alleged they had purchased the water in reliance on the misrepresentation and because "[i]f Nestlé indeed mislabeled its water as plaintiffs claim, it is plausible to conclude that plaintiffs chose to buy Poland Spring water and paid more for it than for non-spring-water alternatives." *Id.* at 380.

The critical distinction between Plaintiffs' claims and *Patane* is that in *Patane* the consumers alleged that not a single bottle of Poland Spring contained "spring water." The logical corollary was that every bottle of Poland Spring purchased by the consumers was falsely labeled. Thus, when the Court was assessing the consumer's allegations of injury, there was no question that "*[i]f* Nestlé indeed mislabeled its water . . .", then the consumer had bought a mislabeled product. *Id.* In this case, no equivalent corollary can be drawn—Plaintiffs do not squarely allege that the individual bottles of sunscreen they purchased contained trace amounts of benzene, or that all bottles of sunscreen contained trace amounts of benzene, and thus cannot allege that they suffered an injury-in-fact because their products were deceptively marketed or worthless. Plaintiffs in this case, unlike the consumers in *Patane*, can only speculate regarding whether trace amounts of benzene below the FDA's standard were even present in the purchased products.[1]

To be clear, Plaintiff is not required to prove their product was deceptively marketed to have suffered injury-in-fact. What a plaintiff must do, and what these Plaintiffs fail to do, is plead that their product actually contained the benzene that renders it mislabeled (as distinct from pleading that their bottles *may* have contained benzene). In this way, Plaintiffs' pleadings are most

---

[1] Plaintiffs cite to out-of-district cases that are all distinguished on the same basis as *Patane*. *See Hughes v. Ester C Co.,* 930 F.Supp.2d 439, 453-54 (E.D.N.Y. 2013) (plaintiffs allege economic harm based on deceptive statements concerning immune support based on effectiveness of a particular ingredient that was indisputably in *every* product); *O'Neill v. Standard Homeopathic Co.,* 346 F.Supp.3d 511, 525 (S.D.N.Y. 2018) (plaintiffs allege economic harm based on fact that the product *they purchased* was recalled by the FDA because of contamination issues); *Ackerman v. Coca-Cola Co*., 2013 WL 7044866, at *15 (E.D.N.Y. July 18, 2013) (plaintiffs allege economic harm based on a misrepresentation that  its product was not merely "another sugary soft drink" based on nutrition facts common across *all* products). In each of these cases, it was pled that every product—and thus necessarily the product purchased by plaintiffs—was deceptively marketed. No similar pleading is made here.

similar to those in *Dimuro*, which were dismissed for plaintiffs' failure to plead that they actually purchased the products they alleged were inefficacious. *Dimuro*, 2013 WL 12080901, at *3.

In lieu of citing case law supporting their standing arguments, Plaintiffs misconstrue Defendant's Memorandum. First, they claim Defendant has "[challenged] Plaintiff's standing on the grounds that not *all* of its Products contain benzene[.]" Opp., p. 13. Again, Defendant does not challenge Plaintiffs on their failure to plead that *all* products contain benzene but rather on their failure to plead that the product*s they purchased* contained benzene. Second, Plaintiffs state "Defendant concedes (as it must) that *some* lots of Defendant's products contain benzene[.]" Defendant has stated that benzene "may be present at extremely low levels" in some Banana Boat® products. [2] It has not conceded that benzene may be in the specific products purchased by Plaintiffs.

Finally, Plaintiffs essentially make a policy argument: that if they must allege that their products actually contained trace amounts of benzene, the only way they could "be certain their Products are safe to use" would be to "spend hundreds of dollars or more for forensic testing of bottles of sunscreen that retail below ten dollars." Opp., p. 14. The idea that plaintiffs must investigate what substances are actually present in their product to be able to plead injury is false. Under *Dimuro* and other authority cited in Defendant's Memorandum, pp. 9-10, all a plaintiff must plead is that that the products they purchased contained the substance that rendered it mislabeled or worthless. Because these Plaintiffs do not plead as much, their claims should be dismissed.

### 2. Plaintiffs lack standing to pursue an injunction because they did not allege a threat of future harm.

Plaintiffs next argue that they have standing to pursue an injunction because they have adequately pled a threat of harm in the form of an increased risk of future injury. Plaintiffs allege

---

[2] *Frequently Asked Questions*, Banana Boat, https://www.bananaboat.com/pages/sun-faq (last accessed January 18, 2022). Additionally, while it is true that Defendant has initiated benzene-related product recalls in Australia and New Zealand, the products recalled are not those Plaintiffs are alleged to have purchased.

they purchased the products, that they "continue to have use" for the products, that they "want to purchase the Product in the future" and that absent an injunctive relief they "would not be able to know or trust that Defendant will truthfully and legally label the Product." Compl., ¶¶ 101-111, 118, 131. Finally, they plead "[w]ithout an injunction, Plaintiffs would be unable to trust Defendant's representations and would not purchase the Product." Compl., ¶ 131.

Plaintiffs allege a hypothetical desire to purchase Banana Boat® products—that *if* injunctive relief is granted, *then* they will purchase the products in the future. "Whether plaintiffs seeking injunctive relief for consumer deception have standing where they allege that they would buy the products in the future if not mislabeled is unsettled in this Circuit." *Axon v. Florida's Nat. Growers, Inc.*, 813 F.App'x 701, 703 n.1 (2d Cir. 2020). However, in- and out-of-district[3] authority cuts against a finding of injunctive relief in this instance. The most on-point case is *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 2017 WL 985640, at *10 (D. Conn. Mar. 13, 2017) (Meyer, J.). There, the Court rejected injunctive standing because plaintiff "now understands the true ingredients of the [sunscreen] products . . . Accordingly, an injunction requiring defendant to remove any misleading claim from the products would be of no benefit to plaintiff personally." *Id.* Plaintiffs in this case request the Court "enjoin Defendant from making misrepresentations and omissions . . . and refrain from producing sunscreen products with benzene[.]" Compl., ¶ 131. But as in *Langan*, even if the products here were deceptively labeled, Plaintiffs are obviously no longer deceived. Thus, an injunction would not benefit them personally, meaning they lack standing. Similarly, in *King v. Rell*, 2008 WL 792818, at *2 (D. Conn. Mar. 20, 2008), the Court rejected injunctive standing because plaintiff, who was deceased, "was no longer in danger of suffering a

---

[3] *See* Defendant's Memorandum, pp. 14-15; *O'Neill v. Standard Homeopathic Co.*, 346 F.Supp.3d 511, 527 (S.D.N.Y. 2018) (holding plaintiffs lack standing to pursue injunctive relief for failure to establish possibility of future harm).

future harm" absent an injunction.[4] Plaintiffs, although not deceased, have also ruled out the possibility of future harm absent an injunction. The out-of-district authority cited by Plaintiffs, on the other hand, is either outdated or inapposite.[5]

Defendant is compelled to note that Plaintiffs' claim to a threat of future harm is belied by their own pleadings as a matter of simple logic. If the Court finds that Plaintiffs have standing to pursue injunctive relief, and if the Court thereafter enters an injunction, Defendant will comply. Plaintiffs will be at no risk of harm in this scenario. If the Court does not enter an injunction, "Plaintiffs . . . would not purchase the Product." Compl., at ¶ 131. Plaintiffs will be at no risk of future harm in this scenario, either. Thus, Plaintiffs by their own pleadings have established their future harm to be not merely abstract or conjectural but, indeed, non-existent. While this surely comes as relief to Plaintiffs, it is black letter law that they cannot maintain standing to seek injunctive relief without a threat of future harm. Because Plaintiffs have by their own pleadings ruled out any such threat, their request for injunctive relief fails.

**C. Plaintiffs' claims are preempted and subject to this Court's primary jurisdiction.**

Plaintiffs' claims are grounded in theories of misrepresentation that require the determination of the following issues, each preempted by federal law: (1) whether benzene should

---

[4] Plaintiffs claim *King* is distinguishable because plaintiff died after the suit was filed, and thus, "At risk of stating obvious, '[plaintiff] is no longer in danger of future harm.'" As obvious as it may be that a deceased individual cannot suffer future harm, it is equally obvious that plaintiffs who have pled that "[w]ithout an injunction, Plaintiffs . . . would not purchase a product", Compl., ¶ 131, are not going to purchase that product, and thus will not be further harmed, without an injunction. A plaintiff at no risk of future harm does not have standing to pursue an injunction, whether because the plaintiff is dead or because they have stated they will not purchase the product again absent an injunction.
[5] In *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, *15 n. 23 (E.D.N.Y. July 18, 2013), the court, citing mainly to California cases, states in a footnote that "courts have consistently held that plaintiffs have standing to seek injunctive relief based on the allegation that a product's labeling or marketing is misleading to a reasonable consumer." This outdated statement of law runs counter to the Second Circuit's observation in *Axon*, 813 F.App'x, at 703, that it is "unsettled" whether plaintiffs have standing to pursue injunctive relief when they allege future harm on a conditional basis as well as in-district authority holding the opposite. The court in *Belfiore v. Procter & Gamble Co.*, 94 F.Supp.3d 440, 445 (E.D.N.Y. Mar. 25, 2015) contains the same statement of law, but chiefly relies on *Ackerman* and California district court cases and thus is similarly outdated. While Defendant acknowledges this line of cases supports Plaintiffs' standing argument on injunctive relief, it submits that in-district authority and the standing requirement that injuries not be conjectural identified in *Axon* cuts decisively against a finding of standing for injunctive relief.

8

be listed as an ingredient or disclosed in a warning on the Products; (2) whether the Products are safe and effective; (3) whether the Products are adulterated, misbranded, or violate the FDCA. Rather than addressing Defendant's arguments on each of these issues, Plaintiffs offer flawed interpretations of relevant FDA authorities.

### 1.      Benzene is not an ingredient in the products.

To avoid preemption, Defendant argues the FDCA not only allows but requires Defendant to "include benzene as a 'may contain' inactive ingredient on every product bottle." Opp., p. 19. To reach this conclusion, Plaintiffs either misread or ignore the relevant regulations, which in truth state the opposite. An ingredient list must list the active and inactive ingredients in a product. 21 C.F.R. § 201.66(c). Under 21 C.F.R. § 201.66, an inactive ingredient is defined as any "component" in the product other than an active ingredient. "Component" is defined as: "any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product." 21 C.F.R. § 210.3. Under this definition, benzene is not a component in the Products because it was not intended for use in their manufacture.

First, Plaintiffs seek to escape this definition of component by asserting that it applies in the manufacturing, but not the labeling, context. This nonexistent distinction is not only unsupported by case law but belied by the FDA's own regulations and materials. The FDA's Center for Drug Evaluation and Research confirms that inactive ingredients are only those intentionally used.[6] Further, the FDA does not distinguish between the definition of inactive ingredient contained in the labeling provisions and those contained in the manufacturing

---

[6]      "Bringing      an      Over-the      Counter      (OTC)      Drug      to      Market"      ("Training Module"):      (https://www.accessdata.fda.gov/scripts/cder/training/otc/topic5/images/factor%205.pdf) ("You should also make sure your inactive ingredients are safe and suitable for your product. Inactive ingredients are described as pharmaceutical necessities and excipients that are used to manufacture drug products. An inactive ingredient is any component of a drug product other than the active ingredient.  Examples are: fillers, tablet lubricants and binders, disintegrating agents, colorants, flavoring agents, preservatives, suspending agents, and sweeteners.")

9

provisions.[7] Finally, the FDA uses the same definition of component in rules relating to new drug product applications, demonstrating that the definition is consistent across the regulations.[8]

Second, Plaintiffs argue that a different definition of ingredient is used in the labeling context by quoting selectively from 21 C.F.R. § 201.10(b). *Compare* Opp., p. 20 ("[t]he term ingredient applies to *any* substance in the drug[.]") *with* 21 C.F.R. § 201.10(b) ("The term ingredient applies to any substance in the drug, whether added to the formulation as a single substance or in admixture with other substances."). Read in full, this provision was not intended to define "ingredient" as "any substance in the drug" but rather intended to clarify that substances intentionally *added* to a formulation must be listed as ingredients. The terms "substance" and "component" are not further defined in § 201.10 because there is no other definition. The FDA has consistently applied one definition across the manufacturing and labeling contexts.

Third, Plaintiffs take out of context a recent statement by the FDA that "[d]rug products only contain 'active ingredients' or 'inactive ingredients.'" Opp. at pp. 4-5. This statement was made in a warning letter admonishing a manufacturer of OTC CBD products for listing CBD as neither an active or an inactive ingredient on the label, but rather in a new category ("other ingredients"). The FDA warned the manufacturer for not properly classifying a substance *intentionally added to the product*; it was emphatically not stating that every substance that *could* be in a product in trace amounts is either an active or inactive ingredient.[9]

Finally, Plaintiffs misinterpret the FDA's OTC Labeling Guidance, wherein the FDA

---

[7] *Id*. Current regulations (21 C.F.R. § 201.66(b)(8) and 210.3(b)(8)) define an "inactive ingredient" as any component other than an "active ingredient." Some typical inactive ingredients act as, among other things: color additives, denaturing agents, dispersing agents, etc.

[8] *See* 21 C.F.R. 314.3 defining "inactive ingredient" as "any component other than an active ingredient" and "component" as "any ingredient *intended for use in the manufacture of a drug product*, including those that may not appear in such drug product".

[9] Food and Drug Administration, *Warning Letter to MB Solutions* (July 22, 2021), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mb-solutions-llcbiospectrum-cbd-610649-07222021 (last accessed January 13, 2022).

provides guidance for when to place an asterisk next to an alternative inactive ingredient.[10] Plaintiffs use this guidance to support the erroneous idea that Defendant is required to list on its labeling any substance that "may (or may not) be contained" in the products. First, this requirement only applies to inactive *ingredients*, which are components intentionally added to the products that are not active ingredients. Second, the quotation itself is in a section pertaining to products that may substitute slightly different inactive ingredients from product batch to product batch to ensure an uninterrupted line of product.[11] In this context, the quoted material is meant to provide an example of what a manufacturer can do to indicate that alternative ingredients may be present in a product or may have been substituted with another alternative equivalent ingredient. All example ingredients provided in the guidance are located in the FDA's Inactive Ingredient Database.[12] Third, the guidance states that "[l]isting too many alternative ingredients could be misleading and may cause consumer confusion" and recommends that manufacturers "provide consumers with the opportunity to learn if an ingredient is in the lot number of the drug product" by including a phone number in the labeling. This statement would make no sense if the FDA believed its guidance applied to unintentionally added substances. Plaintiffs have provided no authority for the idea that the FDA requires Defendant to warn of or list every substance that may or may not be in a product.

Accordingly, Plaintiffs' claims are expressly preempted[13] because they seek to impose

---

[10] Food and Drug Administration, Guidance for Industry: Labeling OTC Human Drug Products (May 2009) at 9, 12-13, avail. at https://www.fda.gov/media/76481/download (last accessed January 16, 2022) advises: **"Inactive ingredients: "contains one or more of these ingredients" labeling.**…[T]his type of inactive ingredient labeling can be accomplished best by placing those ingredients that may (or may not) be contained in an OTC drug product in the inactive ingredient listing, as set forth in § 201.66(c)(8), with an asterisk placed next to those ingredients (e.g., acacia*, dextrose*, sucrose, xanthum gum*). The asterisk would then be reprinted at the bottom or end of the inactive ingredient section in the Drug Facts box with the notation "* may contain this ingredient[.]"

[11] "In such cases, the specific inactive ingredients in the drug products may vary slightly from supplier to supplier: some inactive ingredients may be present in drug products coming from all suppliers while other inactive ingredients may not be present." Acacia, dextrose, sucrose, and xanthum gum are all substitutable binding agents.

[12] Food and Drug Administration, *Inactive Ingredients in Approved Drug Products Database*, https://www.accessdata.fda.gov/scripts/cder/iig/index.cfm (last accessed January 13, 2022).

[13] If not expressly preempted, such claims are also impliedly preempted. *See* Memo., pp. 23. *See also Patane*, 314 F.Supp.3d at 384-89 (finding state law consumer protection claims impliedly preempted under FDCA).

liability on Defendant for not listing "benzene" as an ingredient or not including a warning for potential benzene, actions it could not take under FDA regulations.

### 2. Plaintiffs' claims seek to impose safety standards that are different than those imposed by the FDA.

Whether the product is safe and effective is a question expressly preempted under the FDCA. *See* Memo. at 18-19, 25. Plaintiffs purport to bring claims under the alternative theory that "even if the label was not required to disclose benzene as an 'inactive ingredient,' the Product is misbranded under the FDCA since 'it is dangerous to health …'" *See* Opp., p. 5. Similarly, Plaintiffs alleges the Products are adulterated and in violation of 21 C.F.R. § 330.1(e) because they are "unsafe." Opp., p. 22. Any such violations rooted in the idea that the products are dangerous are enforceable only by the FDA. *See* Memo., p. 25. To the extent Plaintiffs purport to bring safety claims under state law, they effectively seek to impose a zero benzene standard, clearly different from the FDA's standard indicating 2 ppm as the "acceptable amounts of residual solvents in pharmaceuticals for the safety of the patient." *See* ICH Q3C at 3. Any claim depending on the contention that the products are unsafe is expressly preempted. *See* 21 U.S.C. § 379r(a).[14]

### 3. Plaintiffs' claims mischaracterize the FDA's Q3C guidelines.

---

[14] Plaintiffs additionally argue their claims are not preempted because the FDA's Q3C guidelines, which permit up to 2 ppm of benzene in the Products, are not binding on this Court. However, the FDA made clear in an Alert issued on December 23, 2021, that it considers violations of the Q3C 2 ppm threshold to be a violation of the FDCA and the current good manufacturing practice regulations for drugs. *See* Food and Drug Administration, *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs,* https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last accessed January 16, 2021). In that Alert, the FDA indicated that drug products with a benzene level above 2 ppm "should be immediately recalled or not released for distribution". *Id.* "Recall" is defined as the removal from the market of a product that the FDA "considers to be in violation of the laws it administers and against which the agency would initiate legal action." 21 C.F.R. 7.3. Further, when a manufacturer "refuses to undertake a recall requested by the [FDA]", the FDA may proceed with seizure or other court action. 21 C.F.R. 7.40. Even if the Court were to find the guidance non-binding, FDA guidance should be considered persuasive insofar as it comports with FDA regulations. *Ignacuinos v. Boehringer Ingelheim Pharms. Inc.*, 8 F.4th 98, 104 (2d Cir. 2021) ("Although the FDA's guidance is not binding on this Court, it fully comports with the plain meaning of the regulation, and we find it persuasive."). Unlike the facts at issue here, the line of "natural" cases cited by Plaintiffs to undermine the preemptive effect of FDA guidelines do not involve violations of a standard that the FDA considers to violate the FDCA, nor do they involve recall recommendations. *C.f.* Opp., p. 23.

In a final attempt to avoid preemption, Plaintiffs contend that the Q3C guidelines designate benzene as a "Class 1 Solvent" that "should not be employed in the manufacture of drug substances" unless its use is "unavoidable." Opp., p. 23. This invocation of the "unavoidable" standard is a red herring. Q3C guidance distinguishes between Class 1 solvents that are *purposefully used* in production and solvents that *may be produced* as part of the manufacturing process, imposing the "unavoidable" standard in the former case and recommended limits in the latter case[15] Plaintiffs ignore this distinction, instead invoking an incorrect "unavoidable" standard that would apply only if Defendant was purposefully putting benzene in its product, which it is not. The purpose of the Q3C residual solvents guidance is to set non-zero limits for the presence of residual solvents in drug products.[16] The Court, if it allows these claims to proceed, will be in effect overruling the Q3C guidelines by imposing a benzene limit less than 2 ppm.[17]

### 3. Plaintiffs' claims are subject to this Court's primary jurisdiction.

Plaintiffs argue this case is not subject to this Court's primary jurisdiction because, rather than requiring technical analysis of FDA regulations, it in fact presents one "central question" unlikely to be addressed by the FDA: "whether the Products' labels are deceptive or misleading." Opp., p. 29.[18] Plaintiffs acknowledge that sunscreen labeling is "particularly within the [FDA's]

---

[15] "[Class 1 solvents] should be avoided in the production of . . . drug products unless their *use* can be strongly justified in a risk-benefit assessment[.]" ICH Q3C (emphasis added).

[16] Plaintiffs erroneously contend the 2 ppm standard only relates to inactive ingredients. *See* Opp., p. 24. This is unsupported by any authority cited by Plaintiffs.

[17] Support for this interpretation of the 2 ppm limit is found elsewhere. On December 23, 2021, the FDA alerted drug manufacturers to the risk of benzene contamination in certain drugs. Food and Drug Administration, "*FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs*", https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last accessed January 16, 2021). The FDA recommended that manufacturers with drug products with benzene "above 2 ppm" contact a recall coordinator and submit a Field Alert Report. Manufacturers with drug products with benzene "above the limit of detection but below 2 ppm" were asked to contact the FDA and gather additional information. The FDA's use of 2 ppm as a cutoff between recommending a manufacturer take recall-focused actions and recommending a manufacturer merely gather information is evidence of the importance the FDA places on the 2 ppm limit in its Q3C guidelines.

[18] Defendant observes that if this were true, Plaintiffs would not have devoted so many pages to analyzing the FDA regulations implicated herein, see, Opp., pp. 3-8, 17-27, nor crafted a Complaint that excessively cites FDA materials. Plaintiffs' repeated misinterpretations of these materials, *see supra*, provides further evidence that the task of applying them to the questions presented by Plaintiffs' Complaint is best left to the FDA.

discretion," Opp., p. 29, but claim the FDA is "*highly unlikely* to address the presence of benzene in sunscreen in its regulations" because the FDA failed to mention benzene in its September 27, 2021, proposed order addressing sunscreen safety. *Id.* (emphasis original). In addition, the FDA in its Response to the Valisure Citizen Petition issued on November 19, 2021, stated it will respond to the content of the Petition in the future. *See* Dkt. #44-1, Ex. E (FDA Response to Petition). The FDA, far from being "highly unlikely" to address the presence of benzene in sunscreen products, has represented the opposite: that it is conducting "extensive review and analysis" and will respond to the issues raised in the Petition. *Id.*

The idea that the FDA is "*highly unlikely*" to address the potential presence of benzene in sunscreen is further contradicted by the FDA alert issued to drug manufacturers, wherein it recommended that sunscreen products with above 2 ppm benzene should be "immediately recalled or not released for distribution…consistent with the considerations described in ICH guidance." *See*, FDA Alert, *supra*, fn. 15. The FDA explained that as it "evaluates the root cause of benzene contamination in certain drugs, the agency is taking a stepwise approach to address the potential for benzene contamination in marketed drug products…" The FDA requested information and Field Alert Reports from manufacturers concerning benzene in order to "help inform further updates to FDA's approach to limiting benzene levels in drug products, as appropriate." *Id*. Based on these communications, it is clear that additional FDA decision-making in this area is forthcoming. Accordingly, Plaintiffs' claims are subject to the primary jurisdiction of the FDA.[19]

    **D.**    **Plaintiffs have not pled claims upon which relief can be granted under Rule 12(b)(6).**

        **1.**    **Plaintiffs fail to satisfy the heightened 9(b) pleading standard.**

---

[19] Plaintiffs attempt to stave off the FDA's primary jurisdiction by distinguishing between their requested relief, which centers on damages and changes to labeling, and the relief requested in the Citizen Petition, which centers on recalls and eliminating benzene contamination. Opp., p. 30. This distinction fails because the Citizen Petition requests the FDA "effect labeling revisions as needed." Dkt. #44-1, Ex. A (Valisure Citizen Petition).

In response to Defendant's argument that their Complaint lacks the requisite specificity under Rule 9(b), Plaintiffs retreat to the general proposition that "Rule 9(b)'s general requirements are less stringent when the plaintiff, as here, alleges fraud by omission." *See Bonfield v. AAMCO Transmissions, Inc*., 708 F.Supp. 867, 875 (N.D. Ill. 1989). Although Plaintiffs' Rule 9(b) burden is lessened in the fraud by omission context, Plaintiffs must nonetheless "explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of Ny*., 375 F.3d 168, 187 (2d Cir. 2004). Plaintiffs argue "[t]he omissions were fraudulent because testing determined the Product contains—or risks containing—benzene." Opp., p. 31. First, even if testing had determined the Products contain or risk containing benzene, that does not by itself show fraud—fraud requires Defendant to possess actual knowledge of the omitted fact. *Bartone v. Robert L. Day Co., Inc*., 232 Conn. 527, 533 (1995). Second, while under Rule 9(b) knowledge may be averred generally, Plaintiffs still must "plead the factual basis which gives rise to a strong inference of fraudulent intent." *O'Brien v. Nat'l Prop. Analysis Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotations omitted). "An ample factual basis must be supplied to support the charges." *Id.* So although knowledge may be averred generally, the circumstances giving rise to that knowledge must have an "ample factual basis." *Id.* The factual basis provided by Plaintiffs here is anything but ample. Indeed, it is bare: limited to a conclusory allegation that Defendant was "aware of the presence (or, alternatively, the significant risk thereof) of benzene in the Product." Compl., ¶ 137. Plaintiffs' failure to plead any facts (much less ample facts) giving rise to an inference of knowledge of the omitted fact is fatal under Rule 9(b).[20]

---

[20]Plaintiffs concede that its first, sixth, eighth, and tenth causes of action "could be characterized" as sounding in fraud but deny that its seventh and ninth causes of action sound in fraud because those claims pertain to the sale of a product that was contaminated. While both of these actions are framed as "unfair trade practice" claims, many of the unfair trade practices in question amount to accusations of fraud. *See, e.g.*, Compl., ¶ 196, 224 (Defendant "instruct[ed] consumers to regularly apply . . . sunscreen . . . and consumers . . . do so without knowledge that the product is contaminated with a known human carcinogen (or, alternatively, there is a substantial risk thereof).") Although Rule 9(b) is generally not applied to unfair trade practice claims, *Powell v. Subaru of America, Inc.*, 502 F.Supp.3d 856,

### 2.    Plaintiffs' claims do not meet the reasonable consumer standard.

Plaintiffs contend that the reasonable consumer standard "is not properly decided on a motion to dismiss." Opp., p. 33. In the Second Circuit, "it is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have mislead a reasonable consumer[.]" *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). Hence, the Court may find as a matter of law that no reasonable consumer expects a product to contain molecular purity.[21]

In its Memorandum, Defendant cited case law establishing that a reasonable consumer would not be deceived by a plaintiff's failure to disclose "trace" amounts of a harmful substance as a matter of law when the harmful substance is in "widespread use" and the amount of the harmful substance in the product is well below the amount permitted by the FDA. *See* Memo., p. 32. Plaintiffs claim *Axon* is inapposite because the decision there hinged on the observation that a reasonable consumer would not believe an orange juice could not contain an herbicide, "[g]iven the widespread use of herbicides", when the amount was "far below the amount deemed tolerable by the FDA[.]" *Axon v. Citrus World, Inc.*, 354 F.Supp.3d 170, 183 (E.D.N.Y. 2018), *aff'd sub nom. Axon v. Florida's Nat. Growers, Inc.*, 813 F.App'x. 701 (2d Cir. 2020). Here, on the other hand, it would supposedly be "inconceivable for a reasonable consumer to believe there is widespread use of benzene" in the manufacture of sunscreen. Opp., p. 35. Plaintiffs, however, admit that "benzene is regularly found in products such as gasoline, plastics, detergents, pesticides, *drugs*, synthetic fibers, and cigarette smoke." Compl., ¶ 25 (emphasis added). Hence, the same reasonable consumer who knows an herbicide could be present in a fruit juice given the widespread

---

887 (D.N.J. 2020), Defendant contends that because these unfair trade practice claims merely repackage fraud claims, Rule 9(b) should be applied. Plaintiffs should not be allowed to evade the 9(b) standard via artifice.

[21] Expectations of the prototypical reasonable consumer aside, the expectations of an actual consumer—and, until three days ago, a named plaintiff in this action—supports Defendant's argument. Heather Rudy, who has voluntarily dismissed her claims in this litigation, consented to a settlement in an MDL action against another sunscreen manufacturer that would allow for up to 1 ppm of benzene in sunscreen products. *In re Johnson & Johnson Sunscreen Marketing Prod. Liab. Litig.*, No. 0:21-md-03015-Singhal, Dkt. #55, p. 6 (S.D. Fla. Dec. 17, 2021).

CORE/3006951.0087/172041937.8

use of herbicides would also know that trace residual solvents are regularly found in drugs. Knowledge of the specific chemical in question in *Axon* was unnecessary—general knowledge that herbicides were often sprayed on oranges was enough. Similarly, any reasonable consumer would know that residual solvents are regularly used in the manufacture of drug products. Because *Axon* and *Parks*[22] support the proposition that a reasonable consumer would expect residual solvents to be present in drug products in amounts far below the FDA-permitted amount, Plaintiffs have not met the reasonable consumer standard required for their ILCFA or FDUDTPA claims.[23]

### 3.     Plaintiffs lack statutory standing to pursue their ILCFA claims.

On January 18, 2022, Plaintiff Heather Rudy voluntarily dismissed her claim. Dkt #67. Rudy was the only plaintiff residing in Illinois or alleging a transaction in Illinois. Compl., ¶¶ 9, 109. "[F]or a nonresident plaintiff . . . to have standing under the [ILCFA] . . . the circumstances that relate to the disputed transaction [must] occur primarily and substantially in Illinois." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (internal quotations omitted). The two remaining plaintiffs do not plead facts suggesting residence in Illinois or any contact with Illinois relating to their purchase of the products. As such, the remaining plaintiffs lack statutory standing to pursue the ILCFA claims (Counts 9 and 10), and those claims should be dismissed on that basis.

### 4.     The FDUTPA Safe Harbor precludes Plaintiffs' FDUTPA claims.

Defendant argued it could invoke the FDUTPA safe harbor because the FDA permits up

---

[22] Plaintiffs argue that *Parks* "is distinguishable for the same reasons" as *Axon*, Opp., p. 35—which is to say, it is not distinguishable at all, for the same reasons *Axon* is not distinguishable.

[23] Plaintiffs' own case law—all out-of-circuit—is inapposite. Although the district court in *Tran v. Sioux Honey Assoc., Cooperative*, 2018 WL 10612686, at *5 (C.D. Cal. Aug. 20, 2018) rejected a reasonable consumer standard defense based on the presence of trace amounts of glysophate in honey, it did so because the product's label represented the honey as "100% Pure." There is no equivalent representation of absolute purity here. *See Axon*, 354 F.Supp.3d at 184 (distinguishing *Axon* from *Tran*). The remaining case law is distinguishable on the same or similar grounds: In *Friends of the Earth v. Sanderson Farms, Inc.*, 2018 WL 7197394, at *3 (N.D. Cal. Dec. 3 2018), defendant represented that their product was "100% Natural" and contained "no additives or artificial ingredients", and in *Organic Consumers Ass'n v. Bigelow Tea Co.*, 2018 D.C. Super. LEXIS 11, at *11 (D.C. Super. Ct. Oct. 31, 2018) the representation in question concerned whether the ingredients were "natural." Here, Defendant has made no affirmative representation that its products are 100% pure, all natural, free of additives, or the like.

to 2 ppm of benzene to be present in the sunscreen products and prohibits it from listing benzene as an ingredient. Memo., pp. 32-33. Plaintiffs contend the safe harbor is inapplicable because "Defendant is wrong on both points." Opp., p. 36. For the reasons in Defendant's Memorandum, pp. 37-39, and *infra*, § E, Plaintiffs' arguments fail, and the FDUTPA safe harbor thus applies.

### 5. Plaintiffs' Express Warranty claim fails because they do not identify the terms of any express warranty.

In their Complaint, Plaintiffs claim the existence of two express warranties: that the Product (1) "contained only those active and inactive ingredients listed on the Product's label;" and (2) "is sunscreen used for sun protection rather than adulterated sunscreen containing—or potentially containing—a dangerous carcinogen." Compl., ¶ 144. Plaintiffs identify the ingredient list as the location of these statements because the ingredient list itself is "an affirmation of fact" that "must identify every inactive ingredient that may be present in the Product[.]" Opp., p. 37.

Plaintiffs' own citations discredit the argument that the Products' ingredient list represents an affirmation that the Product could only contain the ingredients listed therein. Plaintiffs first cite to Conn. Gen. Stat. § 42a-2-313(1), which states that "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Plaintiffs argue the Products did not "conform" to the ingredient list labeling because benzene was not on the ingredient list, despite the alleged risk of its trace presence. This argument was rejected in *Fraser v. Wyeth*, 857 F.Supp.2d 244 (D. Conn. 2012). In *Fraser*, consumers sought to state a breach of warranty claim against a drug manufacturer for not disclosing that the drug did not adequately warn that it heightened their risk of contracting breast cancer and thus did not "conform to the affirmation or promise" that the product was safe for use. *Id.* at 257. The court denied the claim because a "label that does not adequately highlight a particular known or knowable risk does not create an express warranty in the absence of a guarantee that the particular

product is free from all harmful side effects." *Id.* at 257-58. The analogy is clear: Whereas in *Wyeth* the consumer argued the drug did not "conform to the affirmation or promise" that the product was safe because it did not disclose the *risk* of breast cancer, here Plaintiffs argue the Product did not "conform to the affirmation" that benzene was not an ingredient because it did not disclose the alleged *risk* of benzene. [24] This case involves representations on an ingredient list, not a warning label, but the critical point is that without a specific guarantee that Defendant's Product was free of trace residual solvents like benzene, there was no affirmation foreclosing the alleged *risk* of benzene contamination. Because the ingredient list did not create an express warranty foreclosing any risk that trace residual solvents *might* be present in the Products, the claim must fail.

### 6. Plaintiffs' unjust enrichment claim fails because they do not allege that they directly conferred a benefit on Defendant.

Defendant in its Memorandum established that Plaintiffs' unjust enrichment claim failed because they did not allege a direct conferral of a benefit on Defendant. Memo., pp. 37-38. Plaintiffs respond by arguing no such direct conferral requirement exists. Opp., pp. 38-40.

Controlling authority on the question is provided by *Town of New Hartford v. Connecticut Resources Recovery Auth.*, 291 Conn. 433 (2009), a Supreme Court opinion that postdates Plaintiffs' authority. In *New Hartford*, the court stated, "Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit." *Id.* at 468. The court cites the Restatement (Third), Restitution and Unjust Enrichment § 48 to define "superior equitable entitlement." In this way, the

---

[24] Plaintiffs cite to *VanAlstine v. Diversified Farms, LLC*, 2021 WL 1711607, at *5 (Mich. Ct. App. 2021) to support the claim that a reasonable consumer reading a label "would immediately conclude that . . . a substance not listed in the ingredients [iodine] . . . would not be present." This holding is not only non-binding but non-persuasive in that the labeling in that case stated "GUARANTEED ANALYSIS"—a literal express guarantee that the product had been found to contain only those ingredients listed. *Id.* Far from supporting Plaintiffs' argument, this case demonstrates the type of representations that *do* create express warranties that were *not* present on this Products' labeling.

court specifies and delimits the atypical circumstance where an indirect conferral from plaintiff to defendant may support an unjust enrichment claims. It quotes the Restatement: "If a payment to [a] defendant is an asset to which the claimant (as against defendant) has the paramount entitlement, the law of restitution and unjust enrichment supplies a claim to recover the amount in dispute." *Id.* Hence, for Plaintiffs to state an unjust enrichment claim based on an indirect conferral, they must plead they have "paramount entitlement" to the monies they directly conferred to the third-party retailer that indirectly benefitted Defendant. The Restatement defines the term "paramount interest" in a "highly restrictive" fashion, limited to cases where plaintiff has "proof of a legal entitlement" or identifies a right "that is both recognized, and accorded priority over the interest of the defendant[.]" Restatement (Third), § 48 (2011), comment (i). It cannot be based on "[p]roof merely that the defendant has received a windfall, that the claimant has been ill-treated, and that the third party's payment to the defendant (or the defendant's retention of payment as against the claimant) violates rules of good faith, basic fairness, or common decency[.]" *Id.*

Here, Plaintiffs' claim of superior equitable entitlement is grounded in precisely that—in allegations of a windfall premised on violations of principles of equity. But because Plaintiffs do not claim superior equitable entitlement as that term is defined by the Restatement over the benefit conferred from the third-party retailers to Defendant, they cannot claim this as an "atypical circumstance" that works an exception to the rule identified in *New Hartford*. As such, direct conferral of the benefit is required, and Plaintiffs' unjust enrichment claim consequently fails.

### III. CONCLUSION

For the foregoing reasons and for the reasons contained in Defendant's Memorandum in Support of their Motion to Dismiss,[25] the Court should dismiss this action with prejudice.

---

[25] Plaintiffs do not address the argument that their implied warranty claim fails for lack of privity. Memo., pp. 35-36.

DATED: January 21, 2022                    Respectfully submitted,


By:_____ */s/ Megan McCurdy*

**STINSON LLP**

John W. Moticka (admitted *pro hac vice*)
7700 Forsyth Boulevard, Suite 1100
St. Louis, Missouri 63105-1821
Telephone: (314) 863-0800
Facsimile: (314) 863-9388
john.moticka@stinson.com

Megan McCurdy (*admitted pro hac vice)*
Ashley M. Crisafulli (*admitted pro hac vice*)
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
megan.mccurdy@stinson.com
ashley.crisafulli@stinson.com
**DISERIO MARTIN O'CONNOR &
CASTIGLIONI, LLP**

Jonathan P. Whitcomb (ct15014)
jwhitcomb@dmoc.com
Jonathan J. Kelson (ct26755)
jkelson@dmoc.com
Christina Volpe (ct30647)
cvolpe@dmoc.com
1010 Washington Blvd., Suite 800
Stamford, Connecticut 06901
Telephone: (203) 358-0800
Facsimile: (203) 348-2321

**ATTORNEYS FOR DEFENDANT**

21

## CERTIFICATE OF SERVICE

I hereby certify that on this January 21, 2022, a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.


By: _____ /s/ Megan McCurdy_


ATTORNEY FOR DEFENDANT