## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LUIS CHABLA, JESSICA BARTON, BRYAN CLINGER, MONICA BARBA, LISA ZAYAS, DEBORAH JEAN, and SEBE ALGOFI individually on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EDGEWELL PERSONAL CARE BRANDS, LLC, EDGEWELL PERSONAL CARE, LLC, and SUN PHARMACEUTICALS, LLC,<br><br>Defendants. | Case No. 3:21-cv-01040<br><br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>Dated:  April 18, 2022 |

Plaintiffs Luis Chabla, Jessica Barton, Bryan Clinger, Monica Barba, Lisa Zayas, Deborah Jean, and Sebe Algofi (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This action seeks to remedy the deceptive and misleading business practices of Edgewell Personal Care Brands, LLC; Edgewell Personal Care, LLC; and Sun Pharmaceuticals, LLC (hereinafter collectively "Defendants") with respect to the marketing and sale of Defendants' Banana Boat sunscreen line of products throughout the country, including, but not limited to, the following products (hereinafter collectively the "Products"):

- Banana Boat UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4;

- Banana Boat Kids Max Protect & Play Sunscreen C-Spray SPF 100;

- Banana Boat Ultra Sport Clear Sunscreen Spray SPF 100;

- Banana Boat Kids Sport Sunscreen Lotion Spray SPF 50;

- Banana Boat Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15;

- Banana Boat Simply Protect Kids Sunscreen Spray SPF 50+; and

- Banana Boat Ultra Defense Ultra Mist Clear Sunscreen Spray SPF 100.

2.      Defendants do specifically list both the active and inactive ingredients of these Products but fail to disclose that the product contains or may contain "benzene."

3.      For example, a representative example of Defendants' lack of disclosure can be seen below[1]:

---

[1] https://www.walgreens.com/store/c/banana-boat-sport-ultra-clear-sunscreen-spray-spf-100/ID=prod6057753-product?ext=gooBeauty+
+SSC+TestAd+group___local&gclsrc=aw.ds&&gclid=CjwKCAiAg6yRBhBNEiwAeVyL0Exw
wMGonUZG9rCeQM-hiU_XDOnG2mJsMFtHPs2ncWTHRFeZ_FwSDBoCpkAQAvD_BwE



## Active Ingredients

Avobenzone 3.0%, Homosalate 10.0%, Octisalate 5.0%,
Octocrylene 10.0%, Oxybenzone 6.0%

**Inactive ingredients:** Alcohol Denat., Isobutane, VA/Butyl
Maleate/Isobornyl Acrylate Copolymer, Caprylyl Glycol, Cyclopentasiloxane,
Cyclohexasiloxane, Fragrance, Polyglyceryl-3 Stearate/Isostearate/Dimer
Dilinoleate Crosspolymer, Lauryl PEG-8 Dimethicone, Phenylisopropyl
Dimethicone, Ascorbyl Palmitate, Methyl Dihydroabietate, Tocopheryl
Acetate, Mineral Oil, Panthenol, Water, Aloe Barbadensis Leaf Extract.

4.      Benzene is a widely recognized and incredibly dangerous substance, especially in the context of applying it to the skin, and it offers no therapeutic sunscreen benefit whatsoever. Rather, it is a harmful carcinogen.

5.      Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[2]

6.       For example, Benzene is known to harm the bone marrow and continued exposure can lead to blood cancer, such as leukemia.[3]

7.      Consumers like the Plaintiffs trust manufacturers such as Defendants to sell Products that are safe and free from harmful known toxins and carcinogens, including benzene.

8.      Plaintiffs and those similarly situated (hereinafter "Class Members") certainly expect that the sunscreen they purchase will comply with its labeling and not contain any knowingly harmful substances or carcinogens like benzene.

9.      Defendants specifically manufacture, sell, and distribute the Products in this manner using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers.

10.      For example, Defendants' marketing and advertising campaign includes the one place that every consumer looks when purchasing a product – the packaging and labels themselves. Consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products.

---

[2]      James Huff, *Benzene-induced cancers; abridge history and occupational health impact*, 13 Int'l J. Occupational and Env't Health 213 (2007), https://pubmed.ncbi.nlm.nih.gov/17718179/.

[3]      *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited Nov. 23, 2021).

11.    However, Defendants' advertising and marketing campaign is false, deceptive, and misleading because the Products contain or may contain benzene, which Defendants do not list or mention anywhere on the Products' packaging or labeling. Plaintiffs have also standing to represent members of the putative classes because there is sufficient similarity between the specific products purchased by the Plaintiffs and the other Products not purchased by the Plaintiffs. Specifically, each and every one of the Products (i) are marketed in substantially the same way – as "sunscreen" – and (ii) fail to include labeling indicating to consumers that the sunscreen Products may contain benzene as an inactive ingredient. Accordingly, the misleading effect of all of the Products' labels are substantially the same.

12.    Plaintiffs and Class Members relied on Defendants' misrepresentations and omissions of what is in the Products when they purchased them.

13.    Consequently, Plaintiffs and Class Members lost the entire benefit of their bargain when what they received was a sunscreen product contaminated with a known carcinogen.

14.    That is because Defendants' Products containing a known human carcinogen have no value.

15.    As set forth below, sunscreen products, such as Defendants' Products, that contain benzene are in no way safe for humans and are entirely worthless.

16.    Alternatively, Plaintiffs would have never paid a premium for sunscreen products that contained or were at risk of containing the carcinogen benzene.

17.    Accordingly, Plaintiffs bring this action against Defendants to remedy these egregious business practices on behalf of themselves and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

18.     Sunscreen, also known as sunblock or suntan lotion, is a product Defendants market, advertise, and sell to provide protection against the sun's ultraviolet (UV) rays or radiation.

19.     Sunscreens are categorized according to their mechanism of action. There are physical sunscreens which stay on the surface of the skin and deflect the UV rays or light and chemical sunscreens which absorb the UV light.

20.     Since 1974, sunscreens are assigned a Sun Protection Factor ("SPF") which measures the fraction of harmful UV rays or radiation that reach the skin.  For example, the SPF number tells you how long the sun's UV radiation would take to redden your skin when using the product exactly as directed versus the amount of time without any sunscreen.  So ideally, using a product with SPF 30 would take you 30 times longer to burn than if you weren't wearing sunscreen. A product with SPF 30 allows about 3 percent of UVB rays to hit your skin.  A product with SPF 50 allows about 2 percent of those rays through.  That may seem like a small difference until you realize that the product with SPF 30 is allowing 50 percent more UV radiation onto your skin than the product with SPF 50.

21.     After initial application to the skin, sunscreens must be reapplied often, typically every 2-3 hours, to continue to protect the skin from UV radiation or rays.

22.     The most common active ingredients in sunscreen products sold in the United States include avobenzone, homosalate, octinoxate, octisalate, octocylene, oxybenzone, titanium dioxide, and zinc oxide.

23.     Sunscreen products include lotions, sprays, and gels.

24.     Sales of sun care products have steadily increased as consumers have become more vigilant and health conscious in terms of protecting their skin from the exposure to UV rays or

radiation which can cause sunburn and increases the risk for skin cancer.  As of 2016, the estimated market size of the sun care market was $1.95 billion.[4]

25.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in products that they and their family members put on and/or into their bodies. Companies such as Defendants have capitalized on consumers' desire for healthy and safe products, and indeed, consumers are willing to pay, and have paid, a premium for these products.

26.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and do rely on Defendants to truthfully and honestly report what the Products contain on the Products' packaging or labels.

27.     The Products' packaging does not identify benzene.  Indeed, benzene is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.  This leads reasonable consumers to believe the Products do not contain benzene.

28.     However, despite the fact that the Products' labeling and ingredient listing do not list benzene, the Products contain or may contain benzene as an inactive ingredient.

29.     Twenty-first century research has confirmed that there is no safe level of benzene exposure.[5]

---

[4]     *U.S. Sun Care Market Size, Share & Trends Analysis Report, By Product (Self-tanning, After sun, Sun protection), Competitive Landscape, And Segment Forecasts, 2018 – 2025*, GRAND VIEW RESEARCH (Apr. 2018), https://www.grandviewresearch.com/industry-analysis/us-sun-care-market.[5]     *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW      OF      PUBLIC      HEALTH      133      (Apr.      21,      2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

[5]     *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW      OF      PUBLIC      HEALTH      133      (Apr.      21,      2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

30.     Benzene has been recognized, acknowledged, and accepted as a well-known health hazard and human carcinogen for approximately a century.[6]

31.     The National Toxicology Program (hereinafter "NTP") has regarded benzene as "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[7]

32.     The World Health Organization ("WHO") and the International Agency for research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[8]

33.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[9]

34.     Direct benzene exposure through the skin is particularly concerning.  For example, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[10]

---

[6]     *Supra* note 2.

[7]     *Benzene,* Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf.

[8]     *Benzene*, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume                                 120                                 (2018), https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a09 4f45da6d27cc.pdf.

[9]     *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html (last visited Nov. 23, 2021).

[10]    *Supra* note 3.

35.     Research also has revealed that sunscreen ingredients can be absorbed through the skin into the bloodstream.[11]

36.     Moreover, a study by Health Canada's Bureau of Chemical Hazards concluded that "the application of sunscreen specifically increases the absorption rate of benzene through the skin," thereby increasing the risk of harm.[12]

37.     Even low levels of benzene are particularly dangerous in a sunscreen product because "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total [benzene] exposure."[13] "There is not a safe level of benzene that can exist in sunscreen products," stated Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University. "Even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene."[14]

38.     Dr. Bunick, further stated:

Considering that human skin has a large total surface area (~1.85 m2), and that ~28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products. The total mass of sunscreen required to cover and protect the human body, in single daily application or repeated applications daily, means that even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene.[15]

---

[11]     Dr. Manavjeet Sidhu, *Sunscreen can be absorbed in the bloodstream, new study says*, ABCNews (Jan. 20, 2020, 8:30 AM), https://abcnews.go.com/Health/sunscreen-absorbed-bloodstream-testing-needed/story?id=68442221 (last visited Nov. 23, 2021).

[12]     *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.

[13]     Letter from Valisure, LLC to the Food and Drug Administration, re: Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products (May 24, 2021) (https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf/) at 16.

[15]     *Id.* at 17.

39.     FDA guidance provides that no level of benzene is safe, and benzene is not permitted in these types of sunscreen products.  The FDA currently recognizes the high danger of this compound and lists it as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity. . . . However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million("ppm").[16]

40.     Additionally, and not surprising, in the FDA's "list of acceptable active ingredients in products that are labeled as sunscreen," benzene is not listed among them.[17]

41.     This is why recent research revealing benzene in Defendants' Products is particularly concerning.

42.     Valisure, LLC (an analytical pharmacy, patient advocacy, and consumer protection organization) ("Valisure") recently published a study ("Study") that found benzene in 43 out of 234 sunscreens and in 8 out of 48 after-sun products.[18]

43.     Valisure found that Defendants' Products contained benzene through its own laboratory testing.[19] Valisure's testing done on the Banana Boat Products revealed widespread benzene contamination.  Although the entire product line was not tested, benzene contamination was revealed through testing of the following products: Kids Max Protect & Play Sunscreen Spray,

---

[16]     *Supra* note 12.

[17]     *Sunscreen: How to Help Protect Your Skin from the Sun,* FOOD AND DRUG ADMIN., https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun (last visited Nov. 23, 2021).

[18]     *Supra* note 12.

[19]     *Supra* note 13.

Kids Sport Sunscreen Spray, Protective Dry Oil Clear Sunscreen Spray, Simply Protect Kids (a/k/a

Kids Mineral Enriched) Sunscreen Spray, Ultra Defense Ultra Mist Clear Sunscreen Spray, Ultra

Sport Clear Sunscreen Spray, and UltraMist Deep tanning Oil Continuous Clear Spray.[20]

| Test Sample | Benzene in sample (ppm) |
|---|---|
| Banana Boat, Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 0.41, 0.43 |
| Banana Boat, UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4 | 0.36 |
| Banana Boat, Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 0.19 |
| Banana Boat, Ultra Sport Clear Sunscreen Spray SPF 100 | 0.15 |
| Banana Boat, Kids Max Protect & Play Sunscreen C-Spray SPF 100 | 0.11 |
| Banana Boat, Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15 | < 0.1 |
| Banana Boat, Ultra Defense Ultra Mist Clear Sunscreen Spray SPF 100 | < 0.1 |
| Banana Boat, Kids Sport Sunscreen Lotion Spray SPF 50 | < 0.1 |
| Banana Boat, Simply Protect Kids Sunscreen Spray SPF 50+ | < 0.1 |

[21]

44.     For reference, the National Institute for Occupational Safety and Health ("NIOSH")

recommends protective equipment be worn by workers expecting to be exposed to benzene at

concentrations of 0.10 ppm and defines "skin absorption" as an exposure route.[22]

45.     According to the World Health Organization, there is "no safe level of [benzene]

exposure[.]"[23]

---

[20]     *Id*. at 13-15.

[21]     *Id.*

[22]     NIOSH Pocket Guide to Chemical Hazards - Benzene, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html

[23]     Exposure to Benzene: A Major Public Health Concern, WORLD HEALTH ORG., (2010), https://www.who.int/ipcs/features/benzene.pdf

46.     Plaintiffs' independent testing has also established the Products contain or may contain benzene:

Table 2:  GC-MS Benzen Analysis Test Results of the Samples

| Test Sample | GC-MS Peak Area from Benzene | Benzene in Sample (ppm) |
|---|---|---|
| Banana Boat Kids Max Clear Sunscreen Spray, 100 | 10,108 | 1.99 |
| Banana Boat, Protective Dry Oil, Clear Sunscreen Spray, 15 with Coconut Oil | 11,447 | 2.20 |

47.     Moreover, because the majority of the products Valisure tested did not contain detectable levels of benzene, its use is not "unavoidable" in order to achieve the therapeutic benefits of sunscreen.

48.     In fact, Defendants could avoid exposing Plaintiffs and the Class to benzene in the manufacturing process and the Products could have been sold with absolutely no benzene in them.[24]

49.      Valisure investigated the possibility that benzene occurred due to the natural degradation of sunscreen's active ingredients and determined that it did not.  Thus, the presence of benzene in the sunscreen products is likely due to contamination during the manufacturing process.[25]

50.     Benzene was not listed as an inactive ingredient on the Products labels nor did the Products labels inform and/or warn the consumer that the Products contained or may contain benzene.

51.     Therefore, Defendants' false, misleading, and deceptive misrepresentations and omissions regarding the ingredients of the Products are likely to continue to deceive and mislead

---

[24]     *See supra* note 13 at 2.

[25]      *Id*. at 7-8.

12

reasonable consumers and the public, as they have already deceived and misled Plaintiffs and the Class Members.

52.     Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed and not listed. Defendants knew that if they had not omitted that the Products contained benzene, then Plaintiffs and the Class would not have purchased the Products at all or paid less for them.

53.     Defendants Products are also adulterated, misbranded, and/or constitute unapproved new drugs, in violation of federal and state law, rendering them worthless.

54.     Notably, a number of Defendants' competitors responded to the Valisure testing by issuing voluntary recalls of their sunscreen products. Johnson & Johnson, for example, acknowledged the presence of benzene in their products, and recalled various products so it could investigate the source of the benzene.

55.     Defendants have not recalled the Products, and upon information and belief, continue to omit any reference to benzene on the Products' labels.

56.     Plaintiffs bring claims under various state consumer and warranty theories and are not seeking to enforce any federal statute or regulation; however, much of the conduct giving rise to Plaintiffs' claims was likewise in violation of the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, et seq. ("FFDCA") and its implementing regulations.

57.     Most sunscreens, including the Products, are considered drugs that are regulated by the U.S. Food and Drug Administration ("FDA").

58.     They are therefore subject to the FFDCA and its implementing regulations.  These include, *inter alia*, the FFDCA's provisions regarding misbranded drugs, adulterated drugs, and

nonprescription over-the-counter ("OTC") drugs that may be marketed without an approved drug application.  21 U.S.C. §§ 351, 352, 355h.

59.     Under the FFDCA and its implementing regulations, Defendants' Products constitute misbranded drugs, adulterated drugs, and/or unapproved new drugs that do not meet the general requirements for nonprescription drugs to be marketed without an approved application.

60.     The manufacture of any misbranded or adulterated drug is prohibited under federal law. 21 U.S.C § 331(g).

61.     The introduction or delivery for introduction into interstate commerce (or receipt thereof) of any misbranded or adulterated drug is prohibited under federal law.  21 U.S.C. § 331(a), (c).

62.     Further, the introduction or delivery for introduction into interstate commerce of a purported nonprescription OTC drug that fails to meet the OTC drug requirements is prohibited under federal law. 21 U.S.C §§ 355(a) and 331(d).

63.     Defendants' Products are 'misbranded' under 21 U.S.C. § 352 and the relevant regulations.

64.     They are similarly misbranded under the applicable regulations, which state, in part, that an OTC drug "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in [21 C.F.R. §§ 330.1 – 330.15] and each of the conditions contained in any applicable monograph." 21 C.F.R. § 330.1. The general regulations also incorporate the statutory language, providing that a drug is misbranded where it is not "labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act[.]" 21 C.F.R. § 330.1(c)(1).

65.     21 U.S.C. § 352(a)(1) provides that a drug shall be deemed to be misbranded under the FFDCA if, *inter alia,* if "its labeling is false or misleading in any particular."

66.     Further, "[i]f an article is alleged to be misbranded because the labeling…is misleading, then in determining whether the labeling…is misleading there shall be taken into account (among other things) not only representations made or suggested by statement [or] word,…but also the extent to which the labeling…fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article…under such conditions of use as are customary or usual." 21 U.S.C. § 321(n).

67.     Here, Defendants have violated 21 U.S.C. § 352(a)(1) rendering the Products "misbranded."

68.     The Products' labeling (in the ingredients list or otherwise) fails to reveal that the Products contain or may contain benzene.  This absence of this disclosure conveys that it is *not* possible that benzene may be in the Products' bottles, which Plaintiffs' testing coupled with independent third-party testing has proved demonstrably false.

69.     The omission that the Products contain or may contain a dangerous carcinogen is a material fact for any consumer item, and especially so for a product that is purchased for the purposes of promoting health, preventing cancer, and is to be used liberally and reapplied often.

70.     Exposure or potential exposure to carcinogens is even more material given that other products which offer the same protection are carcinogen-free.

71.     21 U.S.C. § 352(e)(1)(A)(iii) provides that a drug is also misbranded under the FFDCA "[i]f it is a drug, unless its label bears, *inter alia*, the established name of each inactive ingredient listed in alphabetical order on the outside container of the retail package." The

regulations incorporate the same, mandating disclosure of "[t]he ingredient information required by [21 USC § 352(e)]" of the FFDCA. 21 C.F.R. § 201.10(a).[26]

72.     The regulations similarly provide, as part of the label's content requirements, that the label discloses the "'inactive ingredients' followed by a listing of the established name of each inactive ingredient." 21 C.F.R. § 201.66(c)(8).

73.     Part 201 (which governs labeling) defines "active ingredient" as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans." 21 C.F.R. § 201.66(b)(2). "Inactive ingredient means any component other than an active ingredient." 21 C.F.R. § 201.66(b)(8).

74.     While 'component' as it is used in Part 201 is not defined, Part 201 specifies that with respect to a finished product's label ingredient list, "[t]he term ingredient applies to any substance in the drug[.]" 21 C.F.R. § 201.10(b). Thus, OTC drugs as they are delivered to consumers may only contain "active ingredients" or "inactive ingredients."

75.     Further, a substance that is present in some, but not all, bottles of a drug product should still be listed as an "inactive ingredient" if a manufacturer were to, as here, use a uniform ingredients list.

76.     In its OTC Labeling Guidance, when discussing 21 C.F.R. § 201.66(c)(8)'s "inactive ingredient" requirement, FDA explains:

**E. Inactive ingredients: "contains one or more of these ingredients" labeling.**

There may be circumstances when manufacturers, packers, and distributors who market OTC drug products use multiple suppliers for some drug products to

---

[26]     The FFDCA requires a label to list, *inter alia*, "the established name and quantity of…each active ingredient" as well as "the established name of each inactive ingredient[.]" 21 U.S.C. § 352(e)(ii), (iii).

maintain an uninterrupted supply of the drug product to their customers. In such cases, the specific inactive ingredients in the drug products may vary slightly from supplier to supplier: some inactive ingredients may be present in drug products coming from all suppliers while other inactive ingredients may not be present. To have one label for all drug products, we recommend that the ingredients that may (or may not) be contained in each individual drug product be listed on the labeling in the following manner.

- We believe that this type of inactive ingredient labeling can be accomplished best by placing those ingredients that may (or may not) be contained in an OTC drug product in the inactive ingredient listing, as set forth in § 201.66(c)(8), with an asterisk placed next to those ingredients (e.g., acacia*, dextrose*, sucrose, xanthum gum*). The asterisk would then be reprinted at the bottom or end of the inactive ingredient section in the Drug Facts box with the notation "* contains one or more of these ingredients" (if more than one ingredient may (or may not) be in the drug product), or "* may contain this ingredient" (if only one ingredient may (or may not) be in the drug product), whichever is appropriate.

….

Manufacturers, packers, and distributors are also reminded to follow all applicable current good manufacturing practice regulations in 21 CFR part 211 for finished pharmaceuticals so that manufacturers maintain appropriate records showing which lot numbers of the drug product contain which inactive ingredients.

FDA, Guidance for Industry: Labeling OTC Human Drug Products (May 2009) at 9, 12-13, avail. at https://www.fda.gov/media/76481/download.

77.     Thus, had Defendants followed FDA's guidance, it would have at least included benzene in the inactive ingredients list with a "may contain this ingredient" asterisk.  Since Defendants chose to use uniform ingredient labeling in all lots of the Products, it was required to make this disclosure, which it failed to do.

78.     Here, Defendants have violated 21 U.S.C. § 352(e) and/or related regulations, rendering the Products "misbranded."

79.     Benzene is a substance found in Defendants' Products by independent third-party testing as well as Plaintiffs' own testing.  Some of Defendants' competitors (but not Defendants)

that also tested positive for benzene have sought fit to issue recalls pulling their sunscreen products off the market.

80.    Upon information and reasonable belief, benzene is not an "active ingredient" in Defendants' Products as it does not (nor could be intended to) provide protection from UV rays, nor is benzene on the FDA's list of approved active ingredients for sunscreen products.

81.    Benzene is therefore an inactive ingredient, yet Defendants unlawfully omitted it as such on the Products' labels.  Defendants should have included benzene in the "inactive ingredients" panel, with or without a "may contain this ingredient" asterisk, as appropriate.

82.    Alternatively, even if benzene were not required to be listed as an inactive ingredient, 21 U.S.C. § 352(j) provides that a drug is also misbranded under the FFDCA if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

83.    Here, Defendants have violated 21 U.S.C. § 352(j), rendering the Products "misbranded."

84.    As described herein, consumer use of sunscreen has grown steadily.  Further, sunscreen products typically instruct users to apply sunscreen liberally and reapply often.

85.    Further, "recent studies by FDA researchers have shown that significant amounts of sunscreen ingredients absorb through the skin and are found in the blood; specifically, over 400 times the threshold for systemic carcinogenicity assessment for at least one sunscreen active ingredient."[27]

---

[27] May 24, 2021, Valisure Citizens Petition, at pg. 2, avail. At https://www.valisure.com/wpcontent/          uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf. (see pg. 2).

86.     Given that the Products are to be applied liberally and frequently, and given that carcinogen-free sunscreens exist offering the same therapeutic benefit, utilizing a sunscreen containing benzene creates a completely avoidable and unreasonable risk, and is dangerous to one's health.

87.     This is consistent with FDA's approach to the use of benzene in drug manufacturing. Recognizing benzene's industrial use as a solvent, FDA has advised drug manufacturers to avoid using benzene, which it classifies as a "known human carcinogen" and "Class 1 solvent…to be avoided[.]"

88.     In its non-binding guidance as to residual solvents (solvents that remain as impurities in finished drug products), FDA explains:

### IV. LIMITS OF RESIDUAL SOLVENTS

#### A. Solvents to Be Avoided

> Solvents in Class 1 (Table 1; see companion document) should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted as shown in Table 1, unless otherwise justified

FDA, Guidance for Industry: Q3C Impurities: Residual Solvents (Dec. 1997), avail. at https://www.fda.gov/media/71736/download, at 6 (emphasis in original).

89.     Insofar as the benzene in Defendants' Products was intentionally utilized or was a residual solvent impurity, since its use was not unavoidable, its presence at any level presents an unacceptable toxicity, rendering the Products dangerous.

90.     Accordingly, the Products are 'misbranded' under the FFDCA.

91.     In addition to (or in the alternative to) being "misbranded" under 21 U.S.C. § 352, Defendants' Products are "adulterated" under 21 U.S.C. § 351 and related regulations.

92.     21 U.S.C. § 351(a)(1) provides that a drug shall deemed to be adulterated under the FFDCA if, *inter alia,* "it consists in whole or in part of any filthy, putrid, or decomposed substance[.]"

93.     Defendants' Products consist in part of benzene, an inherently volatile and unstable compound subject to rapid decomposition.

94.     The inherent nature of benzene aside, insofar as the benzene exists as an impurity or contaminant (rather than an intentional ingredient), its presence in the Products exist as a filthy, putrid, and/or decomposed substance.

95.     21 U.S.C. § 351(a)(2)(A) provides that a drug is also adulterated under the FFDCA "if it has been prepared, packed, or held under insanitary conditions…whereby it may have been rendered injurious to health[.]" Similarly, a drug is also adulterated "if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health[.]" 21 U.S.C. § 351(a)(3).

96.     If it is the case that the benzene in Defendants' Products was not added intentionally to the sunscreen formulation, it follows that the benzene exists due to either contamination or the failure to remove impurities.

97.     With respect to potential contamination, the undisputed discovery of benzene in Defendants' Products (if not intentional) evidence that the Products were either manufactured, packaged, or stored under conditions where they, at the very least, may have been rendered injurious to health.  This renders the Products adulterated, regardless of whether those conditions resulted in benzene contamination in every single product bottle.

98.     Alternatively, if the presence of benzene is that of an impurity (left over after its use as a solvent during the manufacturing process), the mere decision to utilize benzene (as opposed to other equally effective, less harmful, and non-carcinogenic chemicals) amounts to preparing the Products in a way whereby they may be rendered injurious to health.

99.     As noted *supra* in ¶ 88, this is essentially the position taken by FDA in its guidance documents: that benzene "should not be employed in the manufacture of" the Products "because of [the chemical's] unacceptable toxicity."

100.    In the further alternative, even if the decision of Defendants' or one of their agents' to utilize benzene as a solvent does not amount to preparing the sunscreen in a way potentially rendering in injurious to health, the failure to utilize adequate procedures to remove impurities during the manufacturing process amounts to precisely that.

101.    21 U.S.C. § 351(a)(2)(B) provides that a drug is also adulterated under the FFDCA if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug…has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]"

102.    The general regulations governing OTC drugs clarify that OTC drugs must be "manufactured in compliance with current good manufacturing practices, as established by [21 C.F.R.] parts 210 and 211." 21 C.F.R. § 330.1(a); *see also* 21 C.F.R. § 330.1(f) ("[t]he product container and container components meet the requirements of [21 C.F.R.] § 211.94"). "The failure to comply with any regulation set forth in [Parts 210 and 211] in the manufacture, processing, packing, or holding of a drug shall render such drug to be adulterated under [21 U.S.C. § 351(a)(2)(B)]." 21 C.F.R. § 210.1(b).

103.     Insofar as benzene-a harmful carcinogen-made its way into Defendants' Products by accident, it follows that it was due to poor manufacturing processes by either Defendants or its agents.  Further evidencing this fact, Defendants' competitors that have issued recalls following Valisure's testing of their products have announced they are investigating how exactly the benzene contamination may have occurred, and they acknowledge that it should not have happened.

104.     Accordingly, the Products are 'adulterated' under the FFDCA.

105.     Additionally, in passing the New York Food, Drug, and Cosmetic Act, New York has expressly adopted the federal arguments, and defines a drug as "an article other than food that is intended to affect the structure or any function of the body of human or animals, whether intended to be consumer, aspirated or otherwise absorbed, rubbed, poured, sprinkled, sprayed on, ingested, introduced into or otherwise applied to the human body or any part thereof." Public Health Act § 71.03(b)(3).

106.     In New York State, such a drug will be deemed adulterated "as set forth in the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §351)." *Id*. at §(e). Thus, a violation of federal food labeling laws is an independent violation of New York law and actionable as such.

107.     In addition to (or in the alternative) to being 'misbranded' and/or 'adulterated' under 21 U.S.C. §§ 351-352, Defendants' Products do not meet the general requirements for nonprescription drugs to be marketed without an approved application, and are therefore unapproved new drugs marketed in violation of 21 U.S.C. §§ 331 and 355.

108.     21 U.S.C. § 355h sets forth the requirements for marketing nonprescription OTC drugs without an approved new drug application, and OTC drugs failing to meet those requirements are rendered unapproved new drugs marketed in violation of 21 U.S.C §§ 355(a) and 331(d).

109.     In other words, to avail themselves of the privilege of bringing new OTC drugs to market without applying for FDA approval, certain conditions must be met.  If a manufacturer is unable to meet those conditions, then it must follow the FDA's more burdensome procedure of submitting an application for FDA approval.  If a manufacturer who does not meet the conditions nevertheless brings its drug to market, it is rendered an illegal unapproved new drug.

110.     Among those requirements are that the OTC drug is "in conformity with the requirements for nonprescription use of [any applicable] final monograph [and] the general requirements for nonprescription drugs" provided at 21 C.F.R. § 330.1.

111.     As explained above, one or more of the portions of 21 C.F.R. § 330.1 dealing with misbranding and adulteration were violated by Defendants.  *See supra* ⁋ 63, 101 (discussing 21 C.F.R. §§ 330.1(a), (c)(1), (f)).

112.     Further, 21 C.F.R. § 330.1 provides another requirement for OTC drugs implicated here, that "[t]he product contains only suitable inactive ingredients which are safe in the amounts administered[.]" 21 C.F.R. § 330.1(e).  A suitable inactive ingredient generally provides a benefit in terms of the drug formulation (such as a delayed-release mechanism in a prescription drug).

113.     As discussed herein, *supra* ¶¶ 71-77, the benzene was an inactive ingredient in Defendants' Products, warranting its inclusion on the ingredients panel (with a "may contain this ingredient" qualifier at best).

114.     Benzene is not a "suitable" inactive ingredient.  Upon information and belief, the benzene serves no beneficial purpose in the drug.

115.     Nor is benzene a "safe" inactive ingredient given its carcinogenic properties and its status as a Class I solvent that should not be used where, as here, a non-carcinogenic substitute was available.

116.     Therefore, Defendants' Products are unapproved new drugs marketed in violation of 21 U.S.C §§ 355(a) and 331(d).

117.     As noted above, both the general conditions for OTC drugs to be considered generally safe and not misbranded—as well as requirements for nonprescription drugs to be marketed without a drug application—mandate compliance with, *inter alia*, any applicable monograph. *See* 21 C.F.R. §§ 330.1, 355h.

118.     The "applicable monograph" for sunscreen is OTC Monograph M020, which combines 21 C.F.R. part 352 and 21 C.F.R. 201.327 into one order and includes minor technical amendments to facilitate the combination thereof.   See FDA, Final Administrative Order OTC000006, Over-the-Counter Monograph M020: Sunscreen Drug Products for Over-the-Counter Human Use (Sep. 24, 2021), avail. at https://www.accessdata.fda.gov/drugsatfda_docs/ omuf/OTCMonograph_M020-SunscreenDrugProductsforOTCHumanUse09242021.pdf ("Sunscreen Order"), at 1-2.

119.     The Sunscreen Order does not supplant the statutory provisions and regulations cited in ¶¶ 63-117 herein, nor does it represent the entire universe of applicable regulations. Rather, the Sunscreen Order's section entitled "Scope" provides that "[a]n over-the-counter (OTC) sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets each condition in this OTC monograph and each general condition established in 21 CFR 330.1." Sunscreen Order § M020.1- Scope.

120.     Thus, the Sunscreen Order acknowledges that a sunscreen product can meet each condition in the Sunscreen Order and nevertheless not generally be recognized as safe and effective and misbranded if it fails to meet each general condition established in 21 C.F.R. § 330.1.

121.    Further, the scope of the Sunscreen Order does not reach adulteration, and its labeling provisions are largely focused on efficacy and SPF ratings.

122.    The specific provisions of the Sunscreen Order are largely irrelevant with respect to Plaintiffs' claims, involving permitted active ingredients (Part B), additional labeling requirements specific to sunscreen that supplement (but do not replace) the general OTC regulations (Part C), and SPF testing procedures (Part D).

## JURISDICTION AND VENUE

123.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than at least one Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

124.    This Court has personal jurisdiction over Defendants because Defendants conduct and transact business in the state of Connecticut, contract to supply goods within the state of Connecticut, and supply goods within the state of Connecticut.

125.    Venue is proper pursuant to 28 U.S.C. § 1391(a) because Defendants are a residents of this District pursuant to 28 U.S.C. § 1391(c) and pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

### Plaintiffs

126.    Plaintiff Luis Chabla is a citizen and resident of the state of New York.  During the Class Period, Plaintiff purchased Defendants' Products that contained benzene, including, but not limited to, the Banana Boat Protective Dry Oil Clear Sunscreen Spray with Coconut Oil SPF 15

online at Amazon.com and in retail stores in New York in 2020 and 2021. At all times Plaintiff purchased the Products, Plaintiff was unaware that the Products contained or may contain benzene.

127.    Plaintiff Jessica Barton is a citizen and resident of the state of New York.  During the Class Period, Plaintiff purchased Defendants' Products that contained benzene, including, but not limited to, the Banana Boat UltraMist Deep Tanning Dry Oil Continuous Clear Spray SPF 4 and Banana Boat Ultra Sport Clear Sunscreen Spray SPF 100. Plaintiff purchased the Products at Rite Aid and Walgreens in New York City, and other retail stored throughout New York in 2020 and 2021. At all times Plaintiff purchased the Products, Plaintiff was unaware that the Products contained or may contain benzene.

128.    Plaintiff Bryan Clinger is a resident and citizen of Florida. During the Class Period, Plaintiff Clinger purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, Banana Boat Kids Max Protect & Play Sunscreen Spray in late Spring of 2021 from a CVS or Walgreens located in Miami. At all times Plaintiff purchased the Products, Plaintiff was unaware that the Products contained or may contain benzene. When he made the purchase, there was never a disclosure regarding the benzene on the container. Had he known that any amount of benzene was or risked being contained in the Product he purchased, he would have purchased a different sunscreen that did not have the risk of containing benzene.

129.    Plaintiff Monica Barba is a resident and citizen of Florida. During the Class Period, Plaintiff Barba purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, Banana Boat Protective Dry Oil Sunscreen Spray (SPF 15), which was purchased from Amazon in June 2021, as well as Banana Boat Ultra Sport (SPF 30), which was purchased in July 2020 from Target. When she made the purchase, there was never as disclosure regarding the benzene on the container. Had she known that any amount of benzene was or risked being contained in the

Product she purchased, she would have purchased a different sunscreen that did not have the risk of containing benzene

130.   Plaintiff Lisa Zayas is a resident and citizen of Philadelphia, Pennsylvania.  During the Class Period, most recently in 2021 and several years prior to, Plaintiff Zayas purchased Banana Boat Sport Performance SPF 50+ and Banana Boat Ultra Sport SPF 30 from either CVS, Marshall's, Walgreens, and/or Walmart for herself and members of her family. At all times Plaintiff purchased the Products, Plaintiff was unaware that the Products contained or may have contain benzene.

131.   Plaintiff Deborah Jean is a resident and citizen of Salem, Oregon.  During the Class Period, in approximately 2019 and multiple times throughout that year, Plaintiff Jean purchased Banana Boat Spray Oil from Walgreens for herself and her daughter. At all times Plaintiff purchased the Products, Plaintiff was unaware that the Products contained or may contain benzene.

132.   Plaintiff Sebe Algofi resides in Brooklyn, New York.  During the Class Period, Plaintiff purchased Banana Boat Kids Clear Spray Sunscreen SPF 50+ from Target for her children. At all times Plaintiff purchased the Products, Plaintiff was unaware that the Products contained or may contain benzene.

133.   Had Defendants not made the false, misleading, and deceptive representations and omissions regarding the Products containing benzene, Plaintiffs would not have been willing to purchase the Products.  Plaintiffs purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.  The Products Plaintiffs received were worthless because they contain or may contain the known carcinogen benzene.  Alternatively, Plaintiffs paid a premium that they would have never paid had they known the

products contained or risked containing benzene.  Accordingly, Plaintiffs were injured in fact and lost money as a result of Defendants' improper conduct.

**Defendants**

134.   Defendant Edgewell Personal Care Brands, LLC is a Delaware Limited Liability Corporation with its headquarters in Shelton, Connecticut.  Edgewell Personal Care Brands, LLC conducts business throughout the United States, including this district.  Edgewell Personal Care Brands, LLC is a wholly owned subsidiary of and/or 100% controlled by Edgewell Personal Care Company, which is also responsible for the manufacturing, marketing, advertising, and distributing of the Products.

135.   Defendant Edgewell Personal Care, LLC is a Delaware Limited Liability Corporation with its headquarters in Shelton, Connecticut.  Edgewell Personal Care, LLC conducts business throughout the United States, including this district.  Edgewell Personal Care, LLC is a wholly owned subsidiary of and/or 100% controlled by Edgewell Personal Care Company, which is also responsible for the manufacturing, marketing, advertising, and distributing of the Products.

136.   Defendant Sun Pharmaceuticals, LLC is a Delaware limited liability company with its headquarters and principal place of business located in Shelton, Connecticut.   Sun Pharmaceuticals, LLC conducts business throughout the United States, including this district.  Sun Pharmaceuticals, LLC is a subsidiary of Edgewell Personal Care Company and is also responsible for the manufacturing, marketing, advertising, and distributing of the Banana Boat sunscreen products.

137.   Defendants' manufacture, market, advertise, and distribute the Products throughout the United States.  Defendants created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of their Products.

## CLASS ALLEGATIONS

138.    Plaintiffs bring this matter on behalf of themselves and those similarly situated.  As detailed at length in this Complaint, Defendants orchestrated deceptive marketing and labeling practices.  Defendants' customers were uniformly impacted by and exposed to this misconduct.  Accordingly, this Complaint is uniquely situated for class-wide resolution, including injunctive relief.

139.    The Class is defined as all consumers who purchased the Products anywhere in the United States and its territories during the Class Period.

140.    Plaintiffs also seek certification, to the extent necessary or appropriate, of subclasses of individuals who purchased the Products in the states of Florida, New York, Pennsylvania, and Oregon at any time during the Class Period, which shall be known as the "Florida Subclass," "New York Subclass," "Pennsylvania Subclass," and "Oregon Subclass."

141.    The Class, Florida Subclass, New York Subclass, Pennsylvania Subclass, and Oregon Subclass shall be referred to collectively throughout the Complaint as the Class.

142.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

143.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiffs believe that there are thousands of consumers in the Class and the state subclasses who are Class Members as described above who have been damaged by Defendants' deceptive and misleading practices.

144.   <u>Commonality</u>: The questions of law and fact common to the Class Members predominate over any questions which may affect individual Class Members include, but are not limited to:

    a.   whether Defendants are responsible for the conduct alleged herein, which was uniformly directed at all consumers who purchased the Products;

    b.   whether the Products were adulterated, misbranded, and/or an unapproved new drug under the Federal Food Drug and Cosmetic Act;

    c.   whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

    d.   whether Defendants made false and/or misleading statements and omissions to the Class and the public concerning the contents of their Products;

    e.   whether Defendants' false and misleading statements and omissions concerning their Products were likely to deceive the public; and

    f.   whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members?

145.   <u>Typicality</u>: Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive and misleading conduct and purchased Defendants' Products.  Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

146.   <u>Adequacy</u>: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent, their consumer fraud claims are common to all members of the Class, they have a strong interest in vindicating their

rights, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

147. <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' deceptive and misleading marketing and labeling practices.

148. <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. the joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b. the individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive – if not totally impossible – to justify individual actions;

c. when Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d. this class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f. this class action will assure uniformity of decisions among Class Members;

g.      the Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.      it would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendants' uniform false advertising to purchase their Products.

149.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

**INJUNCTIVE CLASS RELIEF**

150.    Rules 23(b)(1) and (2) contemplate a class action for purposes of seeking class-wide injunctive relief.  Here, Defendants have engaged in conduct resulting in misleading consumers about ingredients in the Products.  Since Defendants' conduct has been uniformly directed at all consumers in the United States and its territories, and the conduct continues presently, injunctive relief on a class-wide basis is a viable and suitable solution to remedy Defendants' continuing misconduct.  Plaintiffs are unable to rely with confidence on Defendants' representations in the future and will therefore abstain from purchasing the Products, even though they would like to purchase them.  In addition, members of the proposed classes run the risk of continuing to purchase the Products, under the assumption that the Products will not and do not contain benzene.  Until Defendants reformulate the Products to remove benzene, and be enjoined

from making further false and misleading representations, Plaintiffs and other consumers will continue to bear this ongoing injury.

151.    The injunctive Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

a.      <u>Numerosity</u>: Individual joinder of the injunctive Class Members would be wholly impracticable.  Defendants' Products have been purchased by thousands of people throughout the United States.

b.      <u>Commonality</u>: Questions of law and fact are common to members of the Class.  Defendants' misconduct was uniformly directed at all consumers.  Thus, all members of the Class have a common cause against Defendants to stop their misleading conduct through an injunction.  Since the issues presented by this injunctive Class deal exclusively with Defendants' misconduct, resolution of these questions would necessarily be common to the entire Class.  Moreover, there are common questions of law and fact inherent in the resolution of the proposed injunctive class, including, *inter alia*:

i.      resolution of the issues presented in the 23(b)(3) class;

ii.     whether members of the Class will continue to suffer harm by virtue of Defendants' deceptive product marketing and labeling; and

iii.    whether, on equitable grounds, Defendants should be prevented from continuing to deceptively mislabel the Products?

c.      <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the injunctive Class because their claims arise from the same course of conduct (*i.e.*, Defendants' deceptive and misleading marketing, labeling, and advertising practices).    Plaintiffs are typical

representatives of the Class because, like all members of the injunctive Class, they purchased Defendants' Products, which were sold unfairly and deceptively to consumers throughout the United States.

d.     Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the injunctive Class.  Their consumer protection claims are common to all members of the injunctive Class and they have a strong interest in vindicating their rights. In addition, Plaintiffs and the Class are represented by counsel who are competent and experienced in both consumer protection and class action litigation.

152.    Plaintiffs seek injunctive relief on behalf of the Class Members on grounds generally applicable to the entire injunctive Class, and Defendants have acted or refused to act in a manner that applies generally to the injunctive Class (*i.e.*, Defendants have marketed their Products using the same misleading and deceptive labeling to all of the Class Members).

153.    Plaintiffs also seek to include an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and Class Members to test for the presence of benzene in their blood serum; and the implementation and funding of a medical monitoring program for Plaintiffs and Class Members sufficient to monitor Plaintiffs' and Class Members' health to ensure they are adequately monitored for the harmful effects of benzene in the human body.

154.    Any final injunctive relief or declaratory relief would benefit the entire injunctive Class as Defendants would be prevented from continuing their misleading and deceptive marketing practices and would be required to honestly disclose to consumers the true nature of the contents of the Products.

## CLAIMS

### FIRST CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(On Behalf of Plaintiffs and All Class Members)**

155.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156.    Defendants provided Plaintiffs and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products contained only those active and inactive ingredients listed on the Product's labels. Those active and/or inactive ingredients (as listed on the Product bottles) do not include benzene, a known human carcinogen dangerous to humans.

157.    The above affirmations of fact were not couched as "belief" or "opinion" and were not "generalized statements of quality not capable of proof or disproof."

158.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs and Class Members' transactions.

159.    Plaintiffs and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

160.    Defendants knowingly breached the express warranties by including benzene in the Product line sold to Plaintiffs and the Class without properly notifying them of their inclusion or potential inclusion in the Products.

161.    Within a reasonable time after they knew or should have known, Defendants did not change the Products' labels to include benzene in the ingredient list.

162.    Defendants thereby breached the following state warranty laws:

a.     Code of Ala. § 7-2-313;

b.     Alaska Stat. § 45.02.313;

c.     A.R.S. § 47-2313;

d.     A.C.A. § 4-2-313;

e.     Cal. Comm. Code § 2313;

f.     Colo. Rev. Stat. § 4-2-313;

g.     Conn. Gen. Stat. § 42a-2-313;

h.     6 Del. C. § 2-313;

i.     D.C. Code § 28:2-313;

j.     Fla. Stat. § 672.313;

k.     O.C.G.A. § 11-2-313;

l.     H.R.S. § 490:2-313;

m.     Idaho Code § 28-2-313;

n.     810 I.L.C.S. 5/2-313;

o.     Ind. Code § 26-1-2-313;

p.     Iowa Code § 554.2313;

q.     K.S.A. § 84-2-313;

r.     K.R.S. § 355.2-313;

s.     11 M.R.S. § 2-313;

t.     Md. Commercial Law Code Ann. § 2-313;

u.     106 Mass. Gen. Laws Ann. § 2-313;

v.     M.C.L.S. § 440.2313;

w.     Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

163.    As a direct and proximate result of Defendants' breach of the express warranties, Plaintiffs and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT/ FRAUDULENT NONDISCLOSURE**
**(On Behalf of Plaintiffs and All Class Members)**

164.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

165.    Defendants concealed and failed to disclose on the Products' packaging and labeling the material fact that the Products contained or may contain benzene, and/or that the Products were not safe or healthy for use.

166.    Defendants had knowledge that the Products contained or may contain benzene, and that the Products were not safe or healthy for use.

167.    Defendants have a duty to disclose that the Products contained or may contain benzene, and that the Products were not safe or healthy for use.

168.    Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiffs and Class Members would rely upon the representations and omissions of Defendants regarding the quality and ingredients of their Products. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains benzene, especially at the point of sale.

169.     Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy.  Defendants know that if they had not omitted that the Products contained or may contain benzene, then Plaintiffs and the Class would not have purchased the Products at all or paid a premium for them; however, Defendants wanted to increase sales and profits.

170.     In purchasing the Product, Plaintiffs and the other members of the Class justifiably relied on Defendants to disclose that the Products contained or may contain benzene.

171.     Defendants' concealment misled Plaintiffs and the Class as to the true nature of what they were buying and putting onto and into their bodies.

172.     Defendants fraudulently concealed that the Products contained or may contain benzene and that the Products were not safe or healthy for use.  Consequently, Plaintiffs and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

<u>**THIRD CAUSE OF ACTION**</u>
<u>**UNJUST ENRICHMENT**</u>
**(On Behalf of Plaintiffs and All Class Members in the Alternative)**

173.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

174.     Plaintiffs, on behalf of themselves and consumers nationwide, bring a claim for unjust enrichment.

175.     This count is plead in the alternative, insofar as Plaintiffs do not have an adequate remedy at law

176.    Regardless of whether the label contained a benzene disclosure or not, Defendants should have never sold the Products (and was actually legally precluded therefrom). The drug comprising the Products *itself*, regardless of any disclosures made or not made on the label, was illegal, as the drug: (a) contained unsuitable inactive ingredients, (b) contained unsafe inactive ingredients, (c) was manufactured utilizing a harmful Class I solvent resulting in residual impurity, and/or (d) was contaminated with benzene.

177.    As a result of Defendants' selling the Products, Defendants received a benefit which was conferred upon it by Plaintiffs and the Classes (and/or at their expense), and it is unjust for Defendants to retain that benefit.

178.    Further and/or in the alternative to the theory espoused in the preceding two paragraphs, despite the serious risks of harm inherent in potentially exposing consumers to benzene, Defendants have not disclosed these risks, and in fact has actively obfuscated the dangers of the Products by promising consumers the Products are safe. Plaintiffs and Class members would not have bought the Products if they had known the Products contained or may contain benzene (or, alternatively, a significant risk of benzene existing due to impurities or contamination).

179.    As a result of Defendants' illegal, unfair, and/or deceptive marketing and labeling of its Product, Defendants receive a benefit which was conferred upon them by Plaintiffs and the Classes (and/or at their expense), and it is unjust for Defendants to retain that benefit.

180.    Under the circumstances, it is against equity and good conscience to permit Defendants to retain the ill-gotten benefits that it received from Plaintiffs and Class members.

181.    Thus, it is unjust or inequitable for Defendants to retain the benefit without restitution to Plaintiffs and Class members.

182.     As a direct and proximate result of Defendants' actions, Defendants have been unjustly enriched. Plaintiffs and Class members have a right to restitution in an amount to be proven at trial.

183.     Plaintiffs and Class Members seek establishment of a constructive trust from which Plaintiffs and Class Members may seek restitution.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL §349**
**(On Behalf of Plaintiffs Chabla, Barton, Algofi and New York Subclass Members)**

184.     Plaintiffs Chabla, Barton, and Algofi repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

185.     New York General Business Law Section 349 ("GBL §349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ."

186.     The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL §349, and as such, Plaintiffs and the New York Subclass Members seek monetary damages against Defendants, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

187.     There is no adequate remedy at law.

188.     Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

189.     Defendants' improper consumer-oriented conduct – including failing to disclose that the Products contain or may contain benzene – is misleading in a material way in that it, *inter alia*, induced Plaintiffs and the New York Subclass Members to purchase Defendants' Products

and to use the Products when they otherwise would not have.  Defendants made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

190.    Plaintiffs and the New York Subclass Members have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless.  Plaintiffs and the New York Subclass Members also received less than what they bargained and paid for.

191.    Defendants' advertising and the Products' packaging and labeling induced Plaintiffs and the New York Subclass Members to buy Defendants' Products.

192.    Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiffs and the New York Subclass Members have been damaged thereby.

193.    Additionally, Defendants' deceptive and misleading practices constitute a violation of New York General Business Law §349(g), as Defendants' practices are a violation of the New York Food, Drug and Cosmetic Act, *supra* at ¶¶ 105-106.

194.    Defendants' violation of the New York Food, Drug and Cosmetic Act, as described above, is a *per se* violation of §349(g): as it is an unlawful deceptive act or practice.

195.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL §350**
**(On Behalf of Plaintiffs Chabla, Barton, Algofi and the New York Subclass Members)**

196.    Plaintiffs Chabla, Barton, and Algofi repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

197.    N.Y. Gen. Bus. Law §350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

198.    N.Y. Gen. Bus. Law §350a(1) provides, in part, as follows:

The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual.

199.    Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as they misrepresent that the Products are safe for use and/or do not list that the Products contain or may contain benzene.

200.    Plaintiffs and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled, unhealthy, and entirely worthless.  Accordingly, Plaintiffs and the New York Subclass Members received less than what they bargained and paid for.

201.    Defendants' advertising, packaging, and the Products' labeling induced Plaintiffs and the New York Subclass Members to buy Defendants' Products.

202.    Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

203.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law §350.

204.    Defendants made the material misrepresentations described in this Complaint in its advertising and on the Products' packaging and labeling.

205.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

206.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW**
**(On Behalf the Plaintiff Zayas and the Pennsylvania Subclass Members)**

207.    Plaintiff Zayas incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

208.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL"), 73 Pa. Cons. Stat. §§201-1, *et seq*., prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce. The Pennsylvania CPL is to be liberally construed to effectuate its purpose.

209.    Plaintiff Zayas, and other members of the Pennsylvania Subclass, as purchasers of the Products, are consumers within the meaning of the Pennsylvania CPL given that Defendants' business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

210.    Defendants' conduct in misrepresenting the benefits of their Products and/or omitting material information from the Products' labels constitutes the act, use and employment

of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendants' trade or commerce.

211.    Defendants also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiffs, and other members of the Pennsylvania Subclass, knowing that consumers would rely on the advertisements, packaging, and Defendants' uniform representations to purchase the Products.

212.    Once the material omissions regarding the Products became apparent to Defendants, consumers (Plaintiff Zayas and other members of the putative Pennsylvania Subclass) were entitled to disclosure of the fact that the Product contained or may contain benzene, a human carcinogen, which would be a material fact in a consumer's decision-making process, and, without Defendants' disclosure, consumers would not necessarily know that there is such a risk.

213.    Defendants intended that Plaintiff Zayas, and the Pennsylvania Subclass, would rely on the continued deception by purchasing the Products, unaware of the material facts and omissions described above. Defendants knew that their customers would continue to rely on their representations that the Product consisted of the active and inactive ingredients on the Products' labels, and/or that said ingredients were safe and effective, and knew that consumers would continue to rely upon its silence as to any known risk of the presence of a carcinogenic and toxic chemical impurity, as evidence that the Products were safe. This conduct constitutes consumer fraud within the meaning of the Pennsylvania CPL.

214.    Defendants' material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods, in violation of the Pennsylvania CPL.

215.    Plaintiff Zayas and other members of the Pennsylvania Subclass justifiably relied on the omission of any disclosure related to the contamination of benzene in their purchase of Products that were presumably free from carcinogens.

216.    Plaintiff Zayas, and the other members of the Pennsylvania Subclass, suffered damages as a proximate result of the unfair acts or practices of Defendants alleged herein. Defendants' misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully, or with reckless disregard for the consequences of their actions.

217.    Plaintiff Zayas, and other members of the Pennsylvania subclass, would not have purchased the Products but for the promised benefits and concealment of any risk of harm (including the potential presence of benzene) because the Products as sold had no intrinsic value to them. This constitutes an ascertainable loss readily obtainable by the purchase price of the Product. Alternatively, Plaintiffs suffered an ascertainable loss in that they paid for more for a product than they would have had they known that it contained or risked containing benzene.

218.    Defendants knowingly accepted the benefits of their deception and improper conduct in the form of profits from the increased sale of the Products.

219.    As a proximate result of the above-described violations of the Pennsylvania CPL, Plaintiff Zayas, and other members of the Pennsylvania Subclass: (a) purchased and used the Products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchasing the Products or the premium paid for the Products; and (c) suffered and/or will suffer additional economic losses by purchasing the Products.

220.    Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

221.    Plaintiff Zayas also seeks to enjoin Defendants' ongoing deceptive practices relating to their claims on the Products' labels and advertising.

## SEVENTH CAUSE OF ACTION
## VIOLATIONS OF OREGON UNLAWFUL TRADE PRACTICES ACT ("OUTPA")
### Subsection 646.608(1)(b): causing likelihood of confusion or misunderstanding
### (On Behalf the Plaintiff Jean and the Oregon Subclass Members)

222.    Plaintiff Jean incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

223.    Plaintiff Jean brings this claim under OUTPA, Or. Rev. Stat. §§ 646.605, *et seq*., on behalf of herself and the Oregon Subclass, who were subject to Defendants' above-described illegal conduct.

224.    Plaintiff Jean and Defendants are "persons" within the meaning of O.R.S. § 646.605(4).

225.    Defendants are engaged in the sale of "goods" as defined by O.R.S. § 646.605(6)(a).

226.    Plaintiff Jean and each and every Oregon Subclass members' purchase of Defendants' Banana Boat Sunscreen Products constitutes a "sale" within the meaning of O.R.S. § 646.607.

227.    Defendants are engaged in "trade" or "commerce" within the meaning of O.R.S. § 646.605(8), affecting consumers in Oregon and throughout the United States.

228.    Defendants engaged in the design, development, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the Products.

229.    OUTPA prohibits "unfair *or* deceptive acts conduct in trade or commerce...." O.R.S. § 646.608(1) (emphasis added). Due to the conduct described herein, Defendants willfully,

knowingly, and/or recklessly used and/or employed a method, act or practice declared unlawful under the OUTPA.

230.    Defendants violated O.R.S. § 646.608(1)(b) by causing the likelihood of confusion or of misunderstanding as to the source of goods. Defendants' labeling causes the likelihood that reasonable consumers confuse or misunderstand the source of the Products as containing or potentially containing only those active and inactive ingredients listed on the Products' labels, when in fact, the Products contain or may contain benzene.

231.    A product which does not potentially contain benzene (which is likely to be misunderstood by reasonable consumers as applying to these Products) is inherently worth more than the actual Products purchased by Plaintiff Jean and the Oregon Subclass, which are products that contain or may contain benzene.

232.    Defendants' violations of O.R.S. § 646.608(1)(b) were willful as Defendants knew or should have known that the conduct complained of herein caused the likelihood of confusion or of misunderstanding as to the source of the Products, and violated OUTPA.

233.    Defendants caused the likelihood of confusion complained of herein with the knowledge that their conduct was illegal at the time the Products' label was created through the present. As independent and Plaintiffs' own testing demonstrates, the Products contain or may contain benzene.

234.    Further, Defendants recklessly and/or knowingly engaged in conduct which caused the likelihood of confusion or of misunderstanding as to the source of the Products.

235.    Defendants willfully and knowingly (and/or recklessly) provided the ingredients listed on the Products' labels, which Defendants at all relevant times knew and should have known were not accurate.

236.    Defendants intended to cause confusion as to the source of the Products, as Defendants were aware (or should have been aware) that they could charge more for such Products than products that contain or may contain benzene.

237.    The illegal conduct complained of herein was no isolated incident or one-time mistake; rather, it occurred over years with respect to every bottle of the Products manufactured, labeled, and sold by Defendants to Plaintiff Jean and the Oregon Subclass, which caused likelihood of confusion or of misunderstanding as to the source of the Products.

238.    Defendants continued to manufacture, market, and/or sell the Products with an inaccurate ingredients list, even after receiving notice of independent testing that the Products contain or may contain benzene.

239.    Even after receiving this notice, Defendants made no effort to refund either Plaintiff Jean or the Oregon Subclass in response.

240.    As a result of Defendants' willful and knowing (and/or reckless) violations of O.R.S. § 646.608(1)(b), described above, Plaintiff Jean and the Oregon Subclass suffered an ascertainable loss of money or property.

241.    Plaintiff Jean and the Oregon Subclass lost money due to the difference between the value of the Product as marketed by the Defendants in a way that is likely to cause confusion or of misunderstanding, as inherently reflected in the purchase price, and the lesser value of the Products actually received by the Plaintiff Jean and the Oregon Subclass. Absent the Defendants' willful and knowing (and/or reckless) violations of O.R.S. § 646.608(1)(b), Plaintiff Jean and the Oregon Subclass would not have suffered this ascertainable loss of money.

242.    Pursuant to O.R.S. § 646.638(1), Plaintiff Jean (on behalf of herself and the Oregon Subclass) seek statutory damages in the amount of $200.

243.     Plaintiff Jean and the Oregon Subclass further seek an order declaring Defendants have violated OUTPA.

244.     Plaintiff Jean and the Oregon Subclass also seek equitable relief, an injunction, and attorneys' fees and costs. O.R.S. §§ 646.636 and 656.638.

245.     Injunctive relief is proper, as Plaintiff Jean would purchase the Products again, but only if Defendants sold a Product that neither contains nor may contain benzene.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF OREGON UNLAWFUL TRADE PRACTICES ACT ("OUTPA")**
**Subsections 646.608(1)(e): unlawful omissions**
**(On Behalf the Plaintiff Jean and the Oregon Subclass Members)**

246.     Plaintiff Jean incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

247.     Defendants violated O.R.S. § 646.608(1)(e) by representing that goods have characteristics, ingredients, quantities or qualities that the goods do not have. Notably, "a representation under subsection (1) of this section or ORS § 646.607 may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." O.R.S. § 646.608(2).

248.     Defendants' labeling fails to disclose that benzene is an inactive ingredient, by failing to state that the Products contain or may contain benzene.

249.     A product which does not potentially contain benzene —which is how the product is represented to all consumers—is inherently worth more than the actual Products purchased by Plaintiff Jean and the Oregon Subclass, which are products that contain or may contain benzene.

250.     Defendants' violations of O.R.S. §§ 646.608(1)(e) were willful as Defendants knew or should have known that the conduct complained of herein caused the Products to be misrepresented, and violated OUTPA.

251.     Defendants engaged in the omissions complained of herein with the knowledge that their conduct was illegal at the time the Products' label was created through the present. As independent and Plaintiffs' own testing demonstrates, the Products contain or may contain benzene.

252.     Further, Defendants recklessly and/or knowingly omitted that the Products contain or may contain benzene.

253.     Defendants willfully and knowingly (and/or recklessly) provided the ingredients list on the Products' labels, which Defendants at all relevant times knew and know were not accurate.

254.     Defendants intended to misrepresent the Products, as Defendants (upon reasonable belief) were aware (or should have been aware) that they could charge more for such Products than products that contain or may contain benzene.

255.     The illegal conduct complained of herein was no isolated incident or one-time mistake; rather, it occurred over years with respect to every bottle of the Product manufactured, labeled, and sold by Defendants to Plaintiff Jean and the Oregon Subclass, which misrepresented the Products' ingredient list and omitted that the Products contain or may contain benzene.

256.     Defendants continued to manufacture, market, and/or sell the Products with an inaccurate ingredients list, even after receiving notice of independent testing that the Products contain or may contain benzene.

257.     Even after receiving this notice, Defendants made no effort to refund either Plaintiff Jean or the Oregon Subclass in response.

258.    As a result of Defendants' willful and knowing (and/or reckless) violations of O.R.S. §§ 646.608(1)(e), described above, Plaintiff Jean and the Oregon Subclass suffered an ascertainable loss of money or property.

259.    Plaintiff Jean and the Oregon Subclass lost money due to the difference between the value of the Product as misrepresented by the Defendant, as inherently reflected in the purchase price, and the lesser value of the Products actually received by the Plaintiff Jean and the Oregon Subclass. Absent the Defendants' willful and knowing (and/or reckless) violations of O.R.S. §§ 646.608(1)(e), Plaintiff Jean and the Oregon Subclass would not have suffered this ascertainable loss of money.

260.    Pursuant to O.R.S. § 646.638(1), Plaintiff Jean (on behalf of herself and the Oregon Subclass) seek statutory damages in the amount of $200.

261.    Plaintiff Jean and the Oregon Subclass further seek an order declaring Defendants have violated OUTPA.

262.    Plaintiff Jean and the Oregon Subclass also seek equitable relief, an injunction, and attorneys' fees and costs. O.R.S. §§ 646.636 and 656.638.

263.    Injunctive relief is proper, as Plaintiff Jean would purchase the Products again, but only if Defendants sold a Product that neither contains nor may contain benzene.

**NINTH CAUSE OF ACTION**
**VIOLATIONS OF OREGON UNLAWFUL TRADE PRACTICES ACT ("OUTPA")**
**Subsections 646.608(1)(e): failure to disclose lawfully required information**
**(On Behalf the Plaintiff Jean and the Oregon Subclass Members)**

264.    Plaintiff Jean incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

265.    Defendants violated O.R.S. §§ 646.608(1)(e)—which deal specifically with representations—by failing to disclose lawfully required information. As noted in O.R.S. §

646.608.2 (emphasis added), "[a] *representation* under subsection (1) of this section or ORS 646.607 may [include], but not limited to, a *failure to disclose a fact*."

266.    Defendants were legally required under FFDCA to disclose—and yet failed to disclose—that the Products contained or may contain the inactive ingredient benzene.

267.    The legally required yet omitted information—that the Products contain or may contain the inactive ingredient benzene—relates to the characteristics, ingredients, quantities or qualities of the good, in violation of O.R.S. § 646.608(1)(e).

268.    In failing to provide the legally mandated disclosures, Defendants illegally sold the Products to Plaintiff and the Class, thereby causing Plaintiff and the Class Members' ascertainable loss of money.

269.    Alternatively, a product which does not contain or may contain the inactive ingredient benzene—which is how the product is represented to all consumers—is inherently worth more than a product that contains or may contain the inactive ingredient benzene, which is what consumers actually received.

270.    Defendants' violations of O.R.S. §§ 646.608(1)(e) were willful as Defendants knew or should have known that it was omitting legally required information relating to the characteristics, ingredients, quantities, qualities, and/or standard of the Product, causing the Product to be misrepresented on account of omissions, and violated OUTPA.

271.    Defendants engaged in the omissions complained of herein with the knowledge that their conduct was illegal at the time the Products' label was created through the present. As described above, the Products failed to properly disclose the inactive ingredients in conformance with the FFDCA.

272.    Further, Defendants recklessly and/or knowingly omitted the legally required information (described above) relating to the characteristics, ingredients, quantities, qualities, and/or standard of the Products.

273.    Defendants are sophisticated entities who manufacture and sell a number of products, and can be presumed to have an understanding of federal labeling requirements.

274.    Defendants intended to omit the legally required information discussed herein, as Defendants (upon reasonable belief) were aware (or should have been aware) that they could charge more for such Products without the legally required disclosures than one containing the legally required disclosures.

275.    The illegal conduct complained of herein was no isolated incident or one-time mistake; rather, it occurred over years with respect to every bottle of the Products manufactured, labeled, and sold by Defendants to Plaintiff Jean and the Oregon Subclass, which omitted the legally required information discussed herein.

276.    Defendants continued to manufacture, market, and/or sell the Products without the legally required disclosures, even after receiving notice of independent testing that the Products contain or may contain benzene.

277.    Even after receiving this notice, Defendants made no effort to refund either Plaintiff Jean or the Oregon Subclass in response.

278.    As a result of Defendants' willful and knowing (and/or reckless) violations of O.R.S. §§ 646.608(1)(e), Plaintiff Jean and the Oregon Subclass suffered an ascertainable loss of money or property.

279.    Pursuant to O.R.S. § 646.638(1), Plaintiff Jean (on behalf of herself and the Oregon Subclass) seeks statutory damages in the amount of $200.

280.    Plaintiff Jean and the Oregon Subclass further seek an order declaring Defendants have violated OUTPA.

281.    Plaintiff Jean and the Oregon Subclass also seek equitable relief, an injunction, and attorneys' fees and costs. O.R.S. §§ 646.636 and 656.638

282.    Injunctive relief is proper, as Plaintiff would purchase the Products again, but only if Defendants sold Products that conform with the legally required disclosures and neither contain nor may contain the inactive ingredient benzene.

**TENTH CAUSE OF ACTION**
**VIOLATIONS OF OREGON UNLAWFUL TRADE PRACTICES ACT ("OUTPA")**
**Subsection 646.608(1)(i): false advertising**
**(On Behalf the Plaintiff Jean and the Oregon Subclass Members)**

283.    Plaintiff Jean incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

284.    Defendants violated O.R.S. § 646.608(1)(i) by advertising goods with intent not to provide them as advertised. Through their labeling, Defendants advertised the Products as containing active and/or inactive ingredient other than benzene. However, as discussed here, this was *not* the product provided to Plaintiff Jean and the Oregon Subclass.

285.    A product containing ingredients free of benzene—which is how the Products are advertised to all consumers—is inherently worth more than the actual Products purchased by Plaintiff Jean and the Oregon Subclass, which are products that contain or may contain benzene

286.    Defendants' violations of O.R.S. § 646.608(1)(i) were willful as Defendants knew or should have known that the conduct complained of herein (the labeling) was an advertisement that did not conform to the true nature of the Products, and violated OUTPA.

287.    Defendants engaged in the false advertising complained of herein with the knowledge that their conduct was illegal at the time the Products' label was created through the

present. As independent and Plaintiffs' own testing demonstrates, the Products contain or may contain benzene.

288. Further, Defendants recklessly and/or knowingly engaged in in the false advertising conduct.

289. Defendants willfully and knowingly (and/or recklessly) advertised the Products as containing ingredients other than benzene, which Defendants knew was false, and at no point did Defendants seek to provide a such a product in place of the actual Products advertised to Plaintiff and the Class.

290. Defendants intended to engage in this false advertising without providing the Products as advertised, as Defendants (upon reasonable belief) were aware (or should have been aware) that they could charge more for such Products than products that contain or may contain benzene.

291. The illegal conduct complained of herein was no isolated incident or one-time mistake; rather, the false advertising occurred over years with respect to every bottle of the Products manufactured, labeled, and sold by Defendants to Plaintiff Jean and the Oregon Subclass.

292. Upon reasonable belief, Defendants continued advertise the Products as containing ingredients other than benzene, even after receiving notice of independent testing that the Products contain or may contain benzene.

293. Even after receiving this notice, Defendants made no effort to refund either Plaintiff Jean or the Oregon Subclass in response.

294. As a result of Defendants' willful and knowing (and/or reckless) violations of O.R.S. §§ 646.608(1)(i), described above, Plaintiff Jean and the Oregon Subclass suffered an ascertainable loss of money or property.

295.     Plaintiff Jean and the Oregon Subclass lost money due to the difference between the value of the Products as illegally advertised by Defendants, as inherently reflected in the purchase price, and the lesser value of the Products actually received by the Plaintiff Jean and the Oregon Subclass. Absent the Defendants' willful and knowing (and/or reckless) violations of O.R.S. § 646.608(1)(i), Plaintiff Jean and the Oregon Subclass would not have suffered this ascertainable loss of money.

296.     Pursuant to O.R.S. § 646.638(1), Plaintiff Jean (on behalf of herself and the Oregon Subclass) seeks statutory damages in the amount of $200.

297.     Plaintiff Jean and the Oregon Subclass further seek an order declaring Defendants have violated OUTPA.

298.     Plaintiff Jean and the Oregon Subclass also seek equitable relief, an injunction, and attorneys' fees and costs. O.R.S. §§ 646.636 and 656.638.

299.     Injunctive relief is proper, as Plaintiff would purchase the Product again, but only if Defendants sold the Product as it was advertised to Plaintiff and the Class (i.e., one containing or potentially containing ingredients other than benzene)

### ELEVENTH CAUSE OF ACTION
**Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.**
**Premised on Violations of the FFDCA and Florida's Drug and Cosmetic Act (FLDCA)**
**(On Behalf Plaintiffs Clinger, Barba, and the Florida Subclass)**

300.     Plaintiffs Clinger and Barba incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

301.     Plaintiffs Clinger, Barba, and the Florida Subclass are "consumers" within the meaning of Part II of Chapter 501, Florida Statutes, relating to Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

302.     Defendants each are a "person" or "entity" as used in FDUTPA.

303.     Defendants' conduct alleged herein relating to the distribution and/or sale of the Products constitutes "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

304.     FDUTPA declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204(1).

305.     Further, FDUTPA violations may be predicated on the violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).

306.     Violations of the FFDCA and FLDCA constitute unfair, unconscionable, and/or deceptive acts or practices in violation of FDUTPA.

307.     By violating 21 U.S.C. § 331 (and other provisions of the FFDCA and its implementing regulations cited herein), and Fla. Stat. § 499.005, Defendants have violated the FFDCA and FLDCA and engaged in unfair competition and/or unconscionable/unfair acts or practices in violation of FDUTPA.

308.     Further, by violating 21 U.S.C. § 331 and Fla. Stat. § 499.005, Defendants violated a statute proscribing an unfair method of competition.

309.     Further, by violating 21 U.S.C. § 331 and Fla. Stat. § 499.005, Defendants have engaged in unfair practices. Defendants' violations of these provisions offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

310.     Defendants' violations of 21 U.S.C. § 331 and Fla. Stat. § 499.005 stem from the Products being adulterated and/or misbranded, and/or containing unsafe and/or unsuitable inactive ingredients such that it is rendered an unapproved new drug.

311.    The Products are adulterated under both the FFDCA and FLDCA for at least one of the violations described in ¶¶ 91-104 herein.

312.    The Products are misbranded under both the FFDCA and FLDCA for at least one of the violations described in ¶¶ 63-90 herein.

313.    The Products contain unsafe and/or unsuitable inactive ingredients, rendering them an unapproved new drug, for the reasons provided in ¶¶ 105-116 herein.

314.    As a direct and proximate result of Defendants' violations of the FFDCA and FLDCA (and hence FDUTPA), Plaintiffs and the Florida Subclass have lost money and suffered actual damages.  Since the Product was adulterated, misbranded and/or an unapproved new drug, Defendants illegally sold the Products to Plaintiffs and the Florida Subclass, thereby causing Plaintiffs Clinger and Barba and the Subclass Members' loss of money as measured by the full purchase price.

315.    Alternatively, the Products as it was presented for sale—which is *per se* neither adulterated or misbranded—is inherently worth more than an adulterated, misbranded, and/or unapproved new drug product, which is what the consumers actually received.

316.    This injury is of the type Fla. Stat. § 501.201, *et seq.*, was designed to prevent and directly results from Defendants' conduct violating a law which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

317.    There is no federal or state law which affirmatively authorizes Defendants to engage in the harmful conduct alleged throughout this Complaint.

318.    In addition to actual damages, Plaintiffs Clinger, Barba, and the Florida subclass are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

**TWELFTH CAUSE OF ACTION**
**Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.***
**Unfair Acts or Practices**
**(On Behalf Plaintiffs Clinger, Barba, and the Florida Subclass)**

319.    Plaintiffs Clinger and Barba incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

320.    Independent of whether Defendants' conduct violated the FFDCA or FLDCA, Defendants' conduct, as described throughout the complaint, are unfair acts or practices in violation of FDUTPA.

321.    Defendants' practices, as described herein, offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  The Products labels instruct consumers to regularly apply substantial amounts of sunscreen to achieve the therapeutic benefit, and consumers (including Plaintiffs Clinger, Barba, and the Florida Subclass) do so without knowledge that the Products are contaminated with a known human carcinogen (or, alternatively, there is a substantial risk thereof).

322.    Further, the benzene serves no benefit, therapeutic or otherwise. Defendants subjected consumers, including Plaintiffs Clinger and Barba and the Florida Subclass, to Products that contain or may contain a harmful carcinogen which served no benefit when other sunscreen products without benzene contamination were available at comparable prices.

323.    Alternatively, or in addition, Defendants' modus operandi constitutes an unfair practice in that it knew (or should have known) they were selling topical sunscreens without reasonable controls in place to prevent the type of contamination leading to the benzene detected in the Products, and/or contained an inactive ingredient that was unsafe and/or unsuitable.

324.    The practices complained of herein are not limited to a single instance but rather were done pervasively and uniformly against Plaintiffs Clinger, Barba, and the Florida Subclass.

325.    Defendants' unfair conduct caused substantial injury to Plaintiffs Clinger, Barba, and the Florida Subclass due to Defendants' common omissions and/or unscrupulous practices, which Defendants lack any reasonable or legitimate justification for, and which could not have been avoided by reasonable consumers.

326.    As a direct and proximate result of Defendants' unfair practices (which violate FDUTPA), Plaintiffs and the Florida subclass have lost money and suffered actual damages. Absent Defendants' immoral and unscrupulous business practice of selling a topical sunscreen not free of benzene contamination, Defendants would not have sold the Products, and Plaintiffs Clinger, Barba, and the Florida Subclass would not have lost funds purchasing it.

327.    Defendants have benefitted from the conduct complained of herein while Plaintiffs Clinger and Barba and the Florida Subclass have been misled as to the nature and integrity of the Products and have lost money, in the form of the purchase price of the Product (or, alternatively, by receiving a Product that was worth far less than the Product as represented).

328.    This injury is of the type Fla. Stat. § 501.201, *et seq*., was designed to prevent and directly results from Defendants' unfair conduct.

329.    In addition to actual damages, Plaintiffs Clinger, Barba, and the Florida Subclass are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

### THIRTEENTH CAUSE OF ACTION
### Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.
### Deceptive Acts or Practices
### (On Behalf Plaintiffs Clinger, Barba, and the Florida Subclass)

330.    Plaintiffs Clinger and Barba incorporate by reference and re-allege each of the preceding paragraphs, as though fully set forth herein.

331.    Independent of whether Defendants' conduct violated the FFDCA or FLDCA, Defendants' conduct, as described throughout the complaint, are deceptive acts or practices in violation of FDUTPA.

332.    Defendants engaged in deceptive conduct in violation of FDUTPA when they made omissions regarding benzene (or, alternatively, the potential for benzene) in the Products.  These omissions are likely to mislead consumers acting reasonably under the circumstances, to the consumer's detriment (including Plaintiffs).

333.    Reasonable consumers, such as Plaintiffs Clinger and Barba and the Florida Subclass, do not expect carcinogens to be present in a topical sunscreen, and at the very least expect the presence or potential presence of carcinogens to be brought to their attention on the Products' labels.  By failing to disclose this information, Defendants have engaged, and continue to engage, in conduct likely to deceive members of the public.

334.    Defendants' omissions (as detailed herein) are likely to mislead reasonable consumers and cause them injury.

335.    As a direct and proximate result of Defendants' deceptive acts or practices (which violate FDUTPA), Plaintiffs Clinger, Barba, and the Florida Subclass have lost money and suffered actual damages.  But for the omissions, reasonable consumers would not have purchased the Products, thereby injuring them financially as measured by the full purchase price.

336.    Alternatively, the Products as they were presented for sale—without disclosures as to the presence of (or alternatively, risk of) carcinogens—is inherently worth more than a sunscreen product containing (or, alternatively, potentially containing) benzene, which is what consumers actually received. Defendants were able to charge more for the Products due to their deceptive acts violating FDUTPA.

337. This injury is of the type Fla. Stat. § 501.201, *et seq*. was designed to prevent and directly results from Defendants' deceptive conduct.

338. In addition to actual damages, Plaintiffs Clinger, Barba, and the Florida Subclass are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A. Declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B. Entering preliminary and permanent injunctive relief against Defendants, directing Defendants to correct their practices and to comply with the at issue consumer protection laws;

C. An Order requiring Defendants to establish a blood testing program for Plaintiffs and the Class, as well as to establish a medical monitoring protocol for Plaintiffs and the Class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to benzene;

D. Awarding monetary damages and treble damages;

E. Awarding statutory damages;

F. Awarding punitive damages;

G. Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, experts, and reimbursement of Plaintiffs' expenses; and

H. Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

## NOTICE TO ATTORNEY GENERAL OF OREGON

This Complaint shall be mailed to the Attorney General of the State of Oregon, and proof of receipt of same shall be filed with this Court.

Dated: April 18, 2022

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Joseph P. Guglielmo
Joseph P. Guglielmo (ct27481)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel: 212-223-6444
Fax: 212-223-6334
jguglielmo@scott-scott.com

*Interim Liaison Counsel*

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Gillian L. Wade (*pro hac vice*)
gwade@mjfwlaw.com
Marc A. Castaneda (*pro hac vice*)
mcastaneda@mjfwlaw.com
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Tel: (310) 396-9600
Fax: (310) 396-9635

**SHUB LAW FIRM LLC**
Kevin Laukaitis
Jonathan Shub
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
Telephone: (856) 772-7200
Facsimile:  (856) 210-9088
klaukaitis@shublawyers.com
jshub@shublawyers.com

**LEVIN SEDRAN & BERMAN LLP**
David C. Magagna Jr.
Charles E. Schaffer
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

**CASEY LAW FIRM, LLC**
M. Ryan Casey
PO Box 4577
Frisco, CO 80443
Tel: (970) 372-6509
ryan@rcaseylaw.com

*Co-Lead Counsel for Plaintiffs and the Class*