# EXHIBIT A

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   YVONNE BARNES, et al.,           )  Docket No. 21 C 6191
                                      )
 5                   Plaintiffs,      )
                                      )
 6           vs.                      )
                                      )
 7   UNILEVER UNITED STATES           )  Chicago, Illinois
     INCORPORATED,                    )  July 20, 2022
 8                                    )  3:30 o'clock p.m.
                     Defendant.
 9

10                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12   APPEARANCES:

13

14   For the Plaintiff:    SHUB LAW FIRM LLC
                           BY:  MR. KEVIN LAUKAITIS
15                         134 Kings Highway East
                           Second Floor
16                         Haddonfield, NJ 08033
                           (856) 772-7200
17

18   For the Defendant:    SHOOK, HARDY & BACON LLP
                           BY:  MS. RILEY C. MENDOZA
19                         111 S. Wacker Drive, Suite 5100
                           Chicago, IL 60606
20                         (312) 704-7700

21

22

23

24   Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                           Official Court Reporter
25                         219 S. Dearborn Street, Suite 2102
                           Chicago, Illinois  60604
                           (312) 435-5639
```

1    (The following proceedings were had by video:)

2              THE CLERK:  Case 21 C 6191, Barnes v. Unilever.

3              THE COURT:  Good afternoon.  This is Judge Kennelly.

4    Can counsel for the plaintiffs please -- plaintiff please give

5    your name for the record.

6              MR. LAUKAITIS:  Good afternoon, your Honor.  Kevin

7    Laukaitis on behalf of plaintiffs.

8              THE COURT:  And counsel for the defendant.

9              MS. MENDOZA:  Riley Mendoza on behalf of defendant

10   Unilever.

11             THE COURT:  All right.  So just for the benefit of

12   those who are listening, in contrast to the case that was just

13   argued that was pretty much a one-issue case, there's a bunch

14   of issues in this one.

15             And I apologize for doing this kind of late in the

16   ball game, but I made a quick entry earlier today that

17   basically told the parties that at least from my end, I wanted

18   to focus on the 12(b)(6) arguments as opposed to the 12(b)(1)

19   arguments.  I'm not going to preclude anybody from using time

20   to argue whatever you want, but that's kind of where I'm

21   focused.

22             So it's Ms. Mendoza's motion, so you can go ahead and

23   go first.

24             MS. MENDOZA:  Sure.  The plaintiffs in this case

25   allege that they would not have purchased or they would have

1    paid less for two spray antiperspirants that were manufactured

2    by Unilever.  It's Suave 24-hour Protection Powder and Suave

3    24-hour Protection Fresh.  And they allege they wouldn't have

4    done this if they'd known the results from some testing that

5    was performed by an online pharmacy called Valisure.

6            That testing showed the presence of benzene above the

7    FDA standard in some but not all of the four lots of product

8    that were tested.

9            There's no physical injury alleged in this case.  The

10   plaintiff alleged that there were economic damages only for

11   the decreased value of the product to them.  They also -- and

12   no injury medical monitoring claim.

13           Unilever conducted its own review and found slightly

14   elevated levels of benzene coming from the propellant that

15   sprayed the product out of the can of these products.

16           An independent evaluation determined that the daily

17   exposure to benzene from the products at the level shown in

18   the testing would not be expected to cause adverse health

19   consequences.  However, Unilever did decide to voluntarily

20   recall these products.

21           Unilever is no longer selling these products.  It's

22   offered a refund to any consumer, including the plaintiff

23   here, who purchased the product.

24           Again, the plaintiff has not suffered a physical

25   injury.  There's been no facts to indicate that the product

1   that they actually purchased contains benzene, much less

2   benzene at a level that would increase the risk of cancer.

3           They claim that they wouldn't have paid more for

4   these products if they'd known about the testing.  They claim

5   there -- there is no future harm, the products are no longer

6   being sold, and they have an easy remedy for any past harm;

7   they can get a refund.  But instead of those remedies, they

8   filed this lawsuit.

9           And we argue that the case should be dismissed for

10  several reasons.  As your Honor alluded to, first, that the

11  plaintiff lacks standing.  They don't actually allege any

12  actual injury.

13          In addition, we also brought a motion based

14  on 12(b)(6) that plaintiffs have inadequately alleged the

15  remaining four claims.  The claims are:  Consumer fraud, which

16  affects Counts 1 and 2; unjust enrichment, Count 5; and

17  medical monitoring, Count 6.

18          We also ask that their claims for punitive damages be

19  dismissed because they failed to sufficiently allege a basis

20  for punitive damages.

21          THE COURT:  The punitive damages isn't a separate

22  count, right?  That's alleged under, I guess, the Consumer

23  Fraud Act claim?

24          MS. MENDOZA:  That is correct.

25          THE COURT:  Okay.  Go ahead.

1    MS. MENDOZA:  I'm just going to briefly touch on the
2  standing issue.  I know that's not your focus, but --
3          THE COURT:  Go ahead.
4          MS. MENDOZA:  -- some of the factors are relevant to
5  the rest of the claim.
6          So the Supreme Court, I think, is clear that to
7  establish standing, you need to show that -- among other
8  things, that the injury fact, the particularized meaning that
9  has affected the plaintiff in a personal and individual way.
10          It also has to be concrete, meaning it must actually
11  exist.  It cannot be hypothetical.
12          For future harm, the Supreme Court has said that
13  there's no concrete injury unless it's sufficiently imminent
14  and substantial.
15          Here that means the plaintiff needs to show that the
16  product -- the product they purchased actually exhibited the
17  alleged defect.  They do not do this.  They fail to even
18  allege that the products they purchased contained any benzene,
19  much less at the levels that increase the risk of cancer.
20          In the response brief, they say that -- they allege
21  that their product did contain benzene, and they cite
22  paragraphs 53 through 64 of the complaint, but those
23  allegations do not include any allegation that their
24  particular product contains benzene.
25          The plaintiffs rely entirely on the results of the

1    Valisure testing, and that testing is summarized at

2    paragraph 35 of the complaint, but that testing does not show

3    that the presence of benzene is uniform.

4         Three out of the four lots that were tested were near

5    or below the FDA standard of 2 parts per million.  The four

6    lots that were tested all have similar expiration dates,

7    meaning that they were likely manufactured about the same

8    time.  And if you look to the larger report that's attached to

9    the complaint, other Suave antiperspirants contained no

10   detectable benzene.

11        Plaintiffs don't allege that they purchased product

12   from the lots that were tested by Valisure, and they don't

13   allege that the Valisure testing was a representative sample

14   of the Suave product that they purchased.

15        So on a standing issue, it's just -- it's just

16   allegations of the product that the plaintiffs purchased may

17   have exposed them to benzene based on tests of other lots of

18   product that showed some but not all had levels of benzene

19   above 2 parts per million --

20        THE COURT:  I assume that the argument that they've

21   alleged that they were -- that their product contained benzene

22   is essentially that that's -- that's a reasonable inference

23   from paragraphs 53 and the ones that follow it.  The whole

24   thing, if I had known that there was benzene in the product, I

25   wouldn't have brought it, that's a fair inference from that

1   that I'm saying that there was benzene in the product.

2          If that's what's being said, what's your response to

3   it?

4          MS. MENDOZA:   That's too hypothetical to create

5   allegations of a concrete injury.  The cases have allowed

6   plaintiffs to rely on allegations of sampling when there's

7   uniform defects, but here there's just no allegations of

8   uniform defects at all, and it just doesn't -- it's too --

9   it's a -- you know, it's a sliding scale, frankly, but it's

10  too far removed from the products that they actually

11  purchased.  And they can't -- they cannot allege that the

12  products they purchased contains benzene.

13          What they say is, if I had known about this testing,

14  which showed, you know, evidence, you know, I just described,

15  I wouldn't have purchased the product.

16          THE COURT:  Well, the things that I really want to

17  ask you about have to do with the 12(b)(6) part of the

18  Consumer Fraud Act claim --

19          MS. MENDOZA:  Okay.

20          THE COURT:   -- but since you're on this, I guess I

21  have to ask this.

22          So the plaintiff says, well, we've alleged benzene

23  was in our product, but even if we didn't, we've alleged an

24  economic injury because if we had known that this was the type

25  of product that there's a good chance of containing benzene,

1  we wouldn't have even bought the thing just to avoid the
2  potential of harm.

3          And there's Seventh Circuit cases not all that old,
4  including this -- it's not Dippin' Dots, it's something Dots,
5  though, Aqua Dots, I think, is what it's called; Dippin' Dots
6  is a thing that's an ice cream, I think -- that say that that
7  kind of injury qualifies for standing purposes.

8          So what do you have to say about that alternative
9  argument that they've got?

10          MS. MENDOZA:  Sure.  Well, I would say that the *Aqua*
11  *Dots* case, it's not the same type of injury because in that
12  case -- so it was a toy that looked like candy, basically, and
13  the court found that kids found -- thought it was tasty, and
14  that as any parent would think, there's a possibility that my
15  kid's going to eat this toxic toy.  And so that risk existed
16  in each of the products and each of the toys that were sold.

17          That's not the case here.  We just -- we don't
18  have -- there's no uniform -- there's no evidence of uniform
19  benzene in all the products that were sold, all lots of this
20  product.  We have --

21          THE COURT:  I guess the point is is that if I go to
22  the store to buy an antiperspirant and I know that if this
23  says, well, this might contain benzene or it might not, I'm
24  just not going to buy the thing, or I'm certainly not going to
25  pay 4.95 for it or whatever the price is.  I might be willing

1   to pay a lesser price, or I might not buy it at all, so I'm
2   out money that I wouldn't otherwise buy.
3                   MS. MENDOZA:  Right.
4                   THE COURT:  What's wrong with that argument?
5                   MS. MENDOZA:  Well, it goes back to whether this
6   testing is sufficient -- you know, whether that representative
7   testing is sufficient to plausibly allege that the plaintiff
8   actually would believe that.  Like if the --
9                   THE COURT:  Right.
10                  MS. MENDOZA:  -- consumer would actually believe that
11  based on these four lots, then perhaps that's a good argument.
12                  Our argument, and I think it's the correct one, is
13  that the testing here is not -- it does not show that there's
14  some sort of uniform defect that would likely cause you harm.
15  Remember, it's not even that there's a tiny bit of benzene.
16  That's not enough to create an increased risk of harm.  You
17  also need to not actually create harm.
18                  There's also been a Supreme Court case in TransUnion
19  in 2021 on standing that said that the risk of future harm is
20  not sufficient.  So that --
21                  THE COURT:  That was in the -- that's not this kind
22  of case.  It's not a case about purchase of a product, right?
23  That's about credit reports.
24                  MS. MENDOZA:  Yes.  It is -- it's not a personal
25  injury case --

1          THE COURT:  No.

2          MS. MENDOZA:  -- but it does make some broad

3     statements --

4          THE COURT:  Let me slide you over to the other

5     arguments here.

6          MS. MENDOZA:  Sure.

7          THE COURT:  So the two -- well, let me just kind of

8     ask it straight out.

9          So your argument on the Consumer Fraud Act claim,

10    there's this -- what you refer to as the safe harbor argument,

11    so there's something that says that if conduct is authorized

12    by other law, including federal law, then it's not a violation

13    of the Consumer Fraud Act, and then there's this question

14    about whether there was anything actually misleading or maybe

15    knowingly misleading here.

16         And so here's my questions for you.

17         So, basically, what this boils down to on the

18    plaintiff's side is a contention that what was being sold here

19    was a -- for want of a better word, would be considered an

20    adulterated product; in other words, something that had

21    something dangerous in it that wasn't supposed to be there.

22         I guess I'm having a hard time seeing how that would

23    be protected by this safe harbor provision that says you only

24    have to disclose the intended ingredients, because, I mean,

25    let's just assume for purposes of discussion that what this

1   case was about was arsenic in the thing and it was an oral

2   product of some sort and any amount of arsenic is going to

3   kill you.  I mean -- and it was accidentally in there; it

4   wasn't an intended ingredient.

5            It would be hard to imagine a court saying in that

6   situation, well, you've got a safe harbor from the Consumer

7   Fraud Act because you didn't intend to put it in there and,

8   therefore, it doesn't have to be disclosed.  And it just seems

9   to me -- obviously, that's not this case, I get that, but it

10  seems to me that's a difference of degree rather than kind.

11  What am I missing?

12           MS. MENDOZA:  Well, first of all, I mean, certainly,

13  there's a case where there could be real deception, and -- you

14  know, if someone knew there was arsenic in their product and

15  they were not -- and they were selling the product, that would

16  be a different case.  And the plaintiffs here do not allege

17  that Unilever had any knowledge they expressly claim that

18  that's required for them to seek their claim.

19           So they have not alleged that there's deception, and

20  they've not alleged that Unilever said anything affirmative

21  that was not correct.  They do not allege that -- again, that

22  any of the products they purchased actually contain benzene,

23  and they do not allege that they were harmed.  So they're

24  missing several elements of the claim.

25           On the safe harbor claim, there is a safe harbor

1   which allowed -- which (unintelligible) plaintiff what you're

2   doing is specifically authorized by law.  And that is --

3   they're -- they're -- you know, there really were no

4   statements other than the label.  There was no affirmative

5   statement that this product was benzene-free.

6          So if your entire complaint -- entire account is

7   based on labeling, we have an FDA -- very clear FDA statute on

8   what you need to put in your label.  And you can look at the

9   label.  They put it in the complaint.  That's relatively

10  simple.

11         But that's the FDA.  That's FDA law.  So to hold

12  Unilever -- the statute says you can't be held to higher

13  standards than what federal law tells you to do, and this is a

14  very specific issue.  They're specifically relying on

15  labeling.  We have a very specific labeling statute that tells

16  what we need on our labels, and we complied with that.  And

17  they did not allege that we failed to comply with that --

18         THE COURT:  And the alternative argument is if

19  they're relying on non-disclosure, there has to be a

20  deliberate non-disclosure and intentional or knowing or

21  something like that, and they don't allege that.

22         MS. MENDOZA:  And they don't allege that at all.

23         THE COURT:  I'm going to have you hold the rest of

24  your time for rebuttal.

25         MS. MENDOZA:  Thank you.

1    THE COURT:  I have to kind of keep on track here
2  given that we're starting this other thing at 4:00 o'clock.
3    Okay.  Mr. Laukaitis, you're up.
4    MR. LAUKAITIS:  Thanks, your Honor.  Just -- I know
5  you want to talk about standing.  Briefly, though, we maintain
6  *Aqua Dots* holds in this case.  It's a Seventh Circuit case.
7  Good authority.  Defendant only cites a few out-of-circuit
8  cases.  So we stand by *Aqua Dots* in terms of standing.
9    In terms of the --
10    THE COURT:  So what about -- so since it came up,
11  what about the argument that Ms. Mendoza made that you don't
12  really come right out and say in the complaint that the
13  plaintiffs -- what they purchased actually had benzene in it?
14  At least that's --
15    MR. LAUKAITIS:  Right, your Honor.  Yep.
16    So the Valisure report was pretty clear.  I mean, it
17  was pretty damning.  It found levels of benzene, you know,
18  above 2 parts per million, in even some -- in some cases, 2
19  and a half -- above 2 and a half parts per million.
20    So under *Aqua Dots*, it's the risk of harm, and, you
21  know, it's a financial injury.  So had the plaintiffs known
22  that the -- there would be benzene in the products or there
23  was a risk of benzene being in the products, they wouldn't
24  have purchased the products.  So they would have paid less.
25  So that's a financial --

1    THE COURT:  That's really the economic loss argument
2   for standing, right?

3    MR. LAUKAITIS:  Correct, your Honor.

4    THE COURT:  Okay.  But what about -- I mean, because
5   you make two arguments.  One is -- one of the arguments, and I
6   think Ms. Mendoza was right about this, the response basically
7   says, no, no, Judge, we really did allege that benzene was in
8   what we bought.

9    In this complaint -- and I understand there's some
10   discussion about filing a revised version.  In this complaint,
11   is there an allegation that what these three plaintiffs
12   actually purchased had benzene in it?

13    MR. LAUKAITIS:  We do allege that, your Honor.  We do
14   not conduct our own testing.  Again, we stand by the Valisure
15   report.  But the plaintiffs have purchased the product on
16   multiple occasions for a course of many years.  So they were
17   exposed to those benzene levels in the product for that period
18   of time.

19    THE COURT:  Okay.  You can say anything else about
20   standing that you want, but at some point just kind of
21   transition over to the other points.

22    And I have a couple -- I have one question for you on
23   a topic I did not ask Ms. Mendoza about, and that has to do
24   with the medical monitoring claim.  So not on the standing
25   part of it; on the part of it about whether it states a claim.

1    So my question -- this is going to sound like a dumb

2  question, I guess, but what's the -- the cause of action is

3  not medical monitoring.  Medical monitoring is a remedy.

4  What's the cause of action?  Is it negligence, is it something

5  other than negligence, or what is it?

6    MR. LAUKAITIS:  It's a remedy, your Honor, and I'll

7  make this easy, that plaintiffs will be voluntarily dismissing

8  that claim after a review of the case law and the pleadings.

9  So I'll just make it easy for you there.

10    THE COURT:  Okay.  That saves me a couple of

11  questions.

12    All right, then.  So we'll skip that one.  And so

13  let's -- why don't you focus then on the Consumer Fraud Act

14  claim.

15    MR. LAUKAITIS:  Did you have particular questions

16  about that, your Honor, or someplace that you're --

17    THE COURT:  I think it's the same things I was asking

18  Ms. Mendoza about.  So there's this argument about the safe --

19  really two -- really two things, I think.

20    It's this argument about the safe harbor; in other

21  words, the contention is is that, you know, federal law says

22  we only have to disclose what we intend to put in the product,

23  no contention we did anything other than that, and end of

24  story, safe harbor under 10b -- Section 10b of the Consumer

25  Fraud Act applies.

1       That's one.

2       And then the other point is that, well, if the

3   contention is is that your way around the safe harbor is a

4   non-disclosure under the Consumer Fraud Act, there has to be

5   some level of knowledge in terms of the non-disclosure, and

6   that's missing.

7       So deal with those in whatever sequence you want.

8       MR. LAUKAITIS:  Sure.  So I think it's easier to talk

9   about the safe harbor first.  I think first, that's an

10  affirmative defense, which is typically not decided on a

11  12(b)(6) motion.

12      But even if your Honor does want to consider it, your

13  Honor, you hit the nail on the head where the products are

14  adulterated and mislabeled under the regs that we cite in the

15  complaint.  And, therefore, just by having the benzene in

16  there, the products are adulterated, and, therefore, the safe

17  harbor doesn't apply.

18      Our case is based on --

19      THE COURT:  Sorry about all that honking.  That's a

20  fire engine going past the courthouse.  Sorry about that.

21      MR. LAUKAITIS:  So our case is about omissions, and

22  that's the basis of our ICFA claim.  And there's two ways that

23  you can plead an ICFA claim, and that's under the unfair

24  conduct prong or the deceptive conduct prong, and plaintiffs

25  here allege -- adequately allege a cause of action under each

1   prong.

2          The difference is under the unfairness prong, it's

3   under Rule 8, so you don't have that Rule 9(b) particularity

4   standard, and plaintiffs here sufficiently allege that

5   Unilever's conduct was unfair.  And to determine whether a

6   practice is unfair, Illinois looks at whether it offends

7   public policy, the conduct is immoral, unethical, oppressive,

8   unscrupulous, or causes substantial injury to consumers.  And

9   we believe that Unilever's conduct fits all that, but we only

10  have to actually allege that we need one of the -- one of the

11  -- one of the factors.

12         But by -- by putting benzene in the product, we

13  allege that it was avoidable.  Unilever did not have to use

14  this.  There is no therapeutic benefits to this whatsoever.

15  They should've conducted testing before placing this product

16  into consumers' hands.  It's a really serious issue.  Benzene

17  is carcinogeous, it can cause cancer, and it's -- you know,

18  it's something that you're using every day on your body, on

19  your skin.

20         So, therefore, Unilever, you know, placing this

21  benzene in the product, not testing it, that's sufficient

22  under the unfair -- under the unfairness prong.

23         We've also alleged that Unilever's conduct, the

24  omissions, not disclosing the presence of benzene in the

25  product, was deceptive.  And the difference between the

1   unfairness and the deceptive is that under the deceptive

2   prong, it is, Judge, under Rule 9(b), your Honor, but

3   knowledge is not judged under Rule 9(b), it's judged under

4   Rule 8, where you can allege knowledge generally under

5   *Ichbald*.  And I will give one of your Honor's cases; *Wong v.*

6   *Whole Foods* also held the same thing.

7            So, you know, again, we allege that Unilever

8   should've known and should've done testing prior or in the

9   assembly line process.  They could've done testing there.

10  They had the formulation, development of the product.  You

11  know, other companies are not using benzene in their deodorant

12  products.  Unilever is a huge corporation.

13           THE COURT:  Can I ask you a question?  So one of the

14  things that Ms. Mendoza says is what people are relying on is

15  this testing report, the amount of benzene that's in it is not

16  enough to harm anybody.  What do you have to say about that?

17           MR. LAUKAITIS:  Not what the FDA says, your Honor.

18  You know, FDA says no levels of benzene should be in the

19  product because it's not safe, and that if it's for

20  therapeutic use, 2 parts per million.  And the testing

21  showed --

22           THE COURT:  Therapeutic benzene?  I'd never heard

23  that one before.

24           MR. LAUKAITIS:  It was -- I might have misspoke, your

25  Honor.  Give me a second here, your Honor.

1        THE COURT:  Okay.  I mean, it may be.  My last memory

2   of benzene is high school chemistry case.

3        MR. LAUKAITIS:  I may have misspoke.  It's a

4   therapeutic use of the product, so not a therapeutic product

5   itself.

6        THE COURT:  All right.

7        MR. LAUKAITIS:  Benzene is not therapeutic

8   whatsoever.  It's very dangerous.

9        THE COURT:  Your point, basically, is is that there's

10  no such thing as a safe level.

11       MR. LAUKAITIS:  Correct, your Honor.

12       THE COURT:  Okay.  Let me ask you a different

13  question, related, but different.

14       So on this unfair practices part of the Consumer

15  Fraud Act, as opposed to the deceptive practices part, and I

16  guess the way I kind of read the complaint is that you're

17  putting this product out there that you haven't really

18  adequately tested and has a dangerous chemical in it.  That's

19  unfair.

20       Is that a fair reading of at least part of you're --

21  what you're alleging here?

22       MR. LAUKAITIS:  It's fair, your Honor.  And also, the

23  complaint at paragraph 9 where plaintiffs allege that the use

24  of benzene was avoidable and that there were alternative

25  formulations, design, materials that were available to

1   Unilever at the time that it formulated and designed and
2   manufactured the products.  Yet, they still, you know, ended
3   up putting benzene in the products before placing them into
4   consumers' hands in the stream of commerce.
5           THE COURT:  All right.  You've more or less exhausted
6   my questions, so what else would you like to tell me?
7           MR. LAUKAITIS:  That's it, your Honor, unless you
8   have any other specific questions.
9           Unjust enrichment, you know, we allege -- plaintiffs
10  maintain that we allege a claim under the ICFA and, therefore,
11  we allege a claim under unjust enrichment, which is a theory
12  of recovery.  It's not an independent claim under Illinois
13  law, it's a theory of recovery, so we believe that we have
14  stated a claim there.
15          And the punitive damages issue, I don't believe your
16  Honor touched on that.  Is there a specific question about
17  that?
18          THE COURT:  No, there really isn't.  I have a
19  different way I think -- I think I'm not going to rule on that
20  issue now, but I'm going to come back to it in a little bit.
21          Let me ask you one other question just about
22  procedure, and you alluded to this earlier, and just so those
23  who are listening know this as well.
24          So the -- I have, I think it's right now, three,
25  maybe four, but I think it's three cases, all of which allege

1    the same thing that have all ended up in front of me because
2    this one was filed.  And after I had set the briefing schedule
3    on this and set it for oral argument, there was an indication
4    on the plaintiffs' side that an amended complaint was going to
5    be filed.  And I said hold off on that because my somewhat
6    educated guess, assumption, whatever you want to call it, was
7    that some of the same issues would come up again and it would
8    be beneficial to go ahead and deal with them.  So that's why
9    I'm not going to bother asking you about the medical
10   monitoring claim.
11          How close are you guys to -- how close are you folks
12   to being ready to file an amended complaint once I tell you,
13   okay, you can go ahead and do that?
14          MR. LAUKAITIS:  Yeah, I believe we can file within 30
15   days, your Honor.  I guess it depends --
16          THE COURT:  All right.
17          MR. LAUKAITIS:  -- if you intend to rule first and
18   then we would amend.  I mean --
19          THE COURT:  I get that.  So you'll need about a
20   month.  That's a fair point.
21          Okay.  Ms. Mendoza, is there anything that
22   Mr. Laukaitis has said or anything that I said when he was
23   talking that you want to reply to?
24          MS. MENDOZA:  I would just -- I would just push back
25   a little bit on the unfair acts part of this claim.

1     I mean, this is a -- they allege a deceptive act, and

2  they did use the word "unfair" a few times in their complaint,

3  but what they've actually alleged is a deceptive act.  And so

4  it should be held to the higher state standard of Rule 9(b).

5  And I think that the efforts they are making to try to get

6  away from that standard show that they do not --

7     THE COURT:  Here's what I see is the problem with

8  what you just said on the 12(b)(6) motion.  They've clearly

9  alleged both, and there's no requirement at this stage that

10  they pick one or the other.  You can do it in the alternative.

11     So it just seems to me that if I ignore the

12  references to unfair practices and read this just as a

13  deceptive practices claim, that runs directly contrary to the

14  rule that I'm supposed to read the complaint in the light most

15  favorable to the plaintiff on a 12(b)(6) motion.

16     What's wrong with what I just said?

17     MS. MENDOZA:  What's wrong with what you just said is

18  that when you're alleging deception or fraud, you need to meet

19  a higher standard, and you shouldn't be able to avoid that

20  higher standard just by adding a couple words to the complaint

21  when there's actually no allegations of unfair practices.

22     So the way we read the complaint is that they're

23  alleging deception, and they don't allege that we actually

24  deceived anyone, and we don't believe that meets the standard

25  of Rule 9(b).

1    THE COURT:  Okay.  So there's a bunch of issues in
2  this case, and I kind of want to walk through them.  And as I
3  said in the last case, I'll have a written order which is
4  probably going to be somewhat longer than what I'll say now,
5  but just to kind of walk through them.

6    So there's a bunch of standing arguments.  The first
7  is that there is no injury in fact.  I agree it's not really
8  clearly alleged in the complaint at this point that any of
9  these plaintiffs suffered an actual physical injury, but the
10  law is clear that's not required.  Economic injuries are
11  sufficient, and of course they are because breach of contract
12  cases and, you know, promissory fraud cases can be filed in
13  federal court.  And if this benefit of the bargain theory that
14  the plaintiffs allege didn't work, then all those cases would
15  go out too, and I don't think anybody's suggesting that.

16    The *Aqua Dots* case, which is, I grant you, 10 or 11
17  years old, and there's been some other Supreme Court cases
18  since then, but I think that's pretty darn close to this, and
19  I don't think it's undermined by the Supreme Court cases,
20  particularly the *TransUnion v. Ramirez* case, which was cited.

21    And there's some more recent cases, the one that I
22  thought was persuasive out in another circuit that was cited
23  called *Debernardis*, D-e-b-e-r-n-a-r-d-i-s, out of the 11th
24  Circuit, which basically says the same thing.

25    The second argument is that there's no standing for

1    injunctive relief.  I agree with that.  The Seventh Circuit

2    case that governs that is a case called *Camasta v. Jos. A.*

3    *Bank*, C-a-m-a-s-t-a.  There's some arguments made to

4    distinguish it.  I don't think they really carry the day.  The

5    Supreme Court has made it clear that you have to have standing

6    for each type of relief that you're asking for, and this would

7    require some form of future injury, and I don't think that

8    that's really alleged here.  And the possibility of some

9    future deception doesn't appear to be enough under the Supreme

10   Court cases to count.

11          There was a standing argument on the medical

12   monitoring claims.  I know those aren't going to be repled,

13   but just in case, I think the judge -- I hope he's

14   listening -- I think Judge Valderrama's opinion in *Leslie v.*

15   *Medline* was pretty persuasive on both, actually, the standing

16   and the failure to state a claim issue.  He found there was

17   standing from the exposure to a dangerous chemical because

18   there was some only microscopic effects.  So I think there was

19   standing on that one too.

20          Flipping over to the failure to state a claim issue,

21   there were some warranty claims which the plaintiff basically

22   didn't defend, at least in this version of the complaint, so

23   those will be dismissed.

24          On the punitive damages, so it's a choice of law

25   issue.  And, you know, there's a bunch of different classes

1    that are identified here -- there's a proposed nationwide

2    class, there's proposed statewide classes -- and I can imagine

3    the punitive law -- the punitive damages choice of law

4    question being different depending upon what, if any, type of

5    class gets certified.

6            So I think it's not going to affect discovery much,

7    if at all.  You know, it's basically just a little bit of net

8    worth discovery that has to be done.  That can be deferred

9    anyway.  I think that's a question better decided at a later

10   stage of this case.

11           Just very quickly to say on the merits of the medical

12   monitoring claim, I agree with Judge Valderrama's opinion in

13   the case I just cited that there has to be some actual current

14   physical injury, which I don't think is alleged at least well

15   enough in this version of the complaint.  Increased risk of

16   future harm by itself isn't enough under the leading Supreme

17   Court case from Illinois on this, which is called *Barry* -- I

18   think *Barry v. City of Chicago*.

19           On the unjust enrichment claim, I can't say at this

20   point that it's a complete duplicate of the other claims.  I

21   think people are allowed to plead in the alternative.  I'm not

22   inclined to dismiss that at this point.

23           And the big kahuna, if you will, on this one is the

24   Illinois Consumer Fraud Act claim.  I think that -- and

25   although Ms. Mendoza has a point when she says that the claim

1    is -- seems to be more aiming at the deceptive practices, I
2    think you're allowed to do an either/or.  I think there's
3    enough references to unfair practices, although it could
4    probably be done a little bit better.  And it just seems to me
5    that it's a -- it would be a viable unfair practices claim to
6    allege that you're putting a product that people are going to
7    put in or on their bodies out into the market without doing
8    adequate testing, and it's adulterated by a carcinogen is
9    likely enough for an unfair practices claim.
10          The safe harbor issue is -- the plaintiffs' right
11   that affirmative defenses don't always or don't typically get
12   decided on 12(b)(6) motions, but they can be sometimes if it's
13   clear that there's no way around the defense, and this is kind
14   of pitched as purely a legal issue.  I actually think that's
15   one that's going to benefit from further briefing once you get
16   the amended complaint filed.
17          So what you're going to get from me in the written
18   order is something that basically says, I agree with these
19   standing arguments by the defendant, I disagree with these,
20   these claims are deficient under the current version for
21   such-and-such a reason, and these claims aren't.  I'm
22   deferring a couple issues, kicking them down the road, and
23   then probably giving plaintiff 30 days to file an amended
24   complaint.
25          So I'll try to get that out within the next --

1   hopefully no more than a week or so, and then I'll set it for

2   a status hearing, and we can figure out where to go from here.

3          Much appreciated to both sides for your arguments.

4   You were very responsive to questions.  I really appreciate

5   that.

6          So thanks very much.  You're welcome to listen, but

7   you should turn off your cameras at this point.

8          MR. LAUKAITIS:  Thank you, your Honor.

9          MS. MENDOZA:  Thank you.

10          THE COURT:  All right.  Take care.

11    (Which were all the proceedings had in the above-entitled

12   cause on the day and date aforesaid.)

13    I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

14

15   Carolyn R. Cox                      Date
     Official Court Reporter
16   Northern District of Illinois
     /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

17

18

19

20

21

22

23

24

25